JACKSON LEWIS LLP
59 Maiden Lane
New York, New York 10038
Telephone: (212) 545-4000
Facsimile: (212) 972-3213
Attorneys of Record:
      Eric P. Simon (ES 7002)
      Matthew A. Steinberg (MS 3979)

ATTORNEYS FOR DEFENDANT

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

CHESTER BEAN,

                  Plaintiff,

        v.

IRON MOUNTAIN INFORMATION
MANAGEMENT, INC.,

                Defendant.

------------------------------------------------------------X

Case No. 07 CV 10384 (HB)

**<u>DEFENDANT'S MEMORANDUM OF LAW IN
SUPPORT OF ITS MOTION TO DISMISS
PLAINTIFF'S COMPLAINT</u>**

## TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................................. 1

SUMMARY OF ALLEGATIONS IN PLAINTIFF'S COMPLAINT ................................................. 1

ARGUMENT ....................................................................................................................... 3

POINT I ............................................................................................................................. 3

 STANDARDS ON A MOTION TO DISMISS .......................................................................... 3

POINT II ............................................................................................................................ 3

PLAINTIFF'S CLAIM OF UNLAWFUL DISCRIMINATION UNDER SECTION 1981 MUST BE DISMISSED BECAUSE PLAINTIFF HAS FAILED TO ALLEGE INTENTIONAL DISCRIMINATION BASED UPON RACE ........................................................ 3

POINT III ........................................................................................................................... 6

PLAINTIFF'S NEW YORK LAW CLAIMS FAIL AS A MATTER OF LAW BECAUSE, AT THE TIME OF HIS DISCHARGE, NEW YORK LAW DID NOT RECOGNIZE CRIMINAL CONVICTION DISCRIMINATION AGAINST CURRENT EMPLOYEES ......................................................................................................................... 6

CONCLUSION ..................................................................................................................... 9

## INTRODUCTION

Defendant Iron Mountain Information Management, Inc. (referred to herein as "Defendant" or "Iron Mountain"), by and through its undersigned attorneys Jackson Lewis LLP, hereby submits the following Memorandum of Law in support of its motion to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6), the instant case filed by Plaintiff Chester Bean (referred to herein as "Plaintiff" or "Bean"). As shown below, Plaintiff fails to assert any claims upon which relief can be granted. First, Plaintiff has failed to state a cognizable federal claim. Significantly, the only federal statute upon which Plaintiff relies -- 42 U.S.C. § 1981 -- does not recognize the only federal theory of recovery -- disparate impact -- which Plaintiff advances. Additionally, Plaintiff's Complaint fails to state a cause of action under New York law. In this regard, Plaintiff alleges that Defendant unlawfully terminated his employment, in violation of New York law, because of his prior criminal record. Significantly, however, at the time of Bean's discharge, the New York statute upon which Plaintiff relies prohibited discrimination based upon prior criminal convictions only with respect to applicants for employment. The protections of the statute did not extend to incumbent employees. Consequently, Plaintiff's claims fail as a matter of law and Defendant respectfully requests that the Court dismiss Plaintiff's Complaint, in its entirety and with prejudice.

## SUMMARY OF ALLEGATIONS IN PLAINTIFF'S COMPLAINT

On or around June 30, 2006, Iron Mountain hired Bean as a "delivery driver." See Plaintiff's Complaint ("Compl."), ¶ 13.[1] Bean was discharged by Iron Mountain on or about January 17, 2007. See Compl., ¶ 19. According to the Complaint, Iron Mountain terminated

---

[1] For the Court's convenience, a true and correct copy of Plaintiff's Complaint in this action is attached as Exhibit "A" to the accompanying Affidavit of Eric P. Simon In Support Of Defendant's Motion To Dismiss ("Simon Aff."). References to the Simon Aff. will be referred to herein as "Simon Aff., Ex. ___."

Bean's employment after it learned that, in 2001, Bean had been convicted of a felony, "drug possession with intent to distribute." See Compl., ¶¶ 13, 19.

Based solely upon these factual allegations, Plaintiff alleges that Defendant unlawfully terminated his employment in violation of unspecified provisions of the "New York Human Rights Law, Executive Law" and the "New York Executive Code" (a) because of Plaintiff's "status as a convicted felon," and (b) because Plaintiff contends there is "no direct relationship between Plaintiff's criminal conviction and his employment as a delivery driver." See Compl., ¶ 21; see generally "First Cause of Action" (¶¶ 20 – 25) and "Second Cause of Action" (¶¶ 26 – 28).    Plaintiff separately contends that Defendant's termination of his employment violated 42 U.S.C. § 1981 ("Section 1981"); see generally "Third Cause of Action" (¶¶ 29 – 32).  In support of Plaintiff's federal claim, which is titled "Disparate Impact," Plaintiff alleges African Americans in New York City are "convicted of criminal offenses at a rate substantially higher than Caucasians" and therefore Defendant's purported "policy of terminating employees with criminal convictions has a disparate impact on African Americans and results in African Americans being terminated and refused employment at a substantially higher rate than Caucasians." See Compl., ¶¶ 29 – 32.    Critically, Plaintiff's Section 1981 disparate impact claim does not allege that Defendant acted with discriminatory intent.  Rather, Plaintiff alleges that Defendant's purported facially neutral policy of "terminating employees with criminal convictions" has a disparate impact on African Americans in violation of Section 1981.  See id.

2

**ARGUMENT**

**POINT I**

**STANDARDS ON A MOTION TO DISMISS**

When deciding a motion to dismiss for failure to state a claim upon which relief can be granted under Fed. R. Civ. P. Rule 12(b)(6), courts must accept as true all well-plead factual allegations, since a motion to dismiss for failure to state a claim tests only the legal sufficiency of a complaint. See, e.g., Green v. Maraio, 722 F.2d 1013, 1015 (2d Cir. 1983). In order to avoid dismissal, however, a plaintiff must do more than plead mere "conclusory allegations or legal conclusions masquerading as factual conclusions." Smith v. Local I.B.T. Pension Plan, 291 F.3d 236 (2d Cir. 2002) (internal citations omitted). Indeed, to survive dismissal, a plaintiff must provide the grounds on which his claim rests through factual allegations sufficient "to raise a right to relief above the speculative level." Atsi Communications v. The Shaar Fund, 493 F.3d 87, 92 (2d Cir. 2007) citing Bell Atl. Corp. v. Twombley, 127 S.Ct. 1955, 1965, 167 L. Ed. 929 (2007).

**POINT II**

**PLAINTIFF'S CLAIM OF UNLAWFUL DISCRIMINATION UNDER SECTION 1981 MUST BE DISMISSED BECAUSE PLAINTIFF HAS FAILED TO ALLEGE INTENTIONAL DISCRIMINATION BASED UPON RACE.**

In the Second Circuit, a cause of action under Section 1981 "consists of the following elements: (i) membership in a racial minority; (ii) an intention to discriminate on the basis of race by the defendants; and (iii) discrimination concerning one or more of the activities in the statute." Boykin v. Key Corp., et al., No. 03-CV-9445 (WMS), 2005 U.S. Dist. LEXIS 5546, at * 15 (W.D.N.Y. Mar. 28, 2005) citing Brown v. City of Oneanta, 221 F.3d 329, 339 (2d

3

Cir. 2000) (emphasis added).[2]  Critically, because "intentional" or "purposeful" discrimination is

<u>required</u> under Section 1981, Section 1981 does not recognize the disparate impact theory of

recovery, <u>i.e.</u>, claims which assert that a facially neutral employment policy has a disparate

impact upon a protected group.  <u>See</u> <u>Guardians Asso. Of New York City Police Dep't Ins. v.</u>

<u>Civil Service Comm.</u>, 633 F.2d 232 (2d Cir. 1980) ("certainly nothing in the language of

Section 1981 supports the thesis that the statute was intended to prohibit facially neutral policies

that can be shown to have a disproportionate racial impact despite the absence of any purpose to

discriminate"); <u>Boykin</u>, <u>supra</u> at * 14 (holding that disparate impact theory of recovery is not

available under Section 1981); <u>Tamayo v. City of New York</u>, No. 02 Civ. 8030 (HB), 2004 U.S.

Dist. LEXIS 911, at * 18 (S.D.N.Y. Jan. 27, 2004) (same) (<u>See</u> Simon Aff., Ex. "B"); <u>Bailey v.</u>

<u>the City of New York</u>, No. 98 Civ. 1812 (LBS) (GWG), 2003 U.S. Dist. LEXIS 7254 (S.D.N.Y.

May 2, 2003) (same) (<u>See</u> Simon Aff., Ex. "B"); <u>Local Unions 20, et al. v. United Brotherhood</u>

<u>of Carpenters and Joiners of America, et al.</u>, No. 97 Civ. 5538 (CSH), 1997 U.S. Dist. LEXIS

15689 (S.D.N.Y. Oct. 9, 2007) (collecting authorities in support of holding that "a plaintiff

cannot assert a disparate impact claim under § 1981") (<u>See</u> Simon Aff., Ex. "B"); <u>Ayton v.</u>

<u>Lenox Hill Hosp.</u>, No. 93 Civ. 6601 (BSJ), 1997 U.S. Dist. LEXIS 122, at * 16 (S.D.N.Y. Jan.

10, 1997) ("Plaintiff's disparate impact claim can only be made under Title VII and the NYHRL,

a § 1981 claim must be predicated or intentional discrimination") (<u>See</u> Simon Aff., Ex. "B").

This Court's decision in <u>Tamayo v. City of New York</u>, <u>supra</u>, is particularly

illustrative of the application of the foregoing principle.  In <u>Tamayo</u>, the plaintiffs, black and

Hispanic police officers, alleged, <u>inter alia</u>, that the NYPD's facially neutral staffing policies

resulted in the assignment of a disproportionately high number of black and Hispanic officers to

---

[2] For the Court's convenience, copies of all unreported decisions cited herein are attached as Exhibit "B" to the accompanying Simon Aff.

undercover positions and to the exposure of the inherently greater dangers of such work. In dismissing the Plaintiff's Section 1981 disparate impact claim, the Court succinctly explained that ". . . disparate impact is actionable only under Title VII [in that] claims under Section 1981 . . . require discriminatory animus." Tamayo, 2004 U.S. Dist. LEXIS 911 at * 18.

Here, as in Tamayo and the foregoing controlling authorities, Plaintiff's Section 1981 disparate impact claim is not cognizable as a matter of law. Significantly, Plaintiff's Complaint does not allege, as is required in this Circuit to pursue a viable Section 1981 claim, that Defendant "intentionally" or "purposefully" discriminated against him (or against any other African American employee) because of his criminal record. Rather, Plaintiff merely surmises that, because African Americans are allegedly "convicted of criminal offenses at a rate substantially higher than Caucasians," Defendant's neutral consideration of an employee's conviction records has a disparate impact upon African Americans (and therefore violates Section 1981). Leaving aside Plaintiff's rank speculation, Plaintiff's argument fails as a matter of law because disparate impact claims are not cognizable under Section 1981. See Tamayo, supra. Accordingly, Plaintiff's Third Cause of Action should be dismissed with prejudice.

<h3 style="text-align:center">POINT III</h3>

**<u>PLAINTIFF'S NEW YORK LAW CLAIMS FAIL AS A MATTER OF LAW BECAUSE, AT THE TIME OF HIS DISCHARGE, NEW YORK LAW DID NOT RECOGNIZE CRIMINAL CONVICTION DISCRIMINATION AGAINST CURRENT EMPLOYEES[3]</u>**

Section 296(15) of the New York State Human Rights Law (referred to herein as "Section 296(15)"), in pertinent part, provides as follows:

> It shall be an unlawful discriminatory practice for any . . . corporation or association . . . to <u>deny</u> . . . employment to any individual by reason of his or her having been convicted of one or more criminal offense . . . when such <u>denial</u> is in violation of the provisions of Article 23-A of the corrections law.

<u>See</u> <u>id.</u> (emphasis added).  On its face, Section 296(15) does not apply to personnel decisions affecting current employees.

Furthermore, at the time of Plaintiff's January 2007 termination (and up until July 2007), Article 23-A of the "corrections law" referenced in Section 296(15), in pertinent part, provided that:

> No <u>application</u> for . . . employment . . . shall be denied by reason of the <u>applicant's</u> having been previously convicted of one or more criminal offenses . . . when such finding is based upon the fact that the <u>applicant</u> has previously been convicted of one or more criminal offenses unless:
>
> (1) there is a direct relationship between one or more of the previous criminal offenses and the specific . . . employment sought; or

---

[3] Although Plaintiff's Complaint does not identify the specific provision of the "New York Human Rights Law, Executive Law" and/or "New York Executive Code" upon which his First and Second Causes of action, respectively, rely, Defendant assumes, based on the nature of Plaintiff's arguments, that these two causes of action collectively rely upon the New York State Human Rights Law, § 296(15) which relates to criminal conviction discrimination.

> (2) . . . the granting of the employment would involve an
> unreasonable risk to property or to the safety or welfare of
> specific individuals or the general public.

New York Corrections Law, § 752 (referred to herein as "Section 752") (emphasis added).

Accordingly, at all times relevant hereto, Section 752, like Section 296(15), did not reference

personnel decisions impacting current employees.

Significantly, New York Courts interpreting the foregoing unambiguous statutory

text have held that Section 296 and Section 752 applied only to applicants for employment. See

Green v. Wells Fargo Alarm Service, 192 A.D.2d 463 (1st Dept. 1993) (rejecting plaintiff's claim

that the defendant unlawfully terminated his employment based on drunk driving arrest and

holding that Section 296 "applies only to persons applying for employment previously convicted

of a criminal offense and Article 23-A of the Corrections Law, to which it refers, affords Plaintiff

no relief") (emphasis added).

Six (6) months after the termination of Plaintiff's employment, the New York

legislature amended Section 752, effective immediately, to provide protection for incumbent

employees who experience discrimination based upon criminal records that predate their

employment. See New York Corrections Law § 752 (2007); a true and correct copy of the

legislative history underlying this statutory amendment is attached as Exhibit "C" to the Simon

Aff.    The legislative history regarding this amendment, consistent with Green, supra,

demonstrates that the New York legislature was fully aware that the protections of Section 752

did not extend to incumbent employees. See id. In explaining the need for this amendment, the

Legislature stated "the statute's inapplicability to current employees . . . has limited the intended

protection of the law" and that "the anti-discrimination protections in Section 752 . . . currently

apply only to applicants for employment who have criminal convictions . . . and provide [ ] no

7

protection to current employees . . ." See id.  Moreover, because the New York State legislature directed that the Section 752 statutory amendments "take effect immediately," see Simon Aff., Ex. "C," the amendments do not have retroactive application.  See, e.g., Carr v. Marietta Corp., 211 F.3d 724, 730 (2d Cir. 2000), Hitchens v. Pentair, Inc., No. 95-CV-807S(H), 1997 U.S. Dist. LEXIS 13918, at *12 (W.D.N.Y. June 27, 1997) (holding that "amendments to statutes are . . . to be applied prospectively unless the language of the statute or the legislative intent clearly indicates otherwise" and explaining that "New York courts overwhelmingly have held that where a provision indicates that the statute or amendment is to take effect immediately, it is a clear indication that prospective application is appropriate").

Here, as set forth in Plaintiff's Complaint, Defendant's purported unlawful termination of Plaintiff's employment occurred "on or about January 17, 2007." See Compl., ¶ 19.  Accordingly, pursuant to the statutory text of Section 296(15) and Section 752 in effect at the time of Bean's discharge, the judicial application of the express language of the Section 296(15) and Section 752 exemplified by Green v. Wells Fargo Alarm Services, supra, and the unambiguous legislative history underlying the July 2007 amendments to Section 752, as of the date of Plaintiff's termination by Defendant, Plaintiff did not have a cognizable claim under New York law for alleged discrimination based on his criminal conviction.  Indeed, at that time (and up until July, 2007), Section 296(15) and Section 752 only protected job applicants only, not existing employees.  Consequently, Plaintiff's First and Second Causes of Action fail as a matter of law.[4]

Perhaps recognizing this fatal flaw, Plaintiff's Complaint preemptively cites Givens v. New York City Housing Authority, 249 A.D.2d 133 (1st Dept. 1998) in support of the

---

[4] Notably, the New York legislature chose not to amend Section 296(15) which, on its face, continues to apply only to applicants for employees.  As a result, Plaintiff's state law claims under the "New York Human Rights Law, Executive Law" and the "New York Executive Code" also fail on the independent ground that, even post July 2007, Section 296(15) does not provide a private cause of action for incumbent employees.

misguided proposition that, even prior to July 2007, Section 296(15) and/or Section 752 applied to current employees such as Plaintiff. In <u>Givens</u>, the sole issue presented for the Court's consideration was whether the defendant was liable for negligently hiring and/or retaining an employee (who injured the plaintiff) after it learned of the employee's prior criminal record. Although the Court relied upon the public policy inherent in Section 752 as a shield to reject a claim of negligent employment or retention, it did not recognize Section 752 as a sword to pursue an independent cause of action on behalf of incumbent employees. Accordingly, unlike <u>Green</u>, <u>supra</u>, which specifically held that Section 752 did not create a cause of action for current employees, <u>Givens</u> did not address this issue. Plaintiff's reliance on <u>Givens</u> is misplaced.

## **CONCLUSION**

Based on the foregoing facts and controlling authorities, Defendant respectfully requests that the Court dismiss Plaintiff's Complaint, in its entirety and with prejudice.

Respectfully submitted,

JACKSON LEWIS LLP
59 Maiden Lane
New York, New York 10038-4502
(212) 545-4000

By: _Eric Simon_ _____

Eric P. Simon (ES 7002)
Matthew A. Steinberg (MS 3979)

ATTORNEYS FOR DEFENDANT

9

## CERTIFICATE OF SERVICE

I hereby certify that on January 18, 2008, a true and correct copy of the foregoing Memorandum Of Law was served on Plaintiff's counsel Adam C. Virant, Esq., via Federal Express Overnight Mail, at his address of record located at Karpf, Karpf & Virant, 140 Broadway, 46th Floor, New York, New York 10005.

/ Matthew A. Steinberg, Esq.

10

JACKSON LEWIS LLP
59 Maiden Lane
New York, New York 10038
Telephone: (212) 545-4000
Facsimile: (212) 972-3213
Attorneys of Record:
      Eric P. Simon (ES 7002)
      Matthew A. Steinberg (MS 3979)

ATTORNEYS FOR DEFENDANT

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

CHESTER BEAN,

                       Plaintiff,

          v.

IRON MOUNTAIN INFORMATION
MANAGEMENT, INC.,

                   Defendant.

Case No. 07 CV 10384 (HB)

-------------------------------------------------------------x

## AFFIDAVIT OF ERIC P. SIMON, ESQ. IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT

STATE OF NEW YORK    )
                            ) SS.:
COUNTY OF NEW YORK  )

      Eric P. Simon, Esq., an attorney in good standing, admitted to practice before the

United States District Court for the Southern District of New York, deposes and says:

      1.      I am a Partner with the law firm Jackson Lewis LLP, attorneys of record

for Defendant Iron Mountain Information Management, Inc. (referred to herein as "Defendant")

in connection with the above-captioned action. As such, I am fully familiar with the facts set

forth herein and with the documents attached hereto.  I make this Affidavit in support of

Defendant's motion, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss Plaintiff's

Complaint in its entirety and with prejudice.

2.    Attached hereto as Exhibit "A" is a true and correct copy of Plaintiff's

judicial Complaint.

3.    Collectively attached hereto as Exhibit "B" are copies of the following

unreported decisions cited in Defendant's accompanying Memorandum Of Law: (a) Boykin v.

Key Corp., et al., No. 03-CV-9445 (WMS), 2005 U.S. Dist. LEXIS 5546 (W.D.N.Y. Mar. 28,

2005); (b) Tamayo v. City of New York, No. 02 Civ. 8030 (HB), 2004 U.S. Dist. LEXIS 911

(S.D.N.Y. Jan. 27, 2004); (c) Bailey v. the City of New York, No. 98 Civ. 1812 (LBS) (GWG),

2003 U.S. Dist. LEXIS 7254 (S.D.N.Y. May 2, 2003); (d) Local Unions 20, et al. v. United

Brotherhood of Carpenters and Joiners of America, et al., No. 97 Civ. 5538 (CSH), 1997 U.S.

Dist. LEXIS 15689 (S.D.N.Y. Oct. 9, 2007); (e) Ayton v. Lenox Hill Hosp., No. 93 Civ. 6601

(BSJ), 1997 U.S. Dist. LEXIS 122 (S.D.N.Y. Jan. 10, 1997); and (f) Hitchens v. Pentair, Inc.,

No. 95-CV-807S(H), 1997 U.S. Dist. LEXIS 13918 (W.D.N.Y. June 27, 1997).

4.    Attached hereto as Exhibit "C" is a true and correct copy of the legislative

history underlying the July 2007 statutory amendments to New York Corrections Law Section

752.

5.    I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Eric P. Simon, Esq.

Sworn to and subscribed before me
this 17 day of January 2008

Notary Public

Jason A. Zoldessy
Notary Public, State of New York
No. 02Z06150173
Qualified in New York County
Commission Expires July 24, 2016

3

## CERTIFICATE OF SERVICE

I hereby certify that on January 18, 2008, a true and correct copy of the foregoing Affidavit of Eric P. Simon, Esq. was served on Plaintiff's counsel Adam C. Virant, Esq., via Federal Express Overnight Mail, at his address of record located at Karpf, Karpf & Virant, 140 Broadway, 46th Floor, New York, New York 10005.

Matthew A. Steinberg, Esq.

# EXHIBIT A

07 CV 10384

JUDGE BAER

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

COPY

CHESTER BEAN
581 Wintertown Road
Bloomingburg, NY 12721

CIVIL ACTION

Plaintiff,

v.

CASE NO.:

JURY TRIAL DEMANDED

IRON MOUNTAIN INFORMATION
MANAGEMENT, INC.
745 Atlantic Ave.
Boston, MA 02111

NOV 16 2007
U.S.D.C. S.D.N.Y.
CASHIERS

Defendant.

## CIVIL ACTION COMPLAINT

Plaintiff, Chester Bean, (hereinafter, referred to as "Plaintiff"), by and through her

undersigned counsel, hereby avers as follows:

### I.    INTRODUCTION

1.    This action has been initiated by Plaintiff for violations of the New York Human

Rights Law and Executive Law.  Plaintiff alleges he was terminated because of his status as a

convicted felon.  As a direct consequence of Defendants' unlawful actions, Plaintiff seeks

damages as set forth herein.

### II.    JURISDICTION AND VENUE

2.    This Court may properly maintain personal jurisdiction over Defendants because

their contacts with this state and this judicial district are sufficient for the exercise of jurisdiction

over Defendants to comply with traditional notions of fair play and substantial justice, satisfying

the standard set forth by the United States Supreme Court in International Shoe Co. v.

Washington, 326 U.S. 310 (1945) and its progeny.

3. In accordance with 28 U.S.C. § 1332, this Court has subject matter jurisdiction over Plaintiff's claims because he is a domiciliary and citizen of New York and is seeking an amount of damages exceeding $75,000.00 (exclusive of interest and costs) from Defendant, a corporation incorporated in Delaware and operating a principal place of business in Massachusetts.

4. In addition, this Court has subject matter jurisdiction over Plaintiff's claims because Plaintiff has filed this lawsuit under 42 U.S.C. § 1981, a federal law. This Court further has jurisdiction over Plaintiff's state claims because they arise out of the same common nucleus of operative facts as his federal claim(s).

5. Venue is properly laid in this District pursuant to 28 U.S.C. sections 1391(b)(1) and (b)(2), because Defendant resides in and/or conduct business in this judicial district and because a substantial part of the acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district.

## IV.    PARTIES

6. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

7. Plaintiff is an adult individual with an address as set forth above.

8. Defendant is a large corporation headquartered in Boston, Massachusetts which specializes in secure records management.

9. Defendant operates throughout much of the world and operates a facility in New York, New York.

2

10.    At all times relevant herein, Defendants acted by and through their agents, servants, and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for the benefit of Defendants.

11.    At all times relevant herein, Plaintiff worked for Defendant as a delivery driver.

## V.    FACTUAL BACKGROUND

12.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

13.    Plaintiff began working for Defendant as a delivery driver on or around June 30, 2006.

14.    Plaintiff was convicted of a drug possession with intent to distribute felony in 2001.

15.    Plaintiff has not been convicted of any other felonies.

16.    Plaintiff fully disclosed to Defendant the aforementioned felony before he was hired as part of Defendant's pre-employment background check.

17.    Plaintiff received no written disciplinary warnings during his entire employment with Defendant.

18.    On or about December 23, 2006, Plaintiff was informed by his manager, one Joe Bloom, that Defendant was suspending Plaintiff because of his status as a convicted felon.

19.    On or about January 17, 2007, Defendant terminated Plaintiff because he was a convicted felon.

3

### First Cause of Action
### Violations of New York Human Rights Law, Executive Law
### (Criminal Conviction Discrimination - Unlawful Termination)

20.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

21.    Plaintiff's employment was unlawfully terminated because of his status as a convicted felon.

22.    There is no direct relationship between Plaintiff's criminal conviction and his employment as a delivery driver for Defendant.

23.    Plaintiff's continued employment did not involve any unreasonable risk to property or to the safety or welfare of specific individuals or the general public.

24.    Defendant's decision to terminate Plaintiff on the basis of his criminal conviction constitutes violations of the state laws prohibiting termination of employment on the basis of a criminal conviction. See Givens v. New York City Housing Authority, 249 A.D.2d 133 (1 Dept. 1998) ("The same public policy that prohibits discrimination in hiring on the basis of a criminal record . . . prohibits discrimination in terminating employment on the basis of a criminal record.")

25.    Plaintiff has suffered damages as a result of Defendant's unlawful conduct as set forth herein.

### Second Cause of Action
### Violations of the New York Executive Code
### (Criminal Conviction Discrimination - Unlawful Termination)

26.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

4

27.    Defendant's decision to terminate Plaintiff on because of his criminal conviction constitutes a violation of the New York Executive Code.

28.    Plaintiff has suffered damages as a result of Defendant's unlawful conduct as set forth herein.

### Third Cause of Action
### Violation of 42 U.S.C. § 1981
### (Disparate Impact)

29.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

30.    In New York City, African Americans are convicted of criminal offenses at a rate substantially higher than Caucasians.

31.    Upon information and belief, Defendant's policy of terminating employees with criminal convictions has a disparate impact upon African Americans and results in African Americans being terminated and refused employment at a substantially higher rate than Caucasians.

32.    Plaintiff has suffered damages as a result of Defendant's unlawful policy of terminating employees because of a criminal conviction.

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

A.    Defendants are to be permanently enjoined from discriminating against Plaintiff on any basis forbidden by the aforesaid federal and state laws;

B.    Defendants are to be prohibited from continuing to maintain its illegal policy, practice, or custom of discriminating against employees and is to be ordered to promulgate an effective policy against such discrimination and to adhere thereto;

C.    Defendants are to compensate Plaintiff, reimburse Plaintiff, and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendants' illegal actions, including but not limited to past lost earnings, future lost earnings, pay increases, bonuses, medical and other benefits, training, promotions, pension, and seniority (if applicable). Plaintiff should be accorded those benefits illegally withheld from the date he first suffered discrimination at the hands of Defendants until the date of verdict;

D.    Plaintiff is to be awarded punitive damages only under the federal claims set forth herein in an amount believed by the trier of fact to punish Defendants for their willful, deliberate, malicious and outrageous conduct, and to deter Defendants or other employers from engaging in such misconduct in the future;

E.    Plaintiff is to be awarded actual damages, as well as damages for the pain, suffering, and humiliation caused by Defendants' actions, as permitted by applicable law;

F.    Plaintiff is to be accorded any and all other equitable and legal relief as the Court deems just, proper, and appropriate.

G.    Plaintiff is to be awarded the costs and expenses of this action and reasonable legal fees as provided by applicable state and city law;

H.    Any verdict in favor of Plaintiff is to be molded by the Court to maximize the financial recovery available to Plaintiff in light of the caps on certain damages set forth in applicable state and city law;

I.    Plaintiff's claims are to receive a trial by jury to the extent allowed by applicable law.

6

KARPF, KARPF & VIRANT

Adam C. Virant (AV 5429)
140 Broadway, 46th Floor
New York, NY 10005

Dated: November 9, 2007

# EXHIBIT B

LEXSEE



Cited
As of: Jan 04, 2008

**YVETTE BOYKIN, Plaintiff, v. KEY CORP and its subsidiary KEYBANK
NATIONAL ASSOCIATION d/b/a KEYBANK, STATE OF NEW YORK
DIVISION OF HUMAN RIGHTS, and U.S. DEPARTMENT OF HOUSING AND
URBAN DEVELOPMENT, Defendants.**

**03-CV-944S**

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF
NEW YORK**

**2005 U.S. Dist. LEXIS 5546**

**March 28, 2005, Decided**

**DISPOSITION:** [*1] Defendants' Motions to Dismiss granted, Plaintiff's motion denied, and NYDHR's Motion for Summary Judgment denied as moot.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Pro se plaintiff individual brought a civil rights action against defendants, bank, State of New York Division of Human Rights (NYDHR), and U.S. Department of Housing and Urban Development (HUD), and alleged causes of action related to the denial of her application for a non-owner-occupied real estate equity loan under, inter alia, 42 U.S.C.S. §§ 1981 and 1982. The bank, the NYDHR, and HUD each filed a motion to dismiss.

**OVERVIEW:** The individual, an African-American woman, applied for a real estate equity loan from the bank to improve rental property she owned in Buffalo, New York. The bank denied the loan application because the individual was not a resident of New York State. The individual filed a housing discrimination complaint with HUD, which was referred to the NYDHR. The NYDHR issued a "No Probable Cause" determination and closed the investigation. The court found that the individual's claims against the bank under the Fair Housing Act, 42 U.S.C.S. § 3601 et seq., had to be dismissed because the claims were time barred under 42 U.S.C.S. § 3613 since the individual failed to file suit within two years of the bank's alleged unlawful denial of her loan application,

not including any time during which an administrative complaint or charge was pending. The bank's motion to dismiss the individual's claims under 42 U.S.C.S. § 1981 and 42 U.S.C.S. § 1982 was granted because the individual's complaint was devoid of any factual allegations that suggested that race was the reason the bank denied her loan application.

**OUTCOME:** The bank's motion to dismiss was granted. The individual's motion to deny the bank's motion to dismiss was denied. HUD's motion to dismiss was granted. NYDHR's motion to dismiss was granted and its motion for summary judgment was denied as moot.

**CORE TERMS:** causes of action, disparate impact, loan application, summary judgment, sex, housing, disparate treatment, intentional discrimination, factual allegations, financial assistance, racial discrimination, sovereign immunity, discriminatory, entity, Civil Rights Act, national origin, failure to state a claim, investigate, pled, Memorandum of Law, pro se, right of action, loan officer, per curiam, protected class, failed to state, discriminate, conclusory, asserting, untimely

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses,
Demurrers, & Objections > Failures to State Claims*

*Civil Procedure > Dismissals > Involuntary Dismissals > Failures to State Claims*

[HN1]Fed. R. Civ. P. 12(b)(6) provides for dismissal of a complaint for failure to state a claim upon which relief can be granted. A court may dismiss an action under this rule if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which will entitle him to relief. Stated another way, a court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. On a Fed. R. Civ. P. 12(b)(6) motion, the issue is not whether a plaintiff will or might ultimately prevail on her claim, but whether she is entitled to offer evidence in support of the allegations in the complaint.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Affirmative Defenses*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
*Governments > Legislation > Statutes of Limitations > General Overview*

[HN2]If it appears from the face of the complaint that a cause of action has not been brought within the applicable statute of limitations period, the defense of limitations may be raised in a pre-answer motion pursuant to Fed. R. Civ. P. 12(b)(6). The complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference. If the plaintiff does not attach or incorporate by reference documents that are integral to the complaint, the court may consider those documents without converting the motion to one seeking summary judgment.

*Civil Procedure > Parties > Self-Representation > General Overview*

[HN3]Because of the distinct disadvantage that pro se litigants face, federal courts routinely read their submissions liberally, and interpret them to raise the strongest arguments that they suggest. However, conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss.

*Civil Rights Law > Contractual Relations & Housing > Fair Housing Rights > General Overview*
*Labor & Employment Law > Discrimination > Disparate Treatment > Employment Practices > Adverse Employment Actions > Discharges & Failures to Hire*
*Public Health & Welfare Law > Housing & Public Buildings > Fair Housing*

[HN4]The Fair Housing Act (FHA), 42 U.S.C.S. § 3601 et seq., makes it unlawful for any person or entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin. 42 U.S.C.S. § 3605(a). A plaintiff can make out a claim of discrimination either on a theory of disparate impact or one of disparate treatment. Claims under the FHA must be brought no later than two years after the occurrence of discrimination or the termination of an allegedly discriminatory housing practice. 42 U.S.C.S. § 3613(a)(1)(A). Computation of the two-year period does not include any time during which an administrative complaint or charge was pending. 42 U.S.C.S. § 3613(a)(1)(B).

*Labor & Employment Law > Discrimination > Disparate Impact > Employment Practices > Selection Procedures > General Overview*
*Labor & Employment Law > Discrimination > Disparate Treatment > Proof > Burden Shifting*
*Public Health & Welfare Law > Housing & Public Buildings > Fair Housing*

[HN5]Disparate treatment claims brought under the Fair Housing Act (FHA), 42 U.S.C.S. § 3601 et seq., are analyzed under the McDonnell Douglas burden-shifting analysis. At the motion to dismiss stage, however, a plaintiff must only allege facts sufficient to state a claim. The elements of a disparate treatment FHA claim are: (1) membership in a protected class; (2) application and qualification for a real estate-related loan; (3) denial of the loan; and (4) continued approval of loans for applicants with similar qualifications. To state a claim for a violation of the FHA based on disparate impact, the plaintiff must allege that an outwardly neutral practice actually or predictably has a discriminatory effect; that is, has a significantly adverse or disproportionate impact on minorities, or perpetuates segregation.

*Civil Procedure > Parties > Self-Representation > General Overview*

[HN6]When alleging a violation of a civil rights statute, even a pro se litigant must make specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning.

*Constitutional Law > Equal Protection > Full & Equal Benefit*

[HN7]See 42 U.S.C.S. § 1981(a).

*Civil Rights Law > Contractual Relations & Housing > Equal Rights Under the Law (sec. 1981) > Proof of Discrimination*
*Civil Rights Law > Contractual Relations & Housing > Equal Rights Under the Law (sec. 1981) > Protected Parties*
*Labor & Employment Law > Discrimination > Disparate Impact > Statutory Application > Reconstruction Statutes (secs. 1981, 1983 & 1985)*
[HN8]A 42 U.S.C.S. § 1981 claim consists of the following elements: (1) membership in a racial minority; (2) an intention to discriminate on the basis of race by the defendants; and (3) discrimination concerning one or more of the activities enumerated in the statute. Because intentional discrimination is required under § 1981, the disparate impact theory of recovery is not available.

*Civil Rights Law > Contractual Relations & Housing > Equal Rights Under the Law (sec. 1981) > Proof of Discrimination*
*Civil Rights Law > Contractual Relations & Housing > Equal Rights Under the Law (sec. 1981) > Protected Parties*
[HN9]In pleading a claim under 42 U.S.C.S. § 1981, the complaint must do more than merely assert that racial discrimination occurred. To survive a motion to dismiss, the § 1981 claim must specifically allege the events claimed to constitute intentional discrimination as well as circumstances giving rise to a plausible inference of racially discriminatory intent. In other words, a proper pleading under § 1981 must set out facts that demonstrate that the plaintiff's race was the reason for the defendants' conduct.

*Civil Rights Law > Contractual Relations & Housing > Equal Rights Under the Law (sec. 1981) > Proof of Discrimination*
*Civil Rights Law > Contractual Relations & Housing > Equal Rights Under the Law (sec. 1981) > Protected Parties*
*Contracts Law > Types of Contracts > Lease Agreements > General Overview*
[HN10]42 U.S.C.S. § 1982 provides that all citizens of the United States shall have the same right, in every state and territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property. As is true of 42 U.S.C.S. § 1981 claims, claims under 42 U.S.C.S. § 1982 must make clear that the alleged mistreatment was a function of racial animus and intentional discrimination.

*Civil Rights Law > Civil Rights Acts > Civil Rights Act of 1964*
*Civil Rights Law > Federally Assisted Programs > General Overview*
[HN11]Title VI of the Civil Rights Act of 1964 (Title VI), 42 U.S.C.S. § 2000d proscribes intentional discrimination. It provides that no person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance. 42 U.S.C.S. § 2000d. Title VI covers only those situations where federal funding is given to a non-federal entity which, in turn provides financial assistance to the ultimate beneficiary. To establish a claim under Title VI, a plaintiff must show that: (1) the entity involved engaged in racial or national origin discrimination; (2) the entity involved received federal financial aid; and (3) plaintiff was an entitled beneficiary of the program or activity receiving the aid.

*Civil Rights Law > Civil Rights Acts > Civil Rights Act of 1964*
*Civil Rights Law > Federally Assisted Programs > Scope*
[HN12]See 45 C.F.R. § 80.13(f).

*Banking Law > Consumer Protection > Equal Credit Opportunity > Discriminatory Acts*
*Civil Rights Law > Contractual Relations & Housing > Fair Housing Rights > Credit & Mortgage Laws*
*Contracts Law > Debtor & Creditor Relations*
[HN13]Under the Equal Credit Opportunity Act (ECOA), 15 U.S.C.S. § 1691 et seq., it is unlawful for a creditor to discriminate against any applicant, with respect to any credit transaction on the basis of race, color, religion, national origin, sex or marital status, or age provided the applicant has the capacity to contract. 15 U.S.C.S. § 1691(a)(1). The ECOA provides for a private cause of action based on disparate impact or disparate treatment. Pursuant to 15 U.S.C.S. § 1691e(f), ECOA violations must be brought not later than two years after the date of the occurrence of the violation.

*Banking Law > Consumer Protection > Equal Credit Opportunity > General Overview*
*Civil Rights Law > Contractual Relations & Housing > Fair Housing Rights > Credit & Mortgage Laws*
[HN14]To assert a disparate treatment claim under the Equal Credit Opportunity Act, 15 U.S.C.S. § 1691 et seq., a plaintiff must allege that she was a member of a protected class, that she was qualified for the loan that

she requested, and that the lender declined the loan and showed a preference for a non-protected individual. To allege a disparate impact claim, the plaintiff must allege a specific policy or practice which the defendant used to discriminate and must allege that the policy or practice had an adverse effect on the protected group.

*Civil Rights Law > Civil Rights Acts > Civil Rights Act of 1964*
*Civil Rights Law > Federally Assisted Programs > Scope*
[HN15]The United States Supreme Court has held that Title VI of the Civil Rights Act of 1964 (Title VI), 42 U.S.C.S. § 2000d can only be violated by acts of intentional discrimination. Accordingly, a plaintiff's disparate impact claim is not cognizable under Title VI.

*Civil Rights Law > Contractual Relations & Housing > Fair Housing Rights > Fair Housing Act*
*Civil Rights Law > Contractual Relations & Housing > Fair Housing Rights > Fair Housing Amendments Act & Housing for Retirees*
*Public Health & Welfare Law > Housing & Public Buildings > Fair Housing*
[HN16]The Fair Housing Act, 42 U.S.C.S. § 3601 et seq., does not create an express or implied private cause of action against the investigating agency.

*Civil Procedure > Jurisdiction > Jurisdictional Sources > General Overview*
*Constitutional Law > State Autonomy > Abrogation of Immunity*
*Constitutional Law > State Autonomy > Waiver > General Overview*
[HN17]The Eleventh Amendment renders an unconsenting state immune from lawsuits in federal court brought by that state's own citizens or citizens of another state. The Eleventh Amendment prohibits courts from exercising jurisdiction over lawsuits against a state unless the state waives sovereign immunity or Congress has expressly and validly abrogated that immunity.

*Civil Procedure > Federal & State Interrelationships > Sovereign Immunity > General Overview*
*Civil Rights Law > Section 1983 Actions > Elements > Color of State Law > General Overview*
*Civil Rights Law > Section 1983 Actions > Scope*
[HN18]42 U.S.C.S. § 1983 provides a cause of action for plaintiffs injured by a "person" acting under color of state law. However, the State of New York Division of Human Rights is an agency of New York State and is

therefore not a "person" within the meaning of § 1983. Moreover, it is well established that § 1983 does not allow a state to be called into federal court to answer in damages for the alleged deprivation of a federal right. Such suits are barred by the Eleventh Amendment.

*Civil Rights Law > Immunity From Liability > General Overview*
*Governments > Federal Government > Claims By & Against*
[HN19]It is axiomatic under the principle of sovereign immunity that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction. The waiver of sovereign immunity must be unequivocally expressed in statutory text, and cannot simply be implied. The United States has not waived sovereign immunity for constitutional torts.

**COUNSEL:** Yvette Boykin, Plaintiff, Pro se, Conley, GA.

For Keycorp and its Subsidiary, KeyBank National Association, doing business as Key Bank, Defendant: Robert P. Heary, Hiscock & Barclay LLP, Buffalo, NY.

For State of New York Division of Human Rights, Defendant: Michael A. Siragusa, New York State Attorney General's Office, Buffalo, NY.

For U.S. Department of Housing and Urban Development, Defendant: Mary K. Roach, U.S. Attorney's Office, Buffalo, NY.

**JUDGES:** WILLIAM M. SKRETNY, United States District Judge.

**OPINION BY:** WILLIAM M. SKRETNY

**OPINION**

**DECISION AND ORDER**

**I. INTRODUCTION**

On December 19, 2003, *pro se* Plaintiff Yvette Boykin commenced this civil rights action by filing a Complaint in the United States District Court for the Western District of New York. Therein, Plaintiff alleges five causes of action related to the denial of her application for a non-owner-occupied real estate equity loan. Presently before this Court are individual Motions to Dismiss filed by Defendants Key Corp and its subsidiary KeyBank National Association d/b/a KeyBank [*2] ("KeyBank"), [1] State of New York Division of Human Rights ("NYDHR"), [2] and U.S. Department of Housing

and Urban Development ("HUD")[3]. Also before this Court is Plaintiff's Motion to Deny KeyBank's Motion to Dismiss.[4] For the reasons discussed below, Defendants' Motions to Dismiss are granted, Plaintiff's motion is denied, and the NYDHR's Motion for Summary Judgment is denied as moot.

1   In support of its Motion to Dismiss, KeyBank filed a memorandum of law, the Affidavit of Laurence B. Oppenheimer, Esq., with attachments, and a reply memorandum of law. In opposition to KeyBank's motion, Defendant filed a Motion to Deny KeyBank's motion, a memorandum of law, and the Affirmation of Yvette Boykin.

2   The NYDHR filed a Motion to Dismiss and for Summary Judgment. In support of its motion, NYDHR filed a memorandum of law, a Rule 56 Statement of Undisputed Facts, the Declaration of Gina M. Lopez with attached exhibits, and the Reply Declaration of Michael A. Siragusa, Esq. In opposition, Plaintiff filed a memorandum of law, a Rule 56 Statement of Material Facts Requiring Trial, and the Affirmation of Yvette Boykin.

[*3]

3   In support of its Motion to Dismiss, HUD filed the Affidavit of Mary K. Roach, Esq., a memorandum of law, and a reply memorandum of law. In opposition, Plaintiff filed a memorandum of law and the affirmation of Yvette Boykin.

4   In support of her Motion to Deny KeyBank's motion, Plaintiff filed a memorandum of law and the Affirmation of Yvette Boykin.

## II. BACKGROUND

### A. Facts

In adjudicating Defendants' Motions to Dismiss, this Court assumes the truth of the following factual allegations contained in Plaintiff's Complaint. See Hosp. Bldg. Co. v. Trs. of Rex Hosp., 425 U.S. 738, 740, 96 S.Ct. 1848, 1850, 48 L.Ed.2d 338 (1976); see also Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton Coll., 128 F.3d 59, 63 (2d Cir. 1997).

Plaintiff is an African-American woman. (Complaint, P2.) At the time of the acts complained of, she was 53 years old and resided in the state of Georgia. (Complaint, P2.) On August 1, 2001, Plaintiff applied for a non-owner-occupied real estate equity loan from Defendant KeyBank to improve, repair and maintain rental [*4] property she owns in Buffalo, New York. (Com-

plaint, P6.) Plaintiff was initially informed by KeyBank's loan officer that her loan application had been conditionally approved based on her credit report. (Complaint, P6.)

Later that day, however, the loan officer telephoned Plaintiff and advised her that her loan application had been denied because she was not a resident of New York State. (Complaint, P7.) The loan officer stated that he was unaware of KeyBank's policy of not providing loans to out-of-state residents, but did not offer Plaintiff any alternative loan products. (Complaint, P8.) On or about August 16, 2001, Plaintiff received a written denial of her loan application, which advised that KeyBank does not grant credit under the terms requested out of its servicing area. (Complaint, P10.) Plaintiff maintains that she met all of KeyBank's financial and credit requirements for securing a non-owner occupied equity loan and was in all respects qualified to receive the real estate financing loan. (Complaint, PP9, 31.)

After Plaintiff's loan was denied, she filed a housing discrimination complaint with HUD, which was referred to the NYDHR. (Complaint, P14.) After investigating the [*5] allegations in Plaintiff's administrative complaint, the NYDHR issued a "No Probable Cause" determination and closed the investigation. (Complaint, P14.) HUD then also closed its case based on the NYDHR's findings. (Complaint, P14.)

### B. Procedural History

Plaintiff commenced this action on December 19, 2003, by filing a Complaint in the United States District Court for the Western District of New York. KeyBank filed its Motion to Dismiss on April 16, 2004; Plaintiff filed her Motion to Deny KeyBank's motion on April 23, 2004; HUD filed its Motion to Dismiss on May 24, 2004; NYDHR filed its Motion to Dismiss or for Summary Judgment on June 24, 2004. This Court took the motions under advisement after full briefing.

## III. DISCUSSION

### A. Legal Standard

Rule 12(b)(6) of the Federal Rules of Civil Procedure [HN1]provides for dismissal of a Complaint for "failure to state a claim upon which relief can be granted." A court may dismiss an action under this rule if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which will entitle him to relief." Cohen v. Koenig, 25 F.3d 1168, 1172 (2d Cir. 1994) [*6] (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). Stated another way, "[a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that

could be proved consistent with the allegations." Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). On a Rule 12(b)(6) motion, "the issue is not whether a plaintiff will or might ultimately prevail on her claim, but whether she is entitled to offer evidence in support of the allegations in the complaint." Hamilton Chapter, 128 F.3d at 62 (citation omitted).

As noted above, all well-pleaded factual allegations contained in the Complaint are assumed true and construed in the non-moving party's favor. See Still v. De-Buono, 101 F.3d 888, 891 (2d Cir. 1996). [HN2]If it appears from the face of the Complaint that a cause of action has not been brought within the applicable statute of limitations period, the defense of limitations "may be raised in a pre-answer motion pursuant to Fed. R. Civ. P. 12(b)(6)." Santos v. Dist. Council of New York City, 619 F.2d 963, 967 n.4 (2d Cir. 1980); [*7] Ghartley v. St. John's Queens Hosp., 869 F.2d 160, 162 (2d Cir. 1989). "The complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir. 1991). If the plaintiff does not attach or incorporate by reference documents that are integral to the Complaint, the court may consider those documents without converting the motion to one seeking summary judgment. See Int'l Audiotext Network, Inc. v. Am. Tel. and Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995) (per curiam).

Here, although Plaintiff does not attach copies of her administrative complaint or the NYDHR's "No Probable Cause" determination letter, these documents are referenced in the Complaint and are integral to Plaintiff's claims. Moreover, both parties have provided copies of the various administrative documents with their motion papers. Accordingly, this Court will consider these documents.

Finally, [HN3]because of the distinct disadvantage that *pro se* litigants face, federal courts routinely read their submissions liberally, and interpret [*8] them to raise the strongest arguments that they suggest. See Haines v. Kerner, 404 U.S. 519, 520, 92 S. Ct. 594, 596, 30 L.Ed.2d 652 (1972); Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994). As Plaintiff is proceeding *pro se*, this Court has reviewed her submissions and arguments accordingly. Importantly, however, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." Smith v. Local 819 I.B.T. Pension Plan, 291 F.3d 236, 240 (2d Cir. 2002) (citation and quotation omitted).

## B. KeyBank's Motion to Dismiss

KeyBank is named as a Defendant in Plaintiff's first four causes of action. It argues that Plaintiff's causes of action are either untimely, fail to state a claim, or both. Each cause of action is addressed below.

## 1. First Cause of Action: Fair Housing Act

Plaintiff's first cause of action alleges that KeyBank denied her loan application because of her race and sex in violation of the Fair Housing Act ("FHA"), 42 U.S.C. § 3601, et seq. (Complaint, PP18-21.) It also alleges FHA violations based on a disparate impact theory [*9] related to the application of KeyBank's lending policy guidelines. (Complaint, P13.)

The FHA [HN4]makes it unlawful for any person or entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin. 42 U.S.C. § 3605(a). "A plaintiff can make out a claim of discrimination either 'on a theory of disparate impact or one of disparate treatment.'" Fair Housing in Huntington Comm., Inc. v. Town of Huntington, NY, 316 F.3d 357, 366 (2d Cir. 2003) (quoting LeBlanc-Sternberg v. Fletcher, 67 F.3d 412, 424 (2d Cir. 1995)). Claims under the FHA must be brought no later than 2 years after the occurrence of discrimination or the termination of an allegedly discriminatory housing practice. 42 U.S.C. § 3613(a)(1)(A). Computation of the 2-year period does not include any time during which an administrative complaint or charge was pending. 42 U.S.C. § 3613(a)(1)(B).

[*10] [HN5]Disparate treatment claims brought under the FHA are analyzed under the McDonnell Douglas burden-shifting analysis. See Mitchell v. Shane, 350 F.3d 39, 47 (2d Cir. 2003); Robinson v. 12 Lofts Realty, Inc., 610 F.2d 1032, 1038 (2d Cir. 1979). At this stage, however, Plaintiff must only allege facts sufficient to state a claim. See Swierkiewicz v. Sorema N.A., 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). The elements of a disparate treatment FHA claim are (1) membership in a protected class, (2) application and qualification for a real estate-related loan, (3) denial of the loan, and (4) continued approval of loans for applicants with similar qualifications. See Mitchell, 350 F.3d at 47; Powell v. Am. Gen. Finance, Inc., 310 F.Supp.2d 481, 487-89 (N.D.N.Y. 2004); Rowe v. Union Planters Bank of Southeast Missouri, 289 F.3d 533, 535 (8th Cir. 2002). To state a claim for a violation of the FHA based on disparate impact, the plaintiff must allege that "an outwardly neutral practice actually or predictably has a discriminatory effect; that is, has a significantly adverse or disproportionate [*11] impact on minorities, or perpetuates segregation." Fair Housing in Huntington Comm., Inc., 316 F.3d at 366; Khalil v. Farash Corp., 260 F.Supp.2d 582, 588 (W.D.N.Y. 2003).

This Court finds that Plaintiff's FHA claims against KeyBank must be dismissed for two reasons. First, the claims are time barred. According to Plaintiff's Complaint, KeyBank unlawfully denied her loan application on August 1, 2001. (Complaint, P7.) Plaintiff filed her administrative complaint with HUD on August 8, 2001. (See Oppenheimer Aff., Exhibit B.) Her administrative complaint was then referred to NYDHR for investigation and processing. See 42 U.S.C. § 3610(f)(1) (requiring HUD to refer complaints to certified state agencies). Plaintiff's administrative complaint then remained pending for 117 days until December 3, 2001, when the NYDHR issued its "No Probable Cause" determination. (See Oppenheimer Aff., Exhibit C.) Accordingly, by this Court's calculation, Plaintiff had 847 days [5] from August 1, 2001, to bring her FHA claim, or November 26, 2003. Plaintiff filed this action on December 19, 2003.

    5  This represents the 2-year statutory period (730 days) plus the 117 days Plaintiff's administrative complaint was pending.

[*12]  Plaintiff argues that her administrative complaint remained pending through February 26, 2002, the date that HUD closed her complaint based on the NYDHR's findings. However, once HUD referred Plaintiff's claim to the NYDHR, it could take no further action on the complaint, except in three specific circumstances not relevant here. See 42 U.S.C. § 3610(f)(2). Accordingly, because HUD could take no further action, Plaintiff's Complaint was no longer pending after the NYDHR made its determination. Plaintiff's FHA claims are therefore untimely and must be dismissed.

Second, even if Plaintiff's FHA claims were timely, this Court would dismiss the disparate treatment claim because it is insufficiently pled. [6] While Plaintiff generally alleges that KeyBank discriminated against her based on her race and sex, the Complaint contains no specific facts supporting her claims. The only specific acts alleged in the Complaint are that KeyBank denied Plaintiff's loan and failed to offer her other loan products. (Complaint, PP7, 8.) There are no factual allegations whatsoever that connect KeyBank's denial of Plaintiff's loan to a discriminatory motive or racial animus. [*13] In fact, each of Plaintiff's claims of racial discrimination is premised "upon information and belief." (Complaint, PP11, 12, 13.) There are no allegations that the loan officer or any other member of KeyBank exhibited any improper animus toward Plaintiff (whether based on race or sex), nor has Plaintiff alleged the existence or any other non-New York State residents who were approved for the same loan that she was denied. It is not enough for Plaintiff to simply state that she is a black woman who was denied a loan. See Gulley v. Roach, 2004 U.S. Dist. LEXIS 13736, No. 02-CV-908S, 2004 WL 2331922, at

*4 (W.D.N.Y. June 7, 2004) [HN6]("when alleging a violation of a civil rights statute, even a *pro se* litigant must make 'specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning'")(quoting Barr v. Abrams, 810 F.2d 358, 363 (2d Cir. 1987)). Accordingly, in this Court's view, Plaintiff's conclusory allegations are insufficient to sustain her disparate treatment FHA claim. See Martin v. New York State Dep't of Mental Hygiene, 588 F.2d 371, 372 (2d Cir. 1978) (per curiam) ("[A] complaint [*14] consisting of nothing more than naked assertions, and setting forth no facts upon which a court could find a violation of the Civil Rights Acts, fails to state a claim under Rule 12(b)(6).")

    6  If timely, Plaintiff's disparate impact claim is sufficiently pled such that it would survive this motion to dismiss. (See Complaint, P13.)

## 2. Second Cause of Action: Civil Rights Act of 1866

The second cause of action alleges that KeyBank denied Plaintiff's loan application on the basis of her race in violation of the Civil Rights Act of 1866, 42 U.S.C. §§ 1981 and 1982. (Complaint, PP22-24.)

### a. 42 U.S.C. § 1981

Forty-two U.S.C. § 1981(a) provides as follows:

    [HN7](a) Statement of equal rights

        All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security [*15] of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

[HN8]A § 1981 claim consists of the following elements: (1) membership in a racial minority; (2) an intention to discriminate on the basis of race by the defendants; and (3) discrimination concerning one or more of the activities enumerated in the statute. See Brown v. City of Oneonta, NY, 221 F.3d 329, 339 (2d Cir. 2000); Mian v. Donaldson, Lufkin & Jenrette Sec. Corp., 7 F.3d 1085, 1087 (2d Cir. 1995) (per curiam). Because intentional discrimination is required under § 1981, the disparate impact theory of recovery is not available. See Jackson v. Univ. of New Haven, 228 F.Supp.2d 156, 162 (D.Conn. 2002).

[HN9]In pleading a § 1981 claim, the Complaint must do more than merely assert that racial discrimination occurred. See Richardson v. Sec. Unit Emples. Council 82, 2001 U.S. Dist. LEXIS 4830, No. 99-CV-1021E(SR), 2001 WL 392089, *4 (W.D.N.Y. Mar. 27, 2001). To survive a motion to dismiss, the § 1981 claim must "specifically allege the events claimed to constitute [*16] intentional discrimination as well as circumstances giving rise to a plausible inference of racially discriminatory intent." Yusuf v. Vassar Coll., 35 F.3d 709, 713 (2d Cir. 1994). "In other words, a proper pleading under section 1981 must set out *facts* that demonstrate that the plaintiff's race was the reason for the defendants' conduct." Burgin v. Toys-R-Us-Nytex, Inc., 1999 U.S. Dist. LEXIS 10073, No. 97-CV-998E, 1999 WL 454302, at *2 (W.D.N.Y. June 30, 1999) (emphasis added) (citing Waldron v. Rotzler, 862 F.Supp. 763, 767 (N.D.N.Y. 1994)).

As just stated, Plaintiff's Complaint is devoid of any factual allegations suggesting that her race (or sex or age) was the reason why KeyBank denied her loan application. As such, Plaintiff's § 1981 claim will be dismissed. [7] See Straker v. Metro. Transit Auth., 333 F.Supp.2d 91, 99-102 (E.D.N.Y. 2004) (stating that "a claim that does not contain any supporting factual allegations cannot withstand a Rule 12(b)(6) motion").

[7] This Court notes that Plaintiff appears to concede that she has failed to state a claim under § 1981. See Plaintiff's Memorandum of Law, p. 1-2 ("Plaintiff now believes that under Defendant's analyses [sic], there may arguably be a basis for asserting that there is a failure to state a claim upon which relief can be granted under . . . the Civil Rights Act of 1866."); Boykin Aff., P1 ("the Complaint may not arguably be valid and timely under . . . the Civil Rights Act of 1866"). Indeed, Plaintiff offers no opposition to the dismissal of her § 1981 claim.

[*17]  **b. 42 U.S.C. § 1982**

Forty-two U.S.C. § 1982 [HN10]provides that "all citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." "As is true of section 1981 claims, claims under section 1982 must make clear that the alleged mistreatment was a function of racial animus and intentional discrimination." Burgin, 1999 U.S. Dist. LEXIS 10073, 1999 WL 454302, at *4 (citing Jones v. Mayer Co., 392 U.S. 409, 436, 20 L. Ed. 2d 1189, 88 S. Ct. 2186 (1968)).

This Court pauses to note that by its plain terms, it does not appear as though § 1982 even applies to this set

of circumstances. Plaintiff sought a loan so that she could improve and maintain property that she already owned. (Complaint, P6.) Thus, the purchase, sale or conveyance of real property is not at issue. See 42 U.S.C. § 1982. However, even assuming that § 1982 applies, Plaintiff's claim fails for the same reason that her § 1981 claim fails: Plaintiff has not alleged any facts supporting racial discrimination. Accordingly, Plaintiff's § 1982 claim will be [*18] dismissed. [8]

[8] This Court notes that Plaintiff appears to concede that she has failed to state a claim under § 1982. See Plaintiff's Memorandum of Law, p. 1-2 ("Plaintiff now believes that under Defendant's analyses [sic], there may arguably be a basis for asserting that there is a failure to state a claim upon which relief can be granted under . . . the Civil Rights Act of 1866."); Boykin Aff., P1 ("the Complaint may not arguably be valid and timely under . . . the Civil Rights Act of 1866"). Indeed, Plaintiff offers no opposition to the dismissal of her § 1982 claim.

### 3. Third Cause of Action: Civil Rights Act of 1964

Plaintiff's third cause of action alleges that KeyBank denied her loan application because of her race and thereby excluded her from participating in and receiving the benefits of a program receiving federal financial assistance in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, et seq. (Complaint, PP25-29.)

Title VI [HN11]proscribes [*19] intentional discrimination. Alexander v. Sandoval, 532 U.S. 275, 280-85, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001). It provides that "no person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. "Title VI covers only those situations where 'federal funding is given to a non-federal entity which, in turn provides financial assistance to the ultimate beneficiary.'" Booker v. Bd. of Educ., Baldwinsville Cent. Sch. Dist., 238 F.Supp.2d 469, 474 (2d Cir. 2002) (citing Soberal-Perez v. Heckler, 717 F.2d 36, 38 (2d Cir. 1983). To establish a claim under Title VI, a plaintiff must show that: (1) the entity involved engaged in racial or national origin discrimination; (2) the entity involved received federal financial aid; and (3) plaintiff was an entitled beneficiary of the program or activity receiving the aid. Babiker v. Ross Univ. Sch. of Med., 2000 U.S. Dist. LEXIS 6921, No. 98 CIV 1429 THK, 2000 WL 666342, at *4 (S.D.N.Y. May 19, 2000).

[*20] This Court finds that Plaintiff's Title VI claim must be dismissed. First, for the reasons discussed at

length above, Plaintiff has not set forth any facts of racial discrimination by KeyBank. Second, although Plaintiff has alleged that KeyBank receives federal financial assistance as defined in Title VI, this allegation is premised on Plaintiff's allegation that KeyBank is a member of the Federal Deposit Insurance Corporation and the Federal Savings and Loan Insurance Corporation. (Complaint, P3.) However, membership in these two corporations, which principally exist to protect borrowers, does not equate to KeyBank being the recipient of federal financial assistance. [9] Finally, there is no allegation that the loan product Plaintiff applied for was federally funded or part of a federal loan program. For all of these reasons, Plaintiff has failed to state a claim under Title VI. Plaintiff's third cause of action will therefore be dismissed as to KeyBank. [10]

9    Pursuant to 45 C.F.R. § 80.13(f), the term "Federal financial assistance" includes:

[HN12](1) grants and loans of Federal funds, (2) the grant or donation of Federal property and interests in property, (3) the detail of Federal personnel, (4) the sale and lease of, and the permission to use (on other than a casual or transient basis), Federal property or any interest in such property without consideration or at a nominal consideration, or at a consideration which is reduced for the purpose of assisting the recipient, or in recognition of the public interest to be served by such sale or lease to the recipient, and (5) any Federal agreement, arrangement, or other contract which has as one of its purposes the provision of assistance.

[*21]

10    This Court notes that Plaintiff appears to concede that she has failed to state a claim under Title VI. See Plaintiff's Memorandum of Law, p. 1-2 ("Plaintiff now believes that under Defendant's analyses [sic], there may arguably be a basis for asserting that there is a failure to state a claim upon which relief can be granted under Title VI."); Boykin Aff., P1 ("the Complaint may not arguably be valid and timely under Title VI of the Civil Rights Act of 1964"). Indeed, Plaintiff offers no opposition to the dismissal of her Title VI claim.

### 4. Fourth Cause of Action: Equal Credit Opportunity Act

The fourth cause of action alleges that KeyBank denied Plaintiff's loan application on account of her race, sex and age in violation of the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691, et seq. (Complaint, P30-33.) It also alleges ECOA violations based on a disparate impact theory related to the application of KeyBank's lending policy guidelines. (Complaint, P13.)

[HN13]Under the ECOA, it is unlawful for a creditor to discriminate against any applicant, [*22] with respect to any credit transaction on the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract). See 15 U.S.C. § 1691(a)(1). "The ECOA provides for a private cause of action based on disparate impact or disparate treatment." Powell, 310 F.Supp.2d at 487 (citing Jones v. Ford Motor Credit Co., 2002 U.S. Dist. LEXIS 1098, No. 00 CIV. 8330, 2002 WL 88431, at *3 (S.D.N.Y. Jan. 22, 2002), rev'd on other grounds, 358 F.3d 205 (2d Cir. 2004)). Pursuant to 15 U.S.C. § 1691e(f), ECOA violations must be brought not later than 2 years after the date of the occurrence of the violation.

[HN14]To assert a disparate treatment claim under the ECOA, "a plaintiff must allege that she was a member of a protected class, that she was qualified for the loan that she requested, and that the lender declined the loan and showed a preference for a non-protected individual." Powell, 310 F.Supp.2d at 487. To allege a disparate impact claim, the plaintiff must allege a specific policy or practice which the defendant used to discriminate and must [*23] allege that the policy or practice had an adverse effect on the protected group. See Powell, 310 F.Supp.2d at 487 (citing Jones, 2002 U.S. Dist. LEXIS 1098, 2002 WL 88431, at *3).

Plaintiff's ECOA claims suffer from the same deficiencies as her FHA claims: they are untimely and the disparate treatment claim is insufficiently pled. [11] First, Plaintiff's Complaint in this action was filed more than two years after KeyBank denied her loan. Therefore, her ECOA claim is untimely. See 15 U.S.C. § 1691e(f). Second, Plaintiff has failed to allege any facts indicating that KeyBank showed preference for non-protected individuals. Accordingly, Plaintiff's ECOA claim will be dismissed. [12]

11    If timely, Plaintiff's disparate impact claim is sufficiently pled such that it would survive this motion to dismiss. (See Complaint, P13.)

12   This Court notes that Plaintiff appears to concede that she has failed to state claims under the ECOA. See Plaintiff's Memorandum of Law, p. 1-2 ("Plaintiff now believes that under Defendant's analyses [sic], there may arguably be a basis for asserting that there is a failure to state a claim upon which relief can be granted under . . . the ECOA:); Boykin Aff., P1 ("the Complaint may not arguably be valid and timely under . . . the Equal Credit Opportunity Act"). Indeed, Plaintiff offers no opposition to the dismissal of her ECOA claims.

[*24] **C. The NYDHR's Motion to Dismiss and for Summary Judgment**

The NYDHR is named as a defendant in Plaintiff's third and fifth causes of action. In the third cause of action, Plaintiff alleges that the NYDHR discriminated against her on account of her race in violation of Title VI by conducting a faulty investigation into her administrative complaint and issuing a deficient "No Probable Cause" determination. (Complaint, P27.) She further contends that "upon information and belief, Defendant DHR administers its program and processes fair housing complaints based on sex and other protected classes more favorably than those based on race." (Complaint, P16.)

As previously discussed, a Title VI plaintiff must allege that: (1) the entity involved engaged in racial or national origin discrimination; (2) the entity involved is receiving federal financial aid; and (3) plaintiff was an entitled beneficiary of the program or activity receiving the aid. Babiker, 2000 U.S. Dist. LEXIS 6921, 2000 WL 666342, at *4.

Without question Plaintiff alleges that the NYDHR failed to properly investigate her complaint. (Complaint, PP15, 16.) It is somewhat unclear, however, whether Plaintiff [*25]   alleges that the NYDHR's failure to properly investigate her case resulted in continuing racial discrimination (by not remedying KeyBank's allegedly discriminatory treatment of her), or whether Plaintiff avers that the NYDHR itself intentionally failed to conduct a proper investigation because she is black. Since the former would not state a claim for racial discrimination against the NYDHR, this Court will construe Plaintiff's Complaint as alleging the latter.

Title VI proscribes only intentional discrimination. Alexander, 532 U.S. at 280-85. It follows that a plaintiff must allege intentional discrimination on the part of the defendant to state a Title VI claim. This Court has already discussed at length the inadequacy of Plaintiff's allegations of race discrimination against KeyBank. The

same holds true for Plaintiff's allegations of discrimination against the NYDHR. Nothing in Plaintiff's Complaint can reasonably be construed as a factual allegation supporting a claim of intentional race discrimination by the NYDHR. Plaintiff's claims of direct race discrimination are entirely conclusory. For example, she alleges that the NYDHR's failure to properly investigate [*26] her case was "because of her race" and that "upon information and belief" the NYDHR processes complaints based on sex and other protected classes more favorably than those based on race. (Complaint, P16.) There are no factual allegations whatsoever supporting these two wholly conclusory allegations. Dismissal of this claim is therefore necessary. See Martin, 588 F.2d at 372 (claims based on "naked assertions" fail to state a claim under the Civil Rights Acts); Straker, 333 F.Supp.2d at 99-102 (claims without supporting factual allegations cannot withstand a motion to dismiss).

Construing Plaintiff's Complaint liberally, it appears that she also alleges disparate impact under Title VI. For example, Plaintiff alleges the following:

> Defendant DHR discriminated against Plaintiff-Applicant because of her race by utilizing criteria or methods of administration which had the effect of defeating or substantially impairing accomplishment of the objective of its fair housing enforcement program, by conducting a faulty investigation, and by issuing a deficient Determination of No Probable Cause on her complaint, which gave rise to this action, in violation [*27] of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, et seq., and 24 CFR Part I, thereby entitling her to all appropriate relief under that statute.

(Complaint, P27.)

To the extent Plaintiff alleges a disparate impact claim under Title VI, it must be dismissed because [HN15]the U.S. Supreme Court has held that Title VI can only be violated by acts of intentional discrimination. See Alexander, 532 U.S. at 280-85 (holding that § 2000d bars only intentional discrimination and therefore does not support a disparate impact theory of recovery); see also Jackson, 228 F.Supp.2d at 162-63 (discussing disparate impact under Title VI). Accordingly, Plaintiff's disparate impact claim is not cognizable under Title VI and must be dismissed.

The NYDHR is also named as a defendant in Plaintiff's fifth cause of action. (Complaint, PP35, 37, 38.) Plaintiff alleges that the NYDHR violated the FHA, its

accompanying regulations, and the Fourteenth Amendment by violating its "legal duty to comply with certifications to administer and enforce its fair housing law in a manner which provided rights and remedies for processing Plaintiff-Applicant's [*28] complaint that were substantially equivalent to those under the Fair Housing Act." (Complaint, P35.) The NYDHR allegedly violated its duty by failing to conduct a complete investigation of Plaintiff's administrative complaint. (Complaint, PP15, 35.)

Plaintiff's claim against the NYDHR must be dismissed because the FHA [HN16]does not create an express or implied private cause of action against the investigating agency. [13] See Weisberg v. Leon, 1999 U.S. Dist. LEXIS 19603, No. 99 Civ. 2661, 1999 WL 1216663, at *2 (S.D.N.Y. Dec. 20, 1999) (dismissing plaintiff's FHA claim against HUD because no private right of action exists for a challenge to action HUD took in addressing complaint); Marinoff v. U.S. Dep't of Housing & Urban Dev., 892 F. Supp. 493, 496 (S.D.N.Y. 1995), aff'd, 78 F.3d 64 (2d Cir. 1996) (dismissing complaint against HUD for failure to properly investigate claim, because the FHA provides no private right of action); Pleune v. Pierce, 697 F.Supp. 113, 119-20 (E.D.N.Y. 1988) (citing cases); Godwin v. Sec'y of Housing & Urban Dev., 360 U.S. App. D.C. 15, 356 F.3d 310, 312 (D.C. Cir. 2004) (per curiam).

13    It appears that any challenge to the NYDHR's determination must be brought under § 298 of the New York Executive Law in the state supreme court in the county where the discriminatory practice occurred.

[*29] Moreover, Plaintiff's constitutional claims against NYDHR brought pursuant to 42 U.S.C. § 1983 must be dismissed because they are barred by the Eleventh Amendment. [HN17]The Eleventh Amendment "renders an unconsenting state immune from lawsuits in federal court brought by that state's own citizens or citizens of another state." A.A. v. Bd. of Educ., 196 F. Supp. 2d 259, 264 (E.D.N.Y. 2002) (citing Burnette v. Carothers, 192 F.3d 52, 57 (2d Cir. 1999); New York City Health & Hosps. Corp. v. Perales, 50 F.3d 129, 134 (2d Cir. 1995)). The Eleventh Amendment prohibits "courts from exercising jurisdiction over lawsuits against a state unless [the state] waive[s] sovereign immunity or Congress has expressly and validly abrogated that immunity." A.A., 196 F. Supp. 2d at 264 (citing Board of Trustees v. Garrett, 531 U.S. 356, 363, 121 S. Ct. 955, 148 L. Ed. 2d 866 (2001); Tuchman v. Connecticut, 185 F.Supp.2d 169, 172 (D.Conn. 2002)).

Section 1983 [HN18]provides a cause of action for plaintiffs injured by a "person" acting [*30] under color of state law. However, the NYDHR is an agency of New York State and is therefore not a "person" within the meaning of § 1983. See Will v. Michigan Dep't of State Police, 491 U.S. 58, 71, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989) (neither the state, its agencies, nor its employees acting in their official capacities are "persons" subject to suit under 42 U.S.C. § 1983). Moreover, it is well established that § 1983 "does not allow a State to be called into Federal Court to answer in damages for the alleged deprivation of a federal right." A.A., 196 F.Supp.2d at 266 (citing Will, 491 U.S. at 65). Such suits are barred by the Eleventh Amendment. Id.; see also Yoonessi v. State Univ. of New York, 862 F. Supp. 1005, 1012 (W.D.N.Y. 1994) ("In the absence of the state's consent to be sued in a federal forum, or congressional authorization to do so, any legal or equitable claims based on alleged constitutional violations brought by private parties against the state or one of its agencies or departments are proscribed by the eleventh amendment.") (citing Pennhurst State Sch.& Hosp. v. Halderman, 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984)). [*31]    Accordingly, Plaintiff's constitutional claims against the NYDHR will be dismissed. [14]

14    In light of this ruling, the NYDHR's Motion for Summary Judgment will be denied as moot.

## D. HUD's Motion to Dismiss

HUD is named as a Defendant only in Plaintiff's fifth cause of action. (Complaint, PP36-38.) Plaintiff alleges that HUD violated the FHA, its accompanying federal regulations, and the Fifth Amendment by failing to supervise the NYDHR's processing of her complaint according to HUD certifications, regulations, and other contractual terms, and failing to ensure that sufficient evidence and facts supported the "No Probable Cause" determination prior to closing its file on Plaintiff's administrative complaint. (Complaint, PP17, 36.) In essence, Plaintiff alleges that HUD failed to adequately supervise the NYDHR's handing of her complaint.

Plaintiff's Complaint against HUD must be dismissed for two reasons. First, Plaintiff's claims for monetary and injunctive relief must be dismissed because the FHA [*32] does not create an express or implied private cause of action against HUD. [15] See Weisberg, 1999 U.S. Dist. LEXIS 19603, 1999 WL 1216663, at *2 (dismissing plaintiff's FHA claim against HUD because no private right of action exists for a challenge to action HUD took in addressing complaint); Marinoff, 892 F.Supp. at 496 (dismissing complaint against HUD for failure to properly investigate claim, because the FHA provides no private right of action); Pleune, 697 F.Supp. at 119-20 (citing cases); Godwin, 356 F.3d at 312.

15   Without passing on the merits, this Court notes that the correct avenue for relief for what is pled as Plaintiff's FHA claim appears to be the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, et seq. See Pleune, 697 F.Supp. at 120.

Second, HUD cannot be sued for damages under the Fifth Amendment because there has been no waiver of sovereign immunity. [HN19]"It is, of course 'axiomatic' under the principle of sovereign [*33] immunity 'that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction.'" Adeleke v. United States, 355 F.3d 144, 150 (2d Cir. 2004) (quoting United States v. Mitchell, 463 U.S. 206, 212, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983)); see also Dep't of the Army v. Blue Fox, Inc., 525 U.S. 255, 260, 119 S.Ct. 687, 142 L.Ed.2d 718 (1999); Aces & Eights Realty, LLC v. Hartman, 2002 U.S. Dist. LEXIS 22647, No. 02-CV-6032, 2002 WL 31663515, at *3 (W.D.N.Y. Nov. 4, 2002) ("It is clear that, absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit, and that, sovereign immunity is jurisdictional in nature.") (citing FDIC v. Meyer, 510 U.S. 471, 114 S. Ct. 996, 1000, 127 L. Ed. 2d 308 (1994)) (internal quotations omitted).

The waiver of sovereign immunity must be unequivocally expressed in statutory text, and cannot simply be implied. United States v. Nordic Village, Inc., 503 U.S. 30, 33, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992); Adeleke, 355 F.3d at 150. The United States has not waived sovereign [*34] immunity for constitutional torts, see Meyer, 510 U.S. at 476-78, and Plaintiff has not otherwise established waiver. See also Polanco v. U.S. Drug Enforcement Admin., 158 F.3d 647, 651 (2d Cir. 1998) (recognizing that Meyer held that an individual cannot bring a constitutional claim for money damages against a federal agency).

Accordingly, Plaintiff's claims against HUD will be dismissed. [16]

16   This Court does not find Young v. Pierce, the only case relied upon by Plaintiff, instructive. 544 F.Supp. 1010 (E.D. Tex. 1982). Not only is Young a non-precedential case arising outside of the Second Circuit, but it is not on point. Moreover, this Court views the case law developed since Young's issuance more than two decades ago to be more persuasive.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motions to Dismiss are granted, the NYDHR's Motion for Summary Judgment is denied as moot, and Plaintiff's motion is denied.

### V. ORDERS

[*35]  IT HEREBY IS ORDERED, that KeyBank's Motion to Dismiss (Docket No. 2) is GRANTED.

FURTHER, that Plaintiff's Motion to Deny KeyBank's Motion to Dismiss (Docket No. 11) is DENIED.

FURTHER, that HUD's Motion to Dismiss (Docket No. 15) is GRANTED.

FURTHER, that the NYDHR's Motion to Dismiss and for Summary Judgment (Docket No. 23) is GRANTED in part and DENIED in part. The NYDHR's Motion to Dismiss is GRANTED. The NYDHR's Motion for Summary Judgment is DENIED as moot.

FURTHER, that the Clerk of the Court is directed to close this case.

SO ORDERED.

Dated: March 28, 2005

Buffalo, New York

WILLIAM M. SKRETNY

United States District Judge

LEXSEE


Caution
As of: Jan 04, 2008

RICHARD TAMAYO, JOHN BANKS, and RICHARD VAZQUEZ on behalf of
themselves and all others similarly situated, Plaintiffs, -against- CITY OF NEW
YORK, Defendant.

02 Civ. 8030 (HB)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

2004 U.S. Dist. LEXIS 911

January 26, 2004, Decided
January 27, 2004, Filed

**SUBSEQUENT HISTORY:** Amended by, in part, Adhered to, in part, On reconsideration by Tamayo v. City of New York, 2004 U.S. Dist. LEXIS 5656 (S.D.N.Y., Mar. 31, 2004)

**PRIOR HISTORY:** Tamayo v. City of New York, 2003 U.S. Dist. LEXIS 10519 (S.D.N.Y., June 20, 2003)

**DISPOSITION:** [*1] Defendant City of New York's motion to dismiss Second Amended Complaint denied in part and granted in part.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant city filed a motion to dismiss the second amended complaint filed by plaintiffs, city police detectives, that asserted a class action against the city in which the detectives alleged discrimination based on race and national origin in the hiring, assignment, promotion, and general treatment of undercover officers by the police department.

**OVERVIEW:** The detectives' complaint alleged eight causes of action, including allegations of violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., U.S. Const. amends. XIII and XIV, 42 U.S.C.S. § 1983, 42 U.S.C.S. § 1981, and state law. The city based its motion to dismiss on the basis that the claims were time barred and that the detectives' federal causes of action failed to state claims. The city also con-

tended that the detectives' pendent state law claims should have been dismissed. The court found that the detectives' claims for discrimination under Title VII had to be dismissed. The court also found that the claims of discriminatory hiring and failure to promote in violation of 42 U.S.C.S. §§ 1983 and 1981 were time barred. The court also dismissed the state law violation claims. However, the court denied the motion to dismiss with respect to the detectives' failure to protect claim.

**OUTCOME:** The court granted the city's motion to dismiss with respect to the detectives' claims under Title VII, their state law claims, and claims with respect to hiring and promotion, but denied the motion with respect to the detectives' failure to protect claim.

**CORE TERMS:** undercover officers, detective, promotion, national origin, undercover, hiring, discriminatory, causes of action, knowingly, intentionally, right-to-sue, assigned, notice of claim, discriminated, adequately protect, retaliation, disparate, notice, police officer, failure to provide, time-barred, no-smoking, race-based, covenant, eligible, sergeant, untimely, lawsuit, exposed, invoke

**LexisNexis(R) Headnotes**

*Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Exhaustion of Remedies > General Overview*
*Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Time Limitations > General Overview*
[HN1]A Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., claim requires a claimant to file a complaint with the Equal Employment Opportunity Commission (EEOC) or a state equivalent within 300 days of the complained-of acts. 42 U.S.C.S. § 2000e-5. Moreover, a district court lacks jurisdiction to hear a claim under Title VII that is not included in or "reasonably related" the EEOC charge.

*Governments > Legislation > Statutes of Limitations > Time Limitations*
[HN2]For claims under 42 U.S.C.S. §§ 1981 and 1983, the statute of limitations is three years.

*Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements*
*Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation*
[HN3]The Federal Rules of Civil Procedure require that a plaintiff's complaint provide a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). Such a statement must simply give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
*Civil Procedure > Dismissals > Involuntary Dismissals > Failures to State Claims*
[HN4]On a motion to dismiss for failure to state a claim, the court accepts as true all factual allegations in the complaint.

*Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements*
*Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation*
*Civil Procedure > Summary Judgment > Notices*
[HN5]The court should construe the complaint liberally and draw inferences from the plaintiff's allegations in the light most favorable to the plaintiff. This simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
[HN6]Dismissal is appropriate only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief, or where the complaint fails as a matter of law.

*Constitutional Law > Equal Protection > Gender & Sex*
*Constitutional Law > Equal Protection > Scope of Protection*
[HN7]To state a claim for an equal protection violation, appellants must allege that a government actor intentionally discriminated against them on the basis of race, national origin or gender.

*Labor & Employment Law > Wrongful Termination > Whistleblower Protection Act > General Overview*
[HN8]See N.Y. Civ. Serv. Law § 75-b.

*Labor & Employment Law > Discrimination > Retaliation > Statutory Application > Whistleblower Protection Act*
*Labor & Employment Law > Wrongful Termination > Whistleblower Protection Act > General Overview*
[HN9]N.Y. Lab. Law § 740, the so-called whistleblower statute, creates a cause of action in favor of an employee against whom an employer has retaliated for disclosing to a supervisor or to a public body, a violation of law on the part of the employer, which creates and presents a substantial and specific danger to the public, health or safety. However, N.Y. Lab. Law § 740 does not apply to public employers; public employers are covered, instead, by N.Y. Civ. Serv. Law § 75-b.

**COUNSEL:** For Richard Tamayo, John Banks, PLAINTIFFS: Raymond Ragues, Ragues & Min, Esq, New York, NY USA.

**JUDGES:** Harold Baer, Jr., U.S.D.J.

**OPINION BY:** Harold Baer, Jr.

**OPINION**

**OPINION & ORDER**

**Hon. HAROLD BAER, JR., District Judge:**

Defendant the City of New York [1] has moved to dismiss the Second Amended Complaint. For the following reasons, Defendant's motion is denied in part and granted in part.

1    Although plaintiffs initially named the New York Police Department ("NYPD"), the NYPD is not a proper defendant and accordingly plaintiffs' Second Amended Complaint only names the City of New York as a defendant. See N.Y. City Charter, Ch. 17, § 396 ("All actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the City of New York and not in that of any agency.").

[*2] **I. BACKGROUND**

**A. Introduction**

The plaintiffs are detectives with the New York City Police Department ("NYPD") who assert this class action against the City of New York in which they allege discrimination based on race and national-origin in the hiring, assignment, promotion, and general treatment of undercover officers by the NYPD. The class asserted consists of current and future undercover officers in the NYPD who are either black or Hispanic. On June 20, 2003, plaintiffs John Banks' and Richard Tamayo's Amended Complaint was dismissed but they were granted leave to replead. [2] Banks and Tamayo filed a Second Amended Complaint on July 10, 2002, which defendant now moves to dismiss. On October 21, 2003, another, nearly identical action was filed by Richard Vazquez, another Hispanic police officer, and was accepted as a related case. The parties agreed to consolidate the new action, Vazquez v. City of New York, 03 Civ. 8326, with the earlier-filed one and that the motion to dismiss encompass both lawsuits, with certain minor adjustments. By Order dated December 31, 2003, these two cases were consolidated.

2    In their Amended Complaint, plaintiffs also asserted claims under the Americans With Disabilities Act for the NYPD's failure to enforce no-smoking laws. These claims were dismissed without leave to replead.

[*3] **B. Facts and Allegations in the Second Amended Complaint**

The amended pleading enumerates eight causes of action, the first five of which pertain to several distinct allegations of race-based and national-origin-based discrimination in violation of Title VII of the Civil Rights Act of 1964, codified at 42 U.S.C. § 2000e; the Thirteenth and Fourteenth Amendments, via 42 U.S.C. § 1983; 42 U.S.C § 1981; Article V of the N.Y. Constitution; and N.Y. Civil Service Law § 50. Plaintiffs allege the disparate treatment of and disparate impact on black and Hispanic officers with respect to 1) the NYPD's hiring and assignment practices, 2) the creation of adverse working conditions, and 3) promotions. Plaintiffs' sixth cause of action pertains to violations of New York's "whistleblower" statute for retaliation against the plaintiffs for complaints about the NYPD's disregard for the safety of undercover officers. [3] Their seventh cause of action is for violation of the Equal Protection Clause of the Fourteenth Amendment. [4] Their eighth cause of action is for breach of the implied covenant [*4] of good faith and fair dealing in the plaintiffs' employment contract for failing to adequately protect and promote these undercover officers. Plaintiffs seek injunctions that would require the NYPD 1) to follow all regulations with respect to the safety and protection of undercover police officers and 2) to change its practices and policies for recruiting, hiring, and assigning undercover officers. Plaintiffs also seek $ 10 million in damages for "breach of Plaintiffs' employment contract, disregard for Plaintiffs' safety and welfare, and the intentional infliction of emotional distress" and $ 10 million in punitive damages for "the knowing and intentional disregard for Plaintiffs' safety and welfare, and for the intentional infliction of emotional distress."

3    Vazquez does not assert this cause of action.

4    It is not clear how this seventh cause of action differs from the first five causes of action, each of which invokes the Fourteenth Amendment, among other laws.

Detective Richard Tamayo is [*5] Hispanic and has been employed with the NYPD for 12 years and has been a detective for approximately 3 years. [5] See 2d Am. Compl. P 7. From August 1999 to January 2002, Tamayo was assigned to Brooklyn North Narcotics in an undercover capacity. See 2d Am. Compl. P 11. Detective John Banks is black and has been employed with the NYPD for 9 years and has been a detective for 5 years. See 2d Am. Compl. P 8. Detective Banks was assigned to Brooklyn North Narcotics in May 1995. See 2d Am. Compl. P 12. Detective Richard Vazquez has been employed as a police officer for NYPD for 10 years. He was assigned as an undercover officer in March 1998 and served as a detective approximately four years before he initiated this lawsuit.

5    The Second Amended Complaint, which was filed in July 2003, and the First Amended Complaint, which was filed in November 2002, both allege that Tamayo has been a detective for approximately 2 years. Thus, it appears the new pleading has not been updated to reflect the different lengths of time.

[*6] Plaintiffs first allege that the NYPD knowingly and intentionally makes race-based decisions when

it recruits and assigns members of the police force to these undercover assignments. See 2d Am. Compl. P 14. Plaintiffs allege that the NYPD has an intentional policy and practice to hire and assign black and Hispanic officers to undercover positions with the result that 95% of undercover assignments are given to black and Hispanic officers. See 2d Am. Compl. P 15. As a result of this practice, minority officers are exposed to the greater dangers that are inherent in undercover work.

Second, plaintiffs claim that the NYPD violated its promotion policy with respect to minority officers - that is, despite the NYPD's policy that undercover officers become eligible for promotion to detective after 18 months, [6] the plaintiffs performed duties as undercover officers for longer than 18 months before they were considered eligible for promotion. See 2d Am. Compl. PP 38-40. In addition, they allege that one unnamed undercover officer testified at the 50-H hearing that the NYPD "employs a discriminatory policy and practice, as voiced by managing officers of undercover operations, of [*7] keeping the undercovers in their 'proper place' i.e. on the street where they can 'be with their own kind' and buy drugs from 'their own people.'" See 2d Am. Compl. P 17.

> [6] In the Second Amended Complaint, plaintiffs repeatedly state that 36 months is the length of time within which undercover officers become eligible for a promotion to detective. However, defendant concedes that the proper length is 18 months.

Third, plaintiffs allege that the NYPD intentionally exposed and continues to expose undercover officers to even greater danger by "intentionally, regularly, [and] continually ... violating safety standards and procedures" [7] that are critical for the protection of undercover officers against the increased risks inherent in these positions, and that this is done with the knowledge that 95% of undercover officers are black or Hispanic. See 2d Am. Compl. P 41; see also id. 13. Banks claims that the sergeant in command knowingly and intentionally violated NYPD regulations designed to protect [*8] officers' safety (sadly, no citations are provided) -- such as utilization of an inadequate number of personnel per assignment, inadequate checks on equipment, and use of inadequate equipment - in approximately half of the 300 undercover operations in which he was involved. See 2d Am. Compl. PP 19, 22. Similarly, Tamayo and Vazquez each claim he was involved in approximately 50 operations in which the sergeant in command knowingly and intentionally violated these regulations. See 2d Am. Compl. P 18. Between January 2000 and January 2002, Tamayo and Banks complained to their superiors on multiple occasions about these failures to comply with proper safety procedures. See 2d Am. Compl PP 24-25.

Thereafter, Tamayo was subject to ethnic slurs, his personal items were vandalized, his Latino Officers Association ("LOA") signs torn down, and he was transferred to other teams. See 2d Am. Compl. P 26. Banks was threatened by his superiors and there were attempts to transfer him without cause or justification. See 2d Am. Compl. P 27.

> [7] Specifically, plaintiffs complain that the NYPD, for example, uses malfunctioning KELs equipment, insufficient backup, using vehicles that are clearly identifiable as police cars. See 2d Am. Compl. P 41.

[*9] **II. DISCUSSION**

Defendant moves to dismiss the Second Amended Complaint on the basis that the claims are time barred and that plaintiffs' federal causes of action fail to state claims. Defendant also contends that plaintiffs' pendant state-law claims - under New York's whistleblower statute and for breach of the implied covenant of good faith and fair dealing - should be dismissed.

**A. Time Bar**

**1. The Title VII Claims in the First Five Causes of Action**

[HN1]A Title VII claim requires a claimant to file a complaint with the Equal Employment Opportunity Commission ("EEOC") or a state equivalent - in this case, the New York State Division of Human Rights ("SDHR") - within 300 days of the complained-of acts. See 42 U.S.C. § 2000e-5; [8] Butts v. New York Dep't of Hous. Preservation & Dev., 990 F.2d 1397, 1401 (2d Cir. 1993). Moreover, a district court lacks jurisdiction to hear a claim under Title VII that is not included in or "reasonably related" the EEOC charge. See Butts, 990 F.2d at 1401; see also Bailey v. Colgate-Palmolive Co., 2003 U.S. Dist. LEXIS 8175, No. 99 Civ. 3228 (CBM), 2003 WL 21108325, at *12 (S.D.N.Y. May 14, 2003). [*10] Defendant contends - and I agree - that all of plaintiffs' claims under Title VII are for one reason or another procedurally barred.

> [8] Section 2000e-5 provides in relevant part that "in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency [such as the New York SDHR] ..., such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred ...."

Tamayo filed a charge with the SDHR on January 8, 2002 (SDHR charge number 1A-E-D-02-2308053-D and EEOC charge number 16GA200269). This charge pertained entirely to his alleged disability ("respiratory allergies") and the NYPD's failure to provide a smoke-free work environment and makes no reference at all to racial discrimination. A right-to-sue letter issued to Tamayo for this charge on July 18, 2002 stated that he had "the right to institute a civil action under Title [*11]  I of the Americans with Disabilities Act of 1990." Tamayo filed a second charge with the SDHR on April 2, 2002 (SDHR charge number 1A-E-OR-02-2308195-E). In this second charge, which pertained to Title VII and alleged discrimination based on race, color and for filing a previous charge with the SDHR, Tamayo charged that after he complained about violations of no-smoking policies, unknown employees of the NYPD from January to August 2001 defaced and removed signs on his locker and billboards for the LOA, of which he is a member. [9] Also, Tamayo claimed that on December 27, 2001 a Caucasian sergeant placed him in danger by providing him inoperable KEL equipment and representing that it was operable when in fact it had not been properly tested. Tamayo claimed that this sergeant deliberately placed him in this danger, and did so because Tamayo was not Caucasian. [10] Although this charge indicated that this action was brought under Title VII, plaintiffs have not provided a right-to-sue letter for this charge. [11] Third, on April 22, 2002, Banks prepared a handwritten Charge of Discrimination for the SDHR, which was assigned charge number 160-A2-01482. Although Banks indicates on the form [*12]  that the discrimination was based on "race" - and also "retaliation" and "other" - the narrative pertains solely to a meeting he had with a superior officer on January 2, 2002 with respect to his complaints about the department's failure to enforce the no-smoking laws. [12] A right-to-sue letter was issued on July 12, 2002 to Banks for this charge. Fourth, Vazquez filed a charge with the EEOC (charge number 160-A3-01290) on March 31, 2003 in which he claimed that the NYPD discriminated on the basis of national origin with respect to hiring undercover officers and failure to provide adequate safety. [13] However, Vazquez indicated two dates on which he was discriminated against, the later of which was June 1, 2002, [14] which is 303 days before he filed the charge. The EEOC issued a right-to-sue letter on July 21, 2002 in which it dismissed Vazquez's charge as untimely.

9  This filing was not attached to plaintiffs' complaint but instead was attached to their opposition to this motion to dismiss.

10  Tamayo stated that he believed that this superior officer "acted in the manner explained [above] because I am not Caucasian. If I was

Caucasian, respondent's [sic] would be more concerned with my personal safety."

[*13]

11  Plaintiffs did not attach these right-to-sue letters to the Second Amended Complaint nor to their opposition to defendant's motion. However, attached to plaintiffs' opposition to the first motion to dismiss are two other dismissal-and-notice-of-rights notices from the EEOC to Tamayo, both of which are dated September 24, 2002. One relates to charge number 16GA200269 - the ADA claim filed on January 8 -- and the other to 16GA200371, a charge number that does not appear to correlate to any of the charges presented to the Court.

12  Tamayo and Banks also filed notices of claim with the New York City Comptroller. These filings were attached to both their Second Amended Complaint and to their memorandum in opposition to this motion to dismiss. Tamayo's notice of claim, which he filed on March 26, 2002, pertained primarily to the NYPD's failure to provide a safe, smoke-free environment, but also mentioned that he was discriminated against because of national origin and that he sought redress for unspecified "derogatory ethnic actions." He claimed that "his security as an undercover officer was compromised; his safety was threatened by his superiors; his work area and his personal items were vandalized; he was subjected to ethnic slurs; his Latino Officers Association sign was repeatedly torn down from his locker; [and] he was treated in a discriminatory manner" - however, he asserted that these actions were based on his attempt to enforce the no-smoking laws. Banks' claim to the NYC Comptroller is similar except that he asserted that he was discriminated against based on race and national origin and alluded to unspecified "derogatory racial actions."

[*14]

13  Vazquez stated in his charge with the SDHR:

As a part of my duties as an undercover officer, I was instructed to enter into transactions to buy illicit drugs, guns and other contraband on the street from dealers, many of whom sold their illicit merchandise in predominantly black or Hispanic neighborhoods. I believe that I was hired for the undercover assignment because of my national origin. I believe that most of NYPD undercover offi-

cers are assigned as undercover officers because of their race or national origin. I believe that the overwhelming majority of NYPD undercover officers are black or of Hispanic origin.

During my assignment as an undercover officer, my employer, NYPD knowingly failed to provide me with adequate protection for my health and safety. As an undercover officer, the NYPD knowingly put me into dangerous situations because of my national origin and without adequate safety equipment and without following their own safety regulations.

During my assignment as an undercover officer, the NYPD knowingly exposed me to greater danger to my health and safety because of my national origin, causing added stress and anxiety. On Tuesday April 2, 2002, I was seriously injured while performing my duties as an undercover officer as a result of the NYPD's knowing failure to provide me with adequate safety protection. Specifically, my superior on April 2, 2002, Lieutenant William F. Dement, admitted that he failed to provide adequate safety. My superior, Lieutenant William F. Dement, would often use racial and ethnic epithets when describing individual undercover officers.

[*15]

14  The narrative in the charge refers to April 2, 2002, which of course is even farther beyond the 300-day period.

Thus, the first of Tamayo's charges with the SDHR has nothing to do with the claims presented in this Second Amended Complaint. Although Tamayo's second claim does refer to racial discrimination and Title VII, it does not appear that he ever received a right-to-sue letter with regard to this charge. Third, Banks' charge does claim race-based discrimination but provides no specifics. [15] Fourth, Vazquez's claims under Title VII are time-barred. Accordingly, the plaintiffs' claims for discrimination under Title VII must be dismissed.

15  There are three situations where "claims not alleged in an EEOC charge are sufficiently related to the allegations in the charge that it would be unfair to civil rights plaintiffs to bar such claims in a civil action." Butts, 990 F.2d at 1402. Here plaintiff invokes the first of these situations, namely "an allowance for loose pleadings," whereby a claim not raised in the administrative filing can still be raised "where the conduct complained of would fall within the 'scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.'"Id. (quoting Smith v. American President Lines, Ltd., 571 F.2d 102, 107 n.10 (2d Cir.1978)). The allowance-for-loose-pleadings situation is animated by the rationale that charges filed with the EEOC or SDHR will oftentimes be prepared without the benefit of counsel. See Butts, 990 F.2d at 1402. However, plaintiffs' reliance on the allowance for loose pleadings is dubious. Although none of their filings with the SDHR bear any indication that they were assisted by counsel, in filings of notices of claim with the New York City Comptroller, they were represented by counsel, the same attorneys who represent them in this matter. Even under the allowance for loose pleadings, the charge brought by Banks for which he received a right-to-sue letter does not sufficiently relate to discrimination in hiring, promotion, assignment, or safety.

[*16]  2. Section 1983and 1981 Claims

[HN2]For claims under sections 1981and 1983, the statute of limitations is three years. See King v. Am. Airlines, Inc., 284 F.3d 352, 356 (2d Cir. 2002) (with respect to § 1981); Pearl v. City of Long Beach, 296 F.3d 76, 79 (2d Cir. 2002) (with respect to § 1983); Owens v. Okure, 488 U.S. 235, 249-50, 102 L. Ed. 2d 594, 109 S. Ct. 573 (1988). Banks' and Tamayo's claims under § 1981 and § 1983 are time-barred to the extent that they are based on action that occurred before October 9, 1999, while Vazquez's claims are time-barred to the extent they are based on conduct that occurred before October 22, 2000. Tamayo became an undercover officer in September 1999, which is more than three years from the commencement of this lawsuit, and thus his claim for discrimination with respect to hiring is untimely. On the other hand, because he became an undercover officer in September 1999, he was eligible for promotion to detective in March 2001 and if the City failed to promote him, such conduct occurred well within the three-year limitations period. Banks was promoted to detective approximately five years ago, and thus any [*17] claims against the NYPD for not following procedure to promote him are necessarily well beyond the three-year statute of limi-

tations. Moreover, since he became a detective approximately five years ago, he was assigned as an undercover approximately seven years ago. Like Banks, Vazquez was both assigned as an undercover officer and promoted to detective more than three years before he instituted his lawsuit, and accordingly his claims with respect to discriminatory hiring and failure to promote are time-barred. [16]

> 16    Plaintiffs' argument in response to defendant's time-bar defense relates almost entirely to Title VII. However, although plaintiffs do not expressly contend that the complained-of conduct is within the three-year limitations period for §§ 1981 and 1983 claims, they argue that these are "continuing violations." The Supreme Court recently held that the continuing-violations doctrine is inapplicable where the discrimination alleged consists of discrete acts, "such as termination, failure to promote, denial of transfer, or refusal to hire [which] are easy to identify." AMTRAK v. Morgan, 536 U.S. 101, 113, 114, 153 L. Ed. 2d 106, 122 S. Ct. 2061 (2002). The Court stated that "each discrete discriminatory act starts a new clock for filing charges alleging that act." Id. (The Court rejected the Ninth Circuit's formulation of the doctrine, under which "a plaintiff may sue on claims that would ordinarily be time barred so long as they either are 'sufficiently related' to incidents that fall within the statutory period or are part of a systematic policy or practice of discrimination that took place, at least in part, within the limitations period." Id. at 105.) Thus, the continuing-violations doctrine does not help to revive plaintiffs' untimely claims with respect to discriminatory hiring and promotion.

## [*18] B. Failure to State a Claim

To recap, plaintiffs claim that these allegations give rise to six theories of discrimination: 1) *disparate treatment* of black and Hispanic officers with respect to i) the NYPD's hiring and assignment practices; ii) the creation of adverse working conditions, and iii) promotions; and 2) *disparate impact* on black and Hispanic officers with respect to i) the NYPD's hiring and assignment practices, ii) the creation of adverse working conditions, and iii) promotions. Plaintiffs invoke Title VII, § 1981, and § 1983 for each of these six theories. Having concluded that plaintiffs' claims under Title VII must be dismissed, their claims under a disparate-impact theory must be dismissed, as disparate impact is actionable only under Title VII, while claims under §§ 1981 or 1983 require discriminatory animus.

1. Standard of Review

[HN3]The Federal Rules of Civil Procedure require that a plaintiff's complaint provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "Such a statement must simply 'give the defendant fair notice of what the plaintiff's [*19] claim is and the grounds upon which it rests.'" Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512, 152 L. Ed. 2d 1, 122 S. Ct. 992 (2002) (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)). [HN4]On a motion to dismiss for failure to state a claim, the court accepts as true all factual allegations in the complaint. See, e.g., Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 164, 122 L. Ed. 2d 517, 113 S. Ct. 1160 (1993). Further, [HN5]the court should construe the complaint liberally and draw inferences from the plaintiff's allegations in the light most favorable to the plaintiff. See Desiderio v. National Ass'n of Sec. Dealers, Inc., 191 F.3d 198, 202 (2d Cir. 1999). "'This simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims.'" In re Initial Pub. Offering Sec. Litig., 241 F. Supp. 2d 281, 322-23 (S.D.N.Y. 2003) (quoting Swierkiewicz, 534 U.S. at 513). [HN6]Dismissal is appropriate only when "it appears beyond doubt that the plaintiff can prove no set of facts [*20] in support of his claim which would entitle him to relief," Phillip v. Univ. of Rochester, 316 F.3d 291 (2d Cir. 2003) (quoting Conley, 355 U.S. at 45-46), or where the complaint fails as a matter of law. See Phelps v. Kapnolas, 308 F.3d 180, 187 (2d Cir. 2002).

Plaintiffs' claims in the Amended Complaint with respect to race-based and national-origin-based discrimination were dismissed as deficient because they did not allege any discriminatory animus or motivation for the NYPD's failure to adequately protect undercover officers and to promote undercover officers within 18 months. See, e.g., Hayden v. County of Nassau, 180 F.3d 42, 48 (2d Cir. 1999) [HN7]("To state a claim for an equal protection violation, appellants must allege that a government actor intentionally discriminated against them on the basis of race, national origin or gender."). With respect to their allegations about the failure to timely promote minority officers, the Amended Complaint failed to allege that these actions were on account of their race and national origin nor that the NYPD's failure to follow its policies with respect to undercover officers' [*21] promotions because they are predominantly minorities, nor that non-minority undercover officers were considered for promotion after 18 months of service, as per the NYPD's policy. Defendant contends that plaintiffs have failed to cure the deficiencies in their previous pleading, specifically the insufficiency of allegations about discriminatory intent.

Although plaintiffs have put relatively little meat to the bone, I nevertheless conclude that their allegations with respect to defendant's failure to adequately protect undercover officers meet the low pleading standard of Rule 8 and provide defendant fair notice of the grounds for the claims. Cf. In re Initial Pub. Offering Sec. Litig., 241 F. Supp. 2d at 322 ("Under the Federal Rules it is remarkably easy for a plaintiff to plead a claim."). The revised pleading emphasizes that the overwhelming majority of undercover assignments are given to black and Hispanic officers, a fact plaintiffs allege which defendant knew even as it failed and fails to adequately protect these officers. The fact that the superiors who failed to follow proper safety procedures in many situations knew that 95% of undercover officers are black [*22] and Hispanic does not, in and of itself mean that this failure was motivated by discriminatory animus. Plaintiffs themselves do not expressly allege this causation. However, in other documents attached or referenced by the complaint, the plaintiffs make this connection expressly. In particular, Vazquez clearly articulated the existence of discriminatory intent in the charge filed with the SDHR:

> During my assignment as an undercover officer, my employer, NYPD knowingly failed to provide me with adequate protection for my health and safety. As an undercover officer, *the NYPD knowingly put me into dangerous situations because of my national origin and without adequate safety equipment* and without following their own safety regulations.

> During my assignment as an undercover officer, *the NYPD knowingly exposed me to greater danger to my health and safety because of my national origin,* causing added stress and anxiety. [emphasis added]

In his charge filed with the SDHR on April 2, 2002, Tamayo made a similar allegation. He stated that he believed that a superior officer deliberately placed him in this danger by providing him inoperable KEL equipment and representing [*23] that it was operable "because I am not Caucasian." He opined, "If I was Caucasian, respondent's [sic] would be more concerned with my personal safety." In sum, plaintiffs have alleged that the NYPD's failure to adequately protect undercover officers was intentional and on account of race and national origin.

With respect to plaintiffs' allegations about the city's failure to promote undercover officers to detective, plaintiffs have failed to adequately plead that defendant inten-

tionally discriminated against them on account of their race or national origin. Plaintiffs merely allege that Banks and Vazquez performed duties as undercover officers for more than 18 months before they were considered for promotion and that "many undercover officers completed their [18] month commitments and they City has refused to promote them." Although plaintiffs allege, as they do repeatedly throughout, that 95% of undercover officers are black or Hispanic, they do not allege that the failure to promote was based on race or national origin. For example, they do not allege that white undercover officers were promoted to detective any sooner or as required by the N.Y.C. Administrative Code.

Having [*24] concluded that each of these three plaintiffs' claims for discrimination with respect to the defendant's allegedly discriminatory practice of disproportionately hiring blacks and Hispanics as undercover officers is untimely, it is not necessary to determine whether their allegations are sufficient to survive defendant's 12(b)(6) motion to dismiss.

## C. Pendant State-Law Claims

Defendant contends that plaintiffs' personal-injury claims against it must be dismissed because plaintiffs failed to file a notice of claim within 90 days of the event that gives rise to the claim and failed to file the action within one year and 90 days of the event, as required by N.Y. General Municipal Law §§ 50-i and 50-e. Banks filed a notice of claim on March 26, 2002, and Tamayo filed a notice of claim on April 11, 2002. Plaintiffs contend that they have met the procedural requirements because they have alleged ongoing violations by the NYPD of their rights. The two notices of claim attached to the Second Amended Complaint are dated, and, accordingly, any claim that occurred before December 26, 2001 is barred.

### 1. New York Labor Law § 740

[*25] Defendant contends that plaintiffs improperly invoke N.Y. Labor Law § 740 with respect to their claim of retaliation for lodging complaints about the NYPD's failure to follow safety procedures. Defendant suggests that any claim for retaliation should be brought, if at all, under Civil Service Law § 75-b. [17] Plaintiffs do not respond to this argument.

17  N.Y. Civil Service Law § 75-b provides:

> [HN8]A public employer shall not dismiss or take other disciplinary or other adverse personnel action against a public employee regarding the employee's employment because the employee dis-

2004 U.S. Dist. LEXIS 911, *

closes to a governmental body information: (i) regarding a violation of a law, rule or regulation which violation creates and presents a substantial and specific danger to the public health or safety; or (ii) which the employee reasonably believes to be true and reasonably believes constitutes an improper governmental action.

[HN9]Section 740 of N.Y. Labor Law, the so-called whistle-blower [*26] statute, "creates a cause of action in favor of an employee against whom an employer has retaliated for disclosing to a supervisor or to a public body, a violation of law on the part of the employer, which 'creates and presents a substantial and specific danger to the public, health or safety.'" See Feinman v. Morgan Stanley Dean Witter, 193 Misc. 2d 496, 752 N.Y.S.2d 229, 231 (Sup. Ct. 2002) (citing N.Y. Labor Law § 740(2)(a)). However, "§ 740 does not apply to 'public employers'; public employers are covered, instead, by New York Civil Service Law § 75-b." Markovic v. New York City Sch. Constr. Auth., 2002 U.S. Dist. LEXIS 214, at *12 (S.D.N.Y. Jan. 8, 2002); see Hanley v. New York State Executive Dept., Div. for Youth, 182 A.D.2d 317, 589 N.Y.S.2d 366, 367-68 (App. Div. 1992). Because plaintiffs do not attempt to salvage this claim - nor did they make this change to their Second Amended Complaint even after defendant made this same argument on its earlier motion to dismiss

- their claim under N.Y. Labor Law § 740 for retaliation is dismissed.

2. Breach [*27] of Contract

Defendant seeks the dismissal of the breach-of-contract claim on the basis that Second Amended Complaint does not provide any hint about the contract to which the implied covenants apply. Plaintiffs, in response, contend that the contract from which spring the implied covenants of good faith and fair dealing is the contract that results from the fact that the City hired them. Plaintiffs cite no case where the employee relationship between a city and a municipal employee gives rise to a breach-of-contract claim. As defendant notes, the City is required to negotiate only with the unions that represent and collectively bargain on behalf of its member employees. Moreover, the relationship between police officers and the City are amply covered by the N.Y. Civil Service Law and N.Y.C. Administrative Code.

## III. CONCLUSION

For the foregoing reasons, defendant's motion is granted with respect to plaintiffs' claims under Title VII, plaintiffs' state-law claims, and claims with respect to hiring and promotion, and denied with respect to plaintiffs' failure-to-protect claim.

**IT IS SO ORDERED.**

**January 26, 2004**

Harold Baer, Jr.

**U.S.D.J.**

LEXSEE



Analysis
As of: Jan 04, 2008

**SIMPSON B. BAILEY, JR., Plaintiff, -v.- THE CITY OF NEW YORK, NYC
DEPARTMENT OF TRANSPORTATION and NYC DEPARTMENT OF
PERSONNEL, Defendants.**

**98 Civ. 1812 (LBS) (GWG)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK**

**2003 U.S. Dist. LEXIS 7254**

**May 2, 2003, Decided**

**PRIOR HISTORY:** Bailey v. New York City DOT,
1999 U.S. Dist. LEXIS 10404 (S.D.N.Y., July 8, 1999)

**DISPOSITION:** Magistrate recommended that plain-
tiff's motion for partial summary judgment be denied and
that defendants' motion for summary judgment dismiss-
ing case be granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff former city em-
ployee sued defendant former city employer alleging
violation of 42 U.S.C.S. §§ 1981 and 1983, as well as
state civil rights regarding the city employer's construc-
tion and administration of qualifying exams for open
positions. The parties cross-moved for summary judg-
ment, and the city employee requested additional discov-
ery. The motions were referred to a magistrate judge.

**OVERVIEW:** The magistrate initially held that the city
employee failed to meet the requirement that he be quali-
fied for one position because he was not qualified to take
the qualifying examination for that position, and that the
city employee was not qualified for the other position
because of his failure on the qualifying examination for
that position. The magistrate further held that the city
employee failed to provide evidence that the city em-
ployer's decision to change the qualifications for the
qualifying exam for the first position was based on bad
faith or intentional discrimination, that the city em-
ployee's evidence was insufficient for a reasonable jury

to find discriminatory intent in support of his equal pro-
tection claim, and that supplemental jurisdiction over the
city employee's state civil rights claims should be de-
clined. The magistrate finally held that the city employee
was not entitled to additional discovery because he had
ample opportunity to conduct discovery, and he failed to
demonstrate how additional discovery would permit him
to show the alleged intentional discrimination.

**OUTCOME:** The magistrate recommended granting the
city employer's motion for summary judgment and deny-
ing the city employee's motion for partial summary
judgment and request for additional discovery.

**CORE TERMS:** exam, discovery, summary judgment,
notice, qualification, citation omitted, reproduced, pro-
motion, disparate impact, prima facie case, discrimina-
tory, purposeful discrimination, unqualified, sur-reply,
partial, lawsuit, genuine, reply, racial discrimination,
intentional discrimination, disparate treatment, satisfac-
tory, civil service, discovery requests, equal protection,
property interest, bad faith, discriminated, supplemental,
undersigned

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Standards >
Genuine Disputes*
*Civil Procedure > Summary Judgment > Standards >
Materiality*

[HN1]Summary judgment may be granted only where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

*Civil Procedure > Summary Judgment > Evidence*
*Civil Procedure > Summary Judgment > Standards >*
*General Overview*
[HN2]On a motion for summary judgment, the court must construe all evidence in the light most favorable to the non-moving party and draw all inferences in the non-movant's favor. A fact is material if it might affect the outcome of the suit under the governing law. An issue of fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

*Civil Procedure > Summary Judgment > Burdens of*
*Production & Proof > General Overview*
*Civil Procedure > Summary Judgment > Standards >*
*Genuine Disputes*
[HN3]To survive a motion for summary judgment, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.

*Civil Procedure > Summary Judgment > Burdens of*
*Production & Proof > Scintilla Rule*
*Civil Procedure > Summary Judgment > Motions for*
*Summary Judgment > General Overview*
*Civil Procedure > Summary Judgment > Opposition >*
*General Overview*
[HN4]On a motion for summary judgment, conclusory allegations, conjecture, and speculation are insufficient to create a genuine issue of fact. Thus, statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment. In addition, the mere existence of a scintilla of evidence supporting the non-movant's case is also insufficient to defeat summary judgment.

*Civil Procedure > Summary Judgment > Burdens of*
*Production & Proof > Movants*
*Civil Procedure > Summary Judgment > Standards >*
*Genuine Disputes*
*Evidence > Procedural Considerations > Burdens of*
*Proof > Ultimate Burden of Persuasion*
[HN5]In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy its burden by pointing to an absence of evidence to support an essential element of the non-moving party's claim. Thus, a defendant moving for summary judgment must prevail if the plaintiff fails to

come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case.

*Constitutional Law > Equal Protection > Full & Equal*
*Benefit*
[HN6]See 42 U.S.C.S. § 1981(a).

*Civil Rights Law > Contractual Relations & Housing >*
*Equal Rights Under the Law (sec. 1981) > Proof of*
*Discrimination*
*Civil Rights Law > Contractual Relations & Housing >*
*Equal Rights Under the Law (sec. 1981) > Protected*
*Parties*
*Labor & Employment Law > Discrimination > Title VII*
*of the Civil Rights Act of 1964 > Amendments*
[HN7]Three elements are required to state a claim under 42 U.S.C.S. § 1981: (1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute. To succeed on a claim of discrimination under 42 U.S.C.S. § 1981, a plaintiff must prove "purposeful discrimination."

*Civil Rights Law > Section 1983 Actions > Scope*
[HN8]42 U.S.C.S. § 1983 imposes liability on persons who under the color of state law deprive a citizen of the rights, privileges, or immunities secured by the United States Constitution and laws. 42 U.S.C.S. § 1983. No substantive rights are created by 42 U.S.C.S. § 1983; instead 42 U.S.C.S. § 1983 provides a procedure for redress for the deprivation of rights established elsewhere.

*Civil Rights Law > Section 1983 Actions > Elements >*
*Color of State Law > General Overview*
*Civil Rights Law > Section 1983 Actions > Scope*
[HN9]To prevail on a 42 U.S.C.S. § 1983 claim a plaintiff must establish that (1) the defendants were acting under color of state law when they committed the complained of acts and (2) the conduct complained of deprived the plaintiff of a right secured by the Constitution and laws of the United States.

*Civil Rights Law > Contractual Relations & Housing >*
*Equal Rights Under the Law (sec. 1981) > Proof of*
*Discrimination*
*Civil Rights Law > Contractual Relations & Housing >*
*Equal Rights Under the Law (sec. 1981) > Protected*
*Parties*

*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview*
[HN10]When a plaintiff has brought a claim of racial discrimination regarding their employment under either 42 U.S.C.S. § 1981 or 42 U.S.C.S. § 1983, the court employs the same analysis as claims brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq.

*Evidence > Procedural Considerations > Burdens of Proof > Initial Burden of Persuasion*
*Labor & Employment Law > Discrimination > Disparate Treatment > Proof > Burden Shifting*
[HN11]Unless a plaintiff has adduced direct evidence of discrimination, the court examines a discrimination claim by utilizing the three-step burden shifting analysis established in McDonnell Douglas. Under the McDonnell Douglas analysis, the plaintiff bears the initial burden to establish a prima facie case of discrimination by showing that he (1) belongs to a protected class, (2) suffered an adverse employment action, (3) was performing his duties satisfactorily, and (4) the circumstances surrounding his adverse employment action give rise to an inference of discrimination.

*Labor & Employment Law > Discrimination > Disparate Treatment > Proof > Burden Shifting*
[HN12]For purposes of the McDonnell Douglas analysis, where the allegations involve a failure to promote, the plaintiff must show the following to make a prima facie case: 1) the plaintiff is a member of a protected class; 2) the plaintiff's job performance was satisfactory; 3) the plaintiff applied for and was denied promotion to a position for which the plaintiff was qualified; and 4) the position remained open and the employer continued to seek applicants.

*Evidence > Inferences & Presumptions > Rebuttal of Presumptions*
*Labor & Employment Law > Discrimination > Disparate Treatment > Proof > Burden Shifting*
[HN13]For purposes of the McDonnell Douglas analysis, the burden to establish a prima facie case of discrimination is "de minimis." If the plaintiff meets his initial burden, a rebuttable presumption of discrimination arises. A defendant may rebut this presumption by articulating a legitimate, nondiscriminatory reason for the challenged action. If the defendant meets this requirement, the burden shifts back to the plaintiff to show that this reason is false and the real motive behind the employment action was discrimination.

*Labor & Employment Law > Discrimination > Disparate Impact > Coverage & Definitions*
*Labor & Employment Law > Discrimination > Disparate Impact > Employment Practices > Selection Procedures > Neutral Factors*
*Labor & Employment Law > Discrimination > Disparate Treatment > Coverage & Definitions*
[HN14]Claims for disparate impact are analyzed differently than disparate treatment claims. These claims are concerned with whether employment policies or practices that are neutral on their face and were not intended to discriminate have nevertheless had a disparate impact on a protected group.

*Civil Rights Law > Contractual Relations & Housing > Equal Rights Under the Law (sec. 1981) > Proof of Discrimination*
*Labor & Employment Law > Discrimination > Disparate Impact > Statutory Application > Reconstruction Statutes (secs. 1981, 1983 & 1985)*
*Labor & Employment Law > Discrimination > Disparate Treatment > Statutory Application > Reconstruction Statutes (secs. 1981, 1983 & 1985)*
[HN15]Disparate impact claims are not available where a plaintiff's lawsuit is brought only under 42 U.S.C.S. §§ 1981 and 1983, both of which require proof of intentional discrimination, that is, disparate treatment.

*Civil Procedure > Summary Judgment > Opposition > Memoranda in Opposition*
*Civil Rights Law > Section 1983 Actions > Government Actions*
*Governments > Local Governments > Claims By & Against*
[HN16]Where a plaintiff's 42 U.S.C.S. §§ 1981 and 1983 claims are brought only against a city and its subdivisions, his claims are limited to acts implementing or executing a municipal policy or custom.

*Labor & Employment Law > Affirmative Action > General Overview*
*Labor & Employment Law > Discrimination > Racial Discrimination > Employment Practices > Demotions & Promotions*
*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview*
[HN17]On a failure to promote claim, absent a showing that the employer's demands were made in bad faith, an employer is not compelled to submit the reasonableness of its employment criteria to the assessment of either judge or jury.

*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview*
[HN18]A plaintiff's failure on an examination required for qualification for a promotion precludes him from establishing a prima facie case of discrimination.

*Labor & Employment Law > Discrimination > Disparate Impact > Coverage & Definitions*
*Labor & Employment Law > Discrimination > Disparate Treatment > Coverage & Definitions*
*Labor & Employment Law > Discrimination > Racial Discrimination > Proof > Burdens of Proof > Employee Burdens*
[HN19]In disparate impact cases, statistical evidence may establish a prima facie case of discriminatory effect. However in an individual disparate treatment action the particular employee must establish that he has been discriminated against because of his race and statistics standing alone do not create a prima facie case.

*Constitutional Law > Bill of Rights > Fundamental Rights > Procedural Due Process > Scope of Protection*
[HN20]In order to show a violation of procedural due process, a plaintiff would need to identify a property interest he held that was entitled to due process protection. However, an applicant for a promotion has no property interest in a competitive examination or fair consideration for a promotion. Although New York State law clearly requires a competitive examination, the law does not create a cognizable property interest in a competitive examination. Additionally, the availability of an Article 78 proceeding under New York law provides a plaintiff with an adequate post-deprivation remedy such that no procedural due process violation occurs, even if the plaintiff possesses a cognizable property interest.

*Constitutional Law > Equal Protection > Scope of Protection*
[HN21]Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.

*Labor & Employment Law > Discrimination > Disparate Impact > Employment Practices > Selection Procedures > General Overview*
[HN22]The "four-fifths" rule, relating to whether the selection rate for the complainant's group is less than 80% of the group with the highest selection rate, relates only to a showing of disparate impact.

*Civil Procedure > Jurisdiction > Jurisdictional Sources > General Overview*
*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview*
*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Supplemental Jurisdiction > General Overview*
[HN23]A district court should decline to exercise supplemental jurisdiction over state law claims when it has dismissed all claims over which it has original jurisdiction. In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well.

*Civil Procedure > Summary Judgment > Opposition > General Overview*
*Civil Procedure > Summary Judgment > Supporting Materials > General Overview*
[HN24]A party resisting summary judgment on the ground that it needs discovery in order to defeat the motion must submit an affidavit showing (1) what facts are sought to resist the motion and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts.

*Civil Procedure > Discovery > General Overview*
*Civil Procedure > Summary Judgment > Supporting Materials > General Overview*
[HN25]Fed. R. Civ. P. 56(f) applies to summary judgment motions made before discovery is concluded.

*Civil Procedure > Discovery > General Overview*
*Civil Procedure > Pretrial Matters > Continuances*
[HN26]A district court may refuse to allow additional discovery if it deems the request to be based on speculation as to what potentially could be discovered.

**COUNSEL:** [*1]  Simpson B Bailey Jr, PLAINTIFF, Pro se, Bronx, NY USA.

For NYC Department of Transportation, NYC Department of Personnel, DEFENDANTS: Hillary Weisman, Paul A Crotty, Corporation Counsel of City of NY, New York, NY USA.

**JUDGES:** GABRIEL W. GORENSTEIN, United States Magistrate Judge, Hon. Leonard B. Sand, United States District Judge.

2003 U.S. Dist. LEXIS 7254, *

**OPINION BY:** GABRIEL W. GORENSTEIN

**OPINION**

*REPORT AND RECOMMENDATION To the Honorable Leonard B. Sand United States District Judge*

GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE

*Pro se* plaintiff Simpson B. Bailey, Jr. has brought this action against the City of New York, the New York City Department of Transportation ("DOT"), and the New York City Department of Personnel (collectively "the City") alleging race discrimination. Bailey has moved for partial summary judgment on the issue of whether the City discriminated against him. The City has cross-moved for summary judgment dismissing the case. For the reasons stated below, Bailey's motion should be denied and the City's motion should be granted.

*I. BACKGROUND*

*A. Factual History*

Bailey was an employee of DOT beginning in 1984 and continuing through 1994, when he was terminated. [*2] *Bailey v. New York City Dep't of Transp.*, 1997 U.S. Dist. LEXIS 471, 1997 WL 26290, at *1 (S.D.N.Y. Jan. 22, 1997). In 1992, Bailey attempted to obtain a promotion to Administrative Director of Fleet Maintenance ("ADFM"). *See* Local Rule 56.1 Statement, dated July 15, 2002 ("Pl. 56.1 Statement"), PP 2, 7. At the time, there were two possible methods to obtain an ADFM position. One method was through examination number 1201 ("exam 1201"). To be eligible to take exam 1201, the City originally required an applicant to have either:

(1) A baccalaureate degree from an accredited college and five years of full-time satisfactory experience in the maintenance and repair of a fleet of motor vehicles, including 18 months in the management of the maintenance and repair of a fleet of at least 100 vehicles; or

(2) A high school diploma or its educational equivalent and nine years of full-time satisfactory experience as described in "1" above. College education may be substituted for the required experience on a year-for-year basis for up to four years. However, all candidates must have a high school diploma or its educational equivalent and 18 months of full-time satisfactory experience in [*3] the management

of the maintenance and repair of a fleet of at least 100 vehicles.

Notice of Examination, (undated) (reproduced in Pl. 56.1 Statement Ex. 1). Bailey applied for this examination and was qualified under subsection (2) of this Notice. *See* Pl. 56.1 Statement PP 7, 8; Defendants' Response to Plaintiff's Statement of Undisputed Facts, dated September 30, 2002 ("Def. 56.1 Resp."), PP 7, 8.

After Bailey had submitted his application and before the examination took place, however, the City issued an amended notice of examination for exam 1201, which changed the qualifications. The amended notice altered the last sentence of subsection (2) to require that candidates have "a high school diploma or its educational equivalent and 18 months of full-time satisfactory experience *in an administrative, managerial or executive capacity* as described in '1' above." Notice of Examination, Second Amended Notice, dated May 27, 1992 (reproduced in Pl. 56.1 Statement Ex. 2) (emphasis added). Because he lacked 18 months experience in an "administrative, managerial or executive capacity," Bailey was deemed ineligible for exam 1201 under the amended notice. Pl. 56.1 Statement [*4] P 9.

Bailey was eligible to apply for the ADFM position through a second method, however, examination number 1606 ("exam 1606"). Defendants' Statement of Undisputed Facts Pursuant to Local Rule 56.1, dated September 30, 2002 ("Def. 56.1 Statement"), P 1. Exam 1606 was an open promotional test available for all persons who held a supervisor of mechanics position (in contrast with exam 1201, which was open only to applicants who met the special qualification requirements discussed above). *See* Amended Complaint, filed November 1, 1999 (Docket # 26) ("Am. Compl."), P 8. While the qualifications for taking the two examinations were different, the actual test utilized for the two examinations was the same. *See* Letter to Simpson Bailey, Jr. from Carol Wachter, dated February 14, 1997 (reproduced in Declaration of William S.J. Fraenkel in Support of Defendants' Cross-Motion for Summary Judgment, dated September 30, 2002 ("Fraenkel Decl."), Ex. A); Plaintiff's Memorandum in Support of Plaintiff's Motion to Compel Special Discovery and Sur-Reply in Opposition to Defendants' Cross-Motion for Summary Judgment, dated March 11, 2003 ("Pl. Sur-Reply"), at 12.

Bailey took the test for exam [*5] 1606 in October 1992. *See* Am. Compl., P 8; Pl. Sur-Reply at 12. The exam consisted solely of essay questions. *See* Am. Compl. P 9(c). In order to pass exam 1606, an applicant needed to obtain a score of 70 or above. *See* Fraenkel Decl., P 5. Bailey was later informed that he had failed the 1606 exam because he received a score of 46.4 --

below passing. *See* Notice of Result, (undated) (reproduced in Fraenkel Decl., Ex. B).

After the exam, Bailey appealed his ineligibility for exam 1201. *See* Appeal of Manifest Error, dated September 21, 1994 ("Bailey Appeal") (reproduced in Fraenkel Decl., Ex. C). Bailey also complained about his results on exam 1606, claiming that the test had not been graded objectively. *See* Letter to Simpson Bailey, Jr. from Carol Wachter, dated February 14, 1995 (reproduced in Fraenkel Decl., Ex. A). Bailey's appeals and complaints were denied. *See id.*; Bailey Appeal at 1.

B. *Procedural History*

1. *Bailey's 1993 Lawsuit*

The instant case is the second lawsuit filed by Bailey raising claims of employment discrimination against the City. Bailey filed a complaint in February 1993 claiming the City had violated Titles VI and [*6] VII of the Civil Rights Act of 1964, <u>42 U.S.C. §§ 2000d to 2000d-7, 2000e to 2000e-17</u>, as well as <u>42 U.S.C. §§ 1981, 1982, 1983, 1985, 1986, 1988</u> and New York State law. *See Bailey v. New York City Dep't of Transp.*, 1997 U.S. Dist. LEXIS 471, 93 Civ. 1121 (LBS) ("*Bailey I*"). The complaint in *Bailey I* alleged that Bailey was subjected to racial discrimination because of job transfers, denials of promotions, discharge, failure to rehire, and the civil service examinations that are the subject of this lawsuit. *See Bailey*, 1997 U.S. Dist. LEXIS 471, 1997 WL 26290, at *2. Bailey voluntarily withdrew his claims under Title VI and his claim for attorney's fees under <u>42 U.S.C. § 1988</u>. *See* 1997 U.S. Dist. LEXIS 471, [WL] at *2 n.1. On January 22, 1997, following the defendants' motion for summary judgment, the Court (by District Judge Leonard B. Sand) dismissed Bailey's claims under <u>42 U.S.C. §§ 1981and 1983</u> for failure to plead the existence of a policy or custom. *See* 1997 U.S. Dist. LEXIS 471, [WL] at *2-*3. The Court also dismissed the <u>section 1982</u> claim because the statute does not create a cause of action for employment discrimination and the <u>section 1985and 1986</u> [*7] claims for failing to properly plead the existence of a conspiracy. *See* 1997 U.S. Dist. LEXIS 471, [WL] at *3-*4. The Court granted summary judgment dismissing Bailey's Title VII claim regarding the failure to re-hire. *See* 1997 U.S. Dist. LEXIS 471, [WL] at *7. Finally, the Court dismissed Bailey's Title VII claim regarding the 1992 civil service examination for failure to exhaust his administrative remedies with the Equal Employment Opportunity Commission ("EEOC"). *See* 1997 U.S. Dist. LEXIS 471, [WL] at *5. However, the Court did not dismiss Bailey's state law claims and most of his Title VII claims regarding various types of

discriminatory conduct. *See* 1997 U.S. Dist. LEXIS 471, [WL] at *4-*5.

The case proceeded to trial and a jury rendered a verdict for the City. After trial, the Court denied Bailey's motions for a directed verdict, judgment as a matter of law or for a new trial. *See Bailey v. New York City Dep't of Transp.*, 1998, U.S. Dist. LEXIS 12578, 1998 WL 472010, at *1 (S.D.N.Y. Aug. 3, 1998). The Court also denied Bailey's challenge to the racial composition of the jury. *See id.* On April 19, 1999, the Second Circuit affirmed in an unpublished opinion. *See* <u>*Bailey v. New York City Dep't. of Transp.*, 173 F.3d 843</u> (table) (2d Cir. 1999).

2. *The Instant* [*8] *Lawsuit*

In October 1997, prior to the start of his first trial, Bailey filed a claim with the EEOC regarding the 1992 Civil Service examinations at issue in this case. *See Bailey v. New York City Dep't. of Transp.*, 1999 U.S. Dist. LEXIS 10404, 1999 WL 493406, at *2 (S.D.N.Y. July 9, 1999). The EEOC subsequently notified Bailey that it could not investigate his charges because they were not filed within the requisite 300-day time limit. *See* Dismissal and Notice of Rights, Charge No. 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, dated November 12, 1997 (reproduced in Complaint, filed March 12, 1998 ("Orig. Compl.") (Docket # 1)); Dismissal and Notice of Rights, Charge No. 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, dated November 12, 1997 (reproduced in Orig. Compl). In a telephone conference on November 5, 1997, Bailey informed the Court in *Bailey I* that he had received a right to sue letter from the EEOC regarding this charge and was apparently directed to file a new lawsuit regarding this claim. *See Bailey*, 1999 U.S. Dist. LEXIS 10404, 1999 WL 493406, at *2.

Bailey filed the instant lawsuit on March 12, 1998, alleging discrimination by the City regarding the ADFM examinations. *See* Orig. Compl. PP 7-13. Bailey claimed that he was discriminated against [*9] because he was terminated from his position in 1994, making him ineligible to be promoted under exam 1606, see *id.* P 8(a); he was deemed unqualified for exam 1201, *see id.* P 8(b); the test utilized for the examination was subjective and biased because it was an essay test, *see id.* P 8(c); and the defendants placed an unqualified white applicant in the ADFM position. *See id.* PP 8(d), 10. Bailey claimed that these actions violated his rights under the <u>Fourteenth Amendment of the Constitution</u> as well as his right under <u>42 U.S.C. § 1981</u> to make and enforce contracts. *Id.* P 11.

On July 9, 1999, the Court granted in part the City's motion for partial summary judgment and dismissed Bai-

ley's Title VII claim relating to the civil service exam because he failed to file his complaint with the EEOC within the 300-day time limit. *See Bailey*, 1999 U.S. Dist. LEXIS 10404, 1999 WL 493406, at *4-*6. In addition, the Court dismissed Bailey's claim for attorney's fees under 42 U.S.C. § 1988 because *pro se* litigants are not entitled to recoup such fees. *See* 1999 U.S. Dist. LEXIS 10404, [WL] at *6. Bailey's claims under 42 U.S.C. §§ 1981, 1983 [*10] and the New York State Civil Service Law were allowed to stand. *See* 1999 U.S. Dist. LEXIS 10404, [WL] at *6. The Court granted leave to file an amended complaint and directed the parties to complete discovery by November 26, 1999. *See* 1999 U.S. Dist. LEXIS 10404, [WL] at *7.

Bailey filed an amended complaint on November 1, 1999. *See* Am. Compl. The amended complaint alleges the City violated 42 U.S.C. §§ 1981, 1983, as well as New York state laws, through discriminatory practices in the construction and administration of exam 1201 and exam 1606. *See id.* PP 8, 12. Bailey alleges that these practices led to the hiring of white persons for positions to the exclusion of African-American applicants. *Id.* PP 9(a)-(d), 11, 12. He alleges that he was wrongfully deemed unqualified for a promotion, *see id.* PP 9(a), (b); that the test itself was intentionally subjective with the purpose of excluding African-American applicants, *id.* P 9(c); and that through these policies the City hired an unqualified white person (Herb Graetz) for the position he was seeking. *Id.* P 9(d). Bailey seeks monetary damages and injunctive relief. *See id.* at 5. The City answered the complaint on November 22, 1999. [*11] *See* Answer, filed November 22, 1999 (Docket # 27).

On January 27, 2000, a law clerk to Judge Sand wrote Bailey reminding him of the November 26, 1999 deadline for discovery and directed Bailey either to inform the Court whether discovery had taken place or to request an extension. *See* Letter to Simpson Bailey Jr., from Daniel Stein, dated January 27, 2000. At some point thereafter, Bailey wrote to Judge Sand asking that the case be put on the suspense calendar. By memorandum endorsement, Judge Sand denied the request and ordered Bailey to proceed with discovery. *See* Memorandum Endorsement, filed July 27, 2000 (Docket # 29). On September 27, 2000, Judge Sand noted that no discovery had taken place and warned Bailey that he would dismiss the case for failure to prosecute unless Bailey could offer an explanation for the lack of discovery. *See* Order, filed September 27, 2000 (Docket # 30). Following receipt of the parties' responses to this Order, Judge Sand determined that the suit would not be dismissed. *See* Order, filed November 22, 2000 (Docket # 31). He directed the defendants to respond to the Bailey's discovery requests by December 18, 2000, and directed the [*12] parties to notify the Court by February 1, 2000 when they would be ready for trial. *Id.*

Thereafter, the matter was referred to the undersigned to resolve any outstanding discovery motions. *See* Order, dated April 6, 2001 (Docket # 34). The undersigned thereupon directed the parties to inform the Court what discovery motions remained to be resolved. *See* Order, filed April 12, 2001 (Docket # 35). At a conference held in July 2001, the Court dealt principally with Bailey's motion to compel the City to respond to his written discovery demands. After a number of efforts to obtain responses from the City, the attorney for which (no longer assigned to this case) was consistently recalcitrant in responding to Bailey's requests, the Court issued an order informing the parties that all discovery would end as of February 25, 2002. *See* Order, filed February 15, 2002 (Docket # 48). Ultimately, the Court issued an order concluding that the City had complied with the remaining discovery requests in the case. *See* Order, filed September 6, 2002 (Docket # 56).

The parties filed their respective summary judgment motions thereafter and the motions were referred to the undersigned [*13] for a Report and Recommendation.

## II. *STANDARD OF REVIEW*

### A. *Summary Judgment Standard*

[HN1]Summary judgment may be granted only where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). [HN2]The Court must construe all evidence in the light most favorable to the non-moving party and draw all inferences in the movant's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986); *Niagara Mohawk Power Corp. v. Jones Chemical Inc.*, 315 F.3d 171, 175 (2d Cir. 2003). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. "An issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) (quoting *Anderson*, 477 U.S. at 248).

[HN3]To survive a motion for summary judgment, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986) [*14] (emphasis omitted) (quoting Fed. R. Civ. P. 56(e)); *see also Mandell v. County of Suffolk*, 316 F.3d 368, 377 (2d Cir. 2003) ("To overcome such a motion, the non-moving party must offer sufficient proof to allow a reasonable factfinder to decide in its favor.").

[HN4]"Conclusory allegations, conjecture, and specula-
tion . . . are insufficient to create a genuine issue of fact."
*Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998)*
(citation omitted). Thus, "statements that are devoid of
any specifics, but replete with conclusions, are insuffi-
cient to defeat a properly supported motion for summary
judgment." *Bickerstaff v. Vassar Coll., 196 F.3d 435, 452
(2d Cir. 1999) (citations omitted), cert denied, 530 U.S.
1242, 147 L. Ed. 2d 960, 120 S. Ct. 2688 (2000).* In addi-
tion, "the 'mere existence of a scintilla of evidence' sup-
porting the non-movant's case is also insufficient to de-
feat summary judgment." *Niagara Mohawk, 315 F.3d at
175* (quoting *Anderson, 477 U.S. at 252).*

[HN5]"In moving for summary judgment against a
party who will bear the ultimate burden of proof at trial,
the movant may satisfy [*15] [its] burden by pointing to
an absence of evidence to support an essential element of
the nonmoving party's claim." *Vann v. City of New York,
72 F.3d 1040, 1048 (2d Cir. 1995)* (citing *Celotex Corp.
v. Catrett, 477 U.S. 317, 322-23, 91 L. Ed. 2d 265, 106
S. Ct. 2548 (1986)).* Thus, "[a] defendant moving for
summary judgment must prevail if the plaintiff fails to
come forward with enough evidence to create a genuine
factual issue to be tried with respect to an element essen-
tial to its case." *Allen v. Cuomo, 100 F.3d 253, 258 (2d
Cir. 1996)* (citing *Anderson, 477 U.S. at 247-48); see
also Chase Manhattan Bank, N.A. v. Am. Nat'l Bank and
Trust Co. of Chicago, 93 F.3d 1064, 1072 (2d Cir. 1996)*
("A defendant moving for summary judgment must pre-
vail if the plaintiff fails to establish an essential element
of its case.") (citation omitted).

B. *Law Governing Bailey's Claims*

Bailey's claims are brought under *42 U.S.C. §§
1981 and 1983. Section 1981* provides in relevant part:

> [HN6]All persons within the jurisdiction
> of the United States shall have the same
> right in every State [*16] and Territory to
> make and enforce contracts, to sue, be
> parties, give evidence, and to the full and
> equal benefit of all laws and proceedings
> for the security of persons and property as
> is enjoyed by white citizens . . .

*42 U.S.C. § 1981(a).* [HN7]Three elements are required
to state a claim under *section 1981:* "(1) the plaintiff is a
member of a racial minority; (2) an intent to discriminate
on the basis of race by the defendant; and (3) the dis-
crimination concerned one or more of the activities enu-
merated in the statute." *Mian v. Donaldson, Lufkin &
Jenrette Sec. Corp., 7 F.3d 1085, 1087 (2d Cir. 1993),
cert. denied, 516 U.S. 824 (1995).* To succeed on a claim

of discrimination under *section 1981,* a plaintiff must
prove "purposeful discrimination." *General Bldg. Con-
tractors Ass'n v. Pennsylvania, 458 U.S. 375, 391, 73 L.
Ed. 2d 835, 102 S. Ct. 3141 (1982); accord Brown v.
City of Oneonta, 221 F.3d 329, 339 (2d Cir. 2000)*
("*Section 1981* . . . only prohibits intentional racial dis-
crimination.") (citations omitted), *cert. denied, 534 U.S.
816, 151 L. Ed. 2d 16, 122 S. Ct. 44 (2001). [*17]*

*Section 1983* [HN8]imposes liability on persons
who under the color of state law deprive a citizen of the
"rights, privileges, or immunities secured by the Consti-
tution and laws." *42 U.S.C. § 1983.* No substantive rights
are created by *section 1983;* instead the statute provides a
"procedure for redress for the deprivation of rights estab-
lished elsewhere." *Thomas v. Roach, 165 F.3d 137, 142
(2d Cir. 1999)* (citations omitted). [HN9]To prevail on a
*section 1983* claim a plaintiff must establish that (1) the
defendants were acting under color of state law when
they committed the complained of acts and (2) the con-
duct complained of deprived the plaintiff of "a right se-
cured by the Constitution and laws of the United States."
*West v. Atkins, 487 U.S. 42, 48, 101 L. Ed. 2d 40, 108 S.
Ct. 2250 (1988); Flagg Bros., Inc. v. Brooks, 436 U.S.
149, 155, 56 L. Ed. 2d 185, 98 S. Ct. 1729 (1978).*

[HN10]When a plaintiff has brought a claim of ra-
cial discrimination regarding their employment under
either *section 1981 or 1983,* the Court employs the same
analysis as claims brought under Title VII. See
*Choudhury v. Polytechnic Inst. of New York, 735 F.2d
38, 44 (2d Cir. 1984) [*18] (section 1981); Sorlucco v.
New York City Police Dep't, 888 F.2d 4, 7 (2d Cir. 1989)
(section 1983).* [HN11]Unless the plaintiff has adduced
direct evidence of discrimination, the Court examines the
claim by utilizing the three-step burden shifting analysis
established in *McDonnell Douglas Corp. v. Green, 411
U.S. 792, 802-04, 36 L. Ed. 2d 668, 93 S. Ct. 1817
(1973). See, e.g., Weinstock v. Columbia Univ., 224 F.3d
33, 42 (2d Cir. 2000).* Under the *McDonnell Douglas*
analysis, plaintiff bears the initial burden to establish a
*prima facie* case of discrimination by showing that he (1)
belongs to a protected class, (2) suffered an adverse em-
ployment action, (3) was performing his duties satisfac-
torily, and (4) the circumstances surrounding his adverse
employment action give rise to an inference of discrimi-
nation. See *McDonnell Douglas, 411 U.S. at 802.*
[HN12]Where as here the allegations involve a failure to
promote, the plaintiff must show the following to make a
*prima facie* case: "1) [the plaintiff] 'is a member of a
protected class'; 2) [the plaintiff's] job performance was
satisfactory; 3) [the plaintiff] [*19] applied for and was
denied promotion to a position for which [the plaintiff]
was qualified; and 4) the position 'remained open and the
employer continued to seek applicants.'" *Cruz v. Coach
Stores, Inc., 202 F.3d 560, 565 (2d Cir. 2000)* (quoting

*Brown v. Coach Stores, Inc.*, 163 F.3d 706, 709 (2d Cir. 1998)) (citation omitted).

[HN13]The burden to establish a *prima facie* case is "'de minimis.'" *Howley v. Town of Stratford*, 217 F.3d 141, 150 (2d Cir. 2000) (quoting *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994)) (citation omitted). If plaintiff meets his initial burden a rebuttable presumption of discrimination arises. *See, e.g., Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 98 (2d Cir. 2001). A defendant may rebut this presumption by articulating a "legitimate, nondiscriminatory reason" for the challenged action. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981). If defendant meets this requirement, the burden shifts back to the plaintiff to show that this reason is false and the real motive behind the [*20] employment action was discrimination. *See, e.g., St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507-08, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993).

[HN14]Claims for disparate impact are analyzed differently. These claims "are concerned with whether employment policies or practices that are neutral on their face and were not intended to discriminate have nevertheless had a disparate impact on [a] protected group." *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 160 (2d Cir. 2001) (citing *Griggs v. Duke Power Co.*, 401 U.S. 424, 432, 28 L. Ed. 2d 158, 91 S. Ct. 849 (1971)), *cert. denied*, 535 U.S. 951 (2002). [HN15]Such claims, however, are not available to Bailey because his lawsuit is brought only under 42 U.S.C. §§ 1981 and 1983 (not Title VII -- both of which require proof of intentional discrimination: that is, disparate treatment. *See, e.g., Knight v. Nassau County Civil Serv. Comm'n*, 649 F.2d 157, 161 (2d Cir.) ("In failing to prove disparate treatment . . . based on the failure to promote . . . [plaintiff] has also necessarily failed to meet the purposeful [*21] discrimination requirement for a section 1983 violation based on equal protection or a section 1981 claim.") (citations omitted), *cert. denied*, 454 U.S. 818, 70 L. Ed. 2d 87, 102 S. Ct. 97 (1981); *accord Weberg v. Franks*, 229 F.3d 514, 528 (6th Cir. 2000) ("mere disparate impact is not sufficient to state an equal protection claim under § 1983") (citations omitted); *Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 715 (5th Cir. 1994) ("To prove a cause of action under section 1983 based on violation of equal protection, Plaintiffs are required, as under section 1981, to demonstrate intentional discrimination; mere disparate impact will not suffice.") (citation omitted); *Jackson v. Univ. of New Haven*, 228 F. Supp. 2d 156, 162 (D. Conn. 2002) ("the disparate impact theory . . . is available only for claims brought pursuant to Title VII, and not claims under 42 U.S.C. § 1981"); *Local Unions v. United Broth. of Carpenters and Joiners*, 1997 U.S. Dist. LEXIS

15689, 1997 WL 630179, at *13 (S.D.N.Y. Oct. 9, 1997) (disparate treatment not cognizable under section 1981), [*22] *aff'd*, 131 F.3d 131 (2d Cir. 1997).

An additional element limits Bailey's claims in this case: Bailey's suit is brought only against the City and its subdivisions -- not any individuals. [HN16]Accordingly, as plaintiff himself recognizes, his claims "are limited to acts implementing or executing a municipal policy or custom." Plaintiff's Reply Memorandum in Support of Plaintiff's Motion for Partial Summary Judgment and in Opposition to Defendants' Cross Motion for Summary Judgment, dated February 10, 2003 ("Pl. Reply"), at 9; *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978); *see also Bailey*, 1997 U.S. Dist. LEXIS 471, 1997 WL 26290, at *3 (dismissing previous claims under section 1981 and 1983 for failure to allege any "facts indicating that the alleged discriminatory acts were the product of any official policy or custom of the City of New York or DOT"). Thus, whether a particular individual was hired to the ADFM position instead of Bailey, *see, e.g.*, Am. Compl. PP 9(d), 10, 11, is not at issue.

### III. DISCUSSION

With respect to exam 1201, Bailey's claim of discrimination is based on the fact that he was deemed [*23] unqualified to be considered for this exam. Applying the *prima facie* requirement, it would appear that Bailey has not met the requirement that he be "qualified" for the position at issue since an employer is entitled to determine the qualification for a position. *See Thornley v. Penton Publ'g, Inc.*, 104 F.3d 26, 29 (2d Cir. 1997) ("being 'qualified' refers to the criteria the employer has specified for the position"). As Bailey was unqualified to take the examination, he was also unqualified for the promotion. Nonetheless, Bailey has claimed that the employer's criteria itself were the result of racial discrimination. Accordingly, the Court must examine whether Bailey has adduced evidence that could show that the City's qualifications for the ADFM position were developed in bad faith. *See id.* [HN17]("Absent a showing . . . that the employer's demands were made in bad faith . . . an employer . . . is not compelled to submit the reasonableness of its employment criteria to the assessment of either judge or jury.") (citations omitted). The only manner in which Bailey has attempted to show "bad faith" by the City is to assert that its choice of qualifications was based [*24] on intentional racial discrimination.

Similarly, Bailey cannot demonstrate a *prima facie* case with respect to exam 1606 because his failure to pass the examination prevented him from being qualified for the promotion. [HN18]Bailey's failure on the examination means that he was not qualified to obtain the promotion and thus precludes him from establishing a *prima*

*facie* case of discrimination. *See Cross v. State Ins. Fund*, 1987 U.S. Dist. LEXIS 2245, 1987 WL 9194, at *2 (S.D.N.Y. Mar. 27, 1987) ("Because plaintiff has failed to pass an examination that is a prerequisite for promotion, plaintiff cannot sustain his claim of discriminatory treatment."), *aff'd*, 837 F.2d 1086 (2d Cir. 1987), *cert. denied*, 488 U.S. 943, 102 L. Ed. 2d 358, 109 S. Ct. 368 (1988). Nonetheless, Bailey has claimed that the scoring of the examination itself was based on improper racially discriminatory criteria and the Court will examine whether this claim is supported by evidence.

What is left of Bailey's case is his claim that he was the victim of intentional racial discrimination because of two events: the change in the standards for exam 1201 and the grading of exam 1606. Because [*25] there are no individual defendants, he must also show that any discrimination was the result of an official policy or custom of the City. Each of these events is discussed in turn.[1]

> 1    Bailey's complaint also makes reference to Bailey's inability to qualify for a July 1997 vacancy notice for the ADFM position. Am. Compl. P 10. It appears that this claim is the same as his challenge to the changes in qualifications for exam 1201.

### A. *Change in Requirements for Exam 1201*

Bailey argues that the change in qualifications for exam 1201 shows discrimination by the City. *See* Memorandum in Support of Plaintiff's Motion for Partial Summary Judgment, dated July 15, 2002 ("Pl. Mem."), at 4. With respect to his section 1981 claim, Bailey's argument is that when he applied to take exam 1201 under the original qualifications for the exam, he entered into a contract with the City that bound the City to consider Bailey qualified for the ADFM position under exam 1201. *Id.* at 3. While it seems unlikely that Bailey's [*26] application to take the exam constituted an enforceable contract, the Court need not reach this question because Bailey has not provided evidence of purposeful discrimination in the City's decision to change the qualifications -- a requirement, as described above, both of section 1981and 1983 claims.

Indeed, Bailey has conceded that his challenge to the change in qualifications is not a claim of "intentional race discrimination." Pl. Mem. at 5. Instead he "asks this Court to decide whether or not the defendants acted legally in issuing the second amended notice with new qualifications." *Id.* at 3. Bailey's admission that he does not allege intentional or purposeful discrimination is fatal to any claims under section 1981or 1983.

Even without Bailey's concession the City is still entitled to summary judgment because Bailey has adduced no evidence of purposeful discrimination. Bailey provides evidence that the City has changed the qualifications for promotion to an ADFM position on notices of examination over a period of years. *See* Notice of Examination (undated) (reproduced in Pl. Mem. Ex. 1); Notice of Examination, Second Amended Notice, dated May 27, 1992 (reproduced in [*27] Pl. 56.1 Statement Ex. 2); Job Vacancy Notice (undated) (reproduced in Pl. 56.1 Statement Ex. 3); Job Vacancy Notice, dated January 10, 1989 (reproduced in Pl. Mem. Ex. 4). This evidence shows only that at different times different qualifications have been required for the promotional exam. Such evidence would not permit a jury to conclude that the change in qualifications for exam 1201 was based on bad faith or intentional discrimination.

Bailey's remaining evidence on this claim consists of statistics showing that fewer minorities would have had the requisite 18-month experience in an administrative, managerial or executive capacity. Pl. Reply at 10. But this at most constitutes evidence of a disparate impact of the 18-month requirement on minorities; it is insufficient to raise a triable issue that the City included this requirement for the actual purpose of excluding minorities. *See Hudson v. Int'l Bus. Mach. Corp.*, 620 F.2d 351, 355 (2d Cir.) [HN19]("In 'disparate impact' cases . . . statistical evidence may establish a prima facie case of discriminatory effect. . . . However . . . [in] an individual 'disparate treatment' action . . . the particular employee must [*28] establish that he has been discriminated against because of his race . . . [and] statistics standing alone do not create [a prima facie case]."), *cert. denied*, 449 U.S. 1066, 66 L. Ed. 2d 611, 101 S. Ct. 794 (1980); *see also Jenkins v. Metro. Opera Ass'n, Inc.*, 1999 U.S. Dist. LEXIS 3023, 1999 WL 147745, at *7 (S.D.N.Y. Mar. 18, 1999) ("Even . . . valid statistical data . . . alone cannot establish a prima facie case of discrimination.") (citations omitted), *aff'd*, 213 F.3d 626 (2d Cir. 2000), *cert. denied*, 531 U.S. 1091, 148 L. Ed. 2d 698, 121 S. Ct. 813 (2001); *Zenni v. Hard Rock Int'l, Inc.*, 903 F. Supp. 644, 654 (S.D.N.Y. 1995) ("statistical evidence of an employer's general hiring practices is insufficient to prove that a particular plaintiff was discriminated against") (citation omitted).

Because Bailey has not provided evidence of discrimination due to the change in qualifications, the defendants are entitled to summary judgment on this claim.

### B. *Claims of Bias in the Scoring of the Exam 1606*

Bailey asserts that his non-passing score on exam 1606 showed discrimination by the City, principally based on his assertion [*29] that the results were biased because it was an essay test that was graded subjectively.

Am. Compl. P 9(c); *see also* Pl. Reply at 20 (claiming "serious questions" exist about "the validity of [exam 1606] itself"). The Court construes this claim as brought under 42 U.S.C. § 1983 and as raising a claim of equal protection. [2]

> 2   Construing his papers liberally, it is possible that Bailey is raising a due process claim with respect to this examination. [HN20]In order to show a violation of procedural due process, however, Bailey would need to identify a property interest he held that was entitled to due process protection. *See, e.g., Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 576-77, 33 L. Ed. 2d 548, 92 S. Ct. 2701 (1972). Bailey cannot do so because an applicant for a promotion has no property interest in a competitive examination or fair consideration for a promotion. *See McMenemy v. City of Rochester*, 241 F.3d 279, 287-88 (2d Cir. 2001). *McMenemy* held that "although even New York State law clearly requires a 'competitive' examination, the law does not create a cognizable *property interest* in a competitive examination." *Id.* at 287 (emphasis in original). *McMenemy* also held that "the availability of an Article 78 proceeding under New York law provides [plaintiff] with an adequate post-deprivation remedy such that no procedural due process violation occurred, even if [plaintiff] possessed a cognizable property interest." *Id.* at 289.

[*30]   As previously noted, [HN21]"'proof of racially discriminatory intent or purpose is required' to show a violation of the Equal Protection Clause." *City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 155 L. Ed. 2d 349, 123 S. Ct. 1389, 1394 (2003) (quoting *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265, 50 L. Ed. 2d 450, 97 S. Ct. 555 (1977)) (citation omitted). The only evidence Bailey has provided of purposeful discrimination relates to the results of exam 1201 (which, as noted, was identical to exam 1606). Of the 118 persons who took that test, 91 (or 75%) were white. Only three persons passed the exam, all of whom were white. Pl. Reply at 8, 20. Whether or not the pass rate shows disparate impact -- a claim that Bailey cannot bring under section 1981or 1983 -- the minute statistical sample and pass rate for whites (3%) versus blacks (0%) is not sufficient evidence to allow a jury to conclude that there was purposeful discrimination by the City in its grading of the exam. *See Pollis v. New Sch. for Soc. Research*, 132 F.3d 115, 122 (2d Cir. 1997) (stating that "as a matter of law . . . [intentional] discrimination [*31] may not be proved by statistics involving" a pool of eight persons); *see also Aguirre v. New York State Police*, 156 F. Supp. 2d 305, 320-21 (S.D.N.Y. 2001) (five examples of disparate treatment

insufficient to establish an inference of discrimination). Bailey's reliance on the "four-fifths" rule, *see* Pl. Reply at 9, 21 (citing 29 C.F.R. § 1607.4(D)), is irrelevant because [HN22]that rule -- relating to whether the selection rate for the complainant's group is less than 80% of the group with the highest selection rate -- relates only to a showing of disparate impact. *See generally Smith v. Xerox Corp.*, 196 F.3d 358, 365-66 (2d Cir. 1999) (discussing the use of the four-fifths rule in disparate impact cases). Because the evidence Bailey presents would be insufficient for a reasonable jury to find discriminatory intent, Bailey cannot state a claim for a denial of equal protection.

## C. State Law Claims

Bailey also claims that the City violated his rights under the New York Human Rights Laws, *see* N.Y. Exec. L. §§ 290-301, and the New York Civil Service Laws. *See* Am. Compl. P 2(e). As his federal claims must be dismissed, this Court should decline [*32] to exercise jurisdiction over these claims. *See, e.g., In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 61 (2d Cir. 1998) (per curiam) [HN23](district court should decline to exercise supplemental jurisdiction over state law claims when it has dismissed all claims over which it has original jurisdiction); *accord Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well.") (citing *Purgess v. Sharrock*, 33 F.3d 134, 138 (2d Cir. 1994); *Baylis v. Marriott Corp.*, 843 F.2d 658, 664-65 (2d Cir. 1988)).

## IV.   *BAILEY'S REQUEST FOR ADDITIONAL DISCOVERY*

On March 12, 2003, this Court received a document from Bailey requesting additional discovery from the City and containing a sur-reply to the City's reply brief. *See* Affirmation in Support of Plaintiff's Motion to Compel Special Discovery, dated March 11, 2003; Pl. Sur-Reply. The Court construes Bailey's request as an application pursuant to Fed. R. Civ. P. 56(f) for a continuance to permit additional discovery.

[HN24]"[A] party resisting summary judgment [*33] on the ground that it needs discovery in order to defeat the motion must submit an affidavit showing '(1) what facts are sought [to resist the motion] and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts.'" *Gurary v. Winehouse*, 190 F.3d 37, 43 (2d Cir. 1999) (quoting *Meloff v. N.Y. Life Ins. Co.*, 51 F.3d 372, 375 (2d Cir. 1995)) (citations omitted).

Bailey's application is insufficient under this standard for two reasons. First, Bailey had ample opportunity to conduct discovery in this matter, as the case was first filed in 1998. Since that time, the Court set multiple deadlines for the completion of discovery. Rule 56(f) [HN25]"applies to summary judgment motions made *before* discovery is concluded." *McAllister v. New York City Police Dep't*, 49 F. Supp. 2d 688, 696 n.5 (S.D.N.Y. 1999) (emphasis added) (citations omitted); *accord McNerney v. Archer Daniels Midland Co.*, 164 F.R.D. 584, 588 (W.D.N.Y. 1995) ("Applications to extend the discovery [*34] deadline must be made prior to expiration of the deadline . . . Rule 56(f) is not intended to circumvent discovery orders."). The Court recognizes that the City's prior counsel was recalcitrant with respect to the City's discovery obligations. Nonetheless, in April 2001, the Court inquired of the parties as to what discovery motions remained in this matter. *See* Order, dated April 12, 2001 (Docket # 35). The only matters raised by Bailey in response to this inquiry concerned his efforts to obtain responses to the written discovery requests that were ultimately the subject of the July 16, 2001 conference. At that conference, the Court made plain that it was going to rule on "all" of plaintiff's discovery requests "one by one." *See* Transcript of July 16, 2001 Conference (Docket # 39) at 2. The Court made its rulings at that conference, requiring the City to respond to some requests and not to others. The City had completed its responses to plaintiff's requests as of April 2002. *See* Order, filed September 6, 2002 (Docket # 56), at 2. Bailey himself moved for partial summary judgment following his receipt of these responses in July 2002. *See* Notice of Plaintiff's Motion [*35] for Partial Summary Judgment, dated July 15, 2002 (Docket # 61). Until the City filed its motion for summary judgment in September 2002, however, Bailey never raised any need for discovery. Thus, Bailey's application to take discovery now is untimely.

Bailey's application is insufficient also because he does not demonstrate how additional discovery would permit him to show the intentional discrimination required by sections 1981and 1983. Instead, Bailey seeks the answers to interrogatories and document demands that were at least in part duplicative of his original discovery demands. *Compare* Pl. Sur-Reply at 2-3, *with* Defendants' Supplemental Responses and Objections to Plaintiff's Document Requests, filed September 6, 2002 (Docket # 58), at 3-12; Defendants' Supplemental Responses and Objections to Plaintiff's Interrogatories, filed September 6, 2002 (Docket # 59), at 3-12; Defendants' Supplemental Responses and Objections to Plaintiff's Request for Admission, filed September 6, 2002 (Docket # 60), at 1-11. Moreover, the proposed discovery consists solely of document demands, interrogatories, and requests for admission that relate to the qualifications for

examinations, information [*36] about individuals passing civil service examinations, and information about persons hired into the ADFM position. *See* Pl. Sur-Reply at 2-3. Even were the City to answer these requests, it could not reasonably be expected that the answers would create a genuine issue of material fact as to whether the City engaged in a policy and practice of intentional discrimination. [HN26]"[A] district court may refuse to allow additional discovery 'if it deems the request to be based on speculation as to what potentially could be discovered.'" *Nat'l Union Fire Ins. Co. of Pittsburgh, PA. v. Stroh Cos., Inc.*, 265 F.3d 97, 117 (2d Cir. 2001) (quoting *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1138 (2d Cir. 1994)). Because the discovery sought would not advance Bailey's claims, this provides a separate basis to deny a continuance for additional discovery.[3]

3    On April 28, 2003, this Court received a document from Bailey. *See* Notice of Plaintiff's Motion for Finding of Fact and/or Declaratory Judgment, dated April 25, 2003. In this latest motion Bailey asks this Court to find the City committed "fraud" by changing the qualifications for exam 1201. *See* Affirmation in Support of Plaintiff's Motion for Finding of Fact and/or Declaratory Judgment, dated April 25, 2003, at 1-3. Bailey has no cause of action for fraud in his amended complaint and, construing this latest filing as a motion to amend his complaint, it is untimely. *See, e.g., Grochowski v. Phoenix Const.*, 318 F.3d 80, 86 (2d Cir. 2003) (affirming denial of motion to amend where "plaintiffs delayed more than one year before seeking to amend" and "discovery had been completed and a summary judgment motion was pending"). Moreover, the statements made in the qualification requirements for exam 1201 are not statements capable of being true or false and, as such, cannot support a claim for fraud. Thus, the motion to amend should also be denied as futile. *See, e.g., Chill v. General Elec. Co.*, 101 F.3d 263, 271-72 (2d Cir. 1996).

[*37] *Conclusion*

For the foregoing reasons, the City's motion for summary judgment should be granted. *A fortiori*, Bailey's motion for partial summary judgment should be denied.

## PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have ten (10) days from service of this Report to file any objec-

tions. *See also* Fed. R. Civ. P. 6(a), (e). Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Honorable Leonard B. Sand, 500 Pearl Street, New York, New York 10007, and to the undersigned at 40 Centre Street, New York, New York 10007. Any request for an extension of time to file objections must be directed to Judge Sand. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. *See* *Thomas v. Arn,* 474 U.S. 140, 88 L. Ed. 2d 435, 106 S. Ct. 466 (1985).

Dated: May 2, 2003

[*38] New York, New York

GABRIEL W. GORENSTEIN

United States Magistrate Judge

LEXSEE



Positive
As of: Jan 04, 2008

**LOCAL UNIONS 20, 135, 257, 296, 531, 740, 902 and 1456 of the United Brotherhood of Carpenters and Joiners of America; CHARLES TERJESEN, JR., President, District Council Delegate and Business Manager of Local 1456; JULIUS D. KLEINSTEIN, District Council Delegate; SCOTT RUBIN, Rank and File Member of Local 135; and SALVESTER ZARZANA, Business Representative of Local 902, Plaintiffs, -against- UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA; DOUGLAS J. MCCARRON, General President of the United Brotherhood of Carpenters and Joiners of America; DISTRICT COUNCIL OF NEW YORK CITY AND VICINITY OF THE UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA; AND DOUGLAS BAINES, Supervisor of the District Council of New York City and Vicinity of of the United Brotherhood of Carpenters and Joiners of America, Defendants.**

97 Civ. 5538 (CSH)

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**1997 U.S. Dist. LEXIS 15689; 157 L.R.R.M. 2421**

October 9, 1997, Decided
October 9, 1997, Filed

**DISPOSITION:**    [*1] Plaintiffs' motion for preliminary injunction denied. Temporary restraining order vacated.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs, eight local unions of defendant, an international union of carpenters and joiners, filed an action against the international union and two union officials alleging violations of the Labor Management Relations Act (LMRA), the Labor Management Reporting and Disclosure Act (LMRDA), and other federal and state statutes. The local unions moved for preliminary injunction to restrain implementation of a restructuring plan.

**OVERVIEW:** The newly elected president of the international union proposed a restructuring plan which dissolved and merged various local unions. The restructuring plan was allegedly aimed at consolidating union operations and saving money. The international union made

a decision to restructure the eight local unions in New York. The eight local unions filed suit claiming, inter alia, that the international union's restructuring plan was being pursued against them in violation of several state and federal laws including 42 U.S.C.S. § 1981. The local unions were denied permission to intervene in an action filed by the United States government against the international union and restated many of the claims brought in their motion to intervene in the instant action. The local unions filed a motion for preliminary injunction under Fed. R. Civ. P. 65 seeking to restrain implementation of the restructuring plan. The local unions claimed that the plan eliminated local unions with minority membership and leadership. The court held that the local unions failed to meet the burden of proving the international union was acting with discriminatory intent and therefore denied the motion for injunction.

**OUTCOME:** The court denied the motion for preliminary injunction and vacated a temporary restraining order. The matter was referred to a magistrate judge for supervision of discovery and pre-trial procedures.

Case 1:07-cv-10384-HB    Document 7-4    Filed 01/18/2008    Page 2 of 17

1997 U.S. Dist. LEXIS 15689, *; 157 L.R.R.M. 2421

**CORE TERMS:** restructuring plan, district council, local unions, merger, carpenter, executive board, bad faith, membership, preliminary injunction, dissolved, election, discriminatory, restructuring, merged, civil rights laws, disparate impact, disparity, labor laws, consent decree, business representatives, irreparable harm, statistical evidence, bargaining, referral, chartered, own choosing, delegate, facie, predominantly, statistical

**LexisNexis(R) Headnotes**

*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*
[HN1]To obtain a preliminary injunction, the movant must establish (a) the injunction is necessary to prevent irreparable harm, and (b) either (i) likelihood of success on the merits, or (ii) sufficiently serious questions going to the merits of the claim as to make it a fair ground for litigation, and that a balance of the hardships tips decidedly in favor of the movant. Need for proof of irreparable harm is "more pronounced" when the plaintiff establishes something less than probable success on the merits.

*Labor & Employment Law > Collective Bargaining & Labor Relations > Fair Representation*
[HN2]See 29 U.S.C.S. § 411(a)(1).

*International Law > Dispute Resolution > General Overview*
*Labor & Employment Law > Collective Bargaining & Labor Relations > Arbitration > Judicial Review of Awards > General Overview*
[HN3]Union constitutions are regarded by courts as enforceable contracts between the international and its locals.

*Labor & Employment Law > Collective Bargaining & Labor Relations > Duty to Bargain*
[HN4]Under the plain wording of section 101 of the Labor Management Relations Act, 29 U.S.C.S. § 157, the employees' right to "representatives of their own choosing" is confined to the collective bargaining process.

*Labor & Employment Law > Collective Bargaining & Labor Relations > Duty to Bargain*
*Labor & Employment Law > Collective Bargaining & Labor Relations > Right to Organize*
[HN5]See 29 U.S.C.S. § 157.

*Civil Rights Law > Contractual Relations & Housing > Equal Rights Under the Law (sec. 1981) > Proof of Discrimination*
*Labor & Employment Law > Discrimination > Disparate Impact > Statutory Application > Reconstruction Statutes (secs. 1981, 1983 & 1985)*
[HN6]Disparate impact alone is not sufficient to sustain a claim under civil rights statutes such as 42 U.S.C.S. § 1981. There must be a showing of discriminatory intent.

*Civil Rights Law > Contractual Relations & Housing > Equal Rights Under the Law (sec. 1981) > Proof of Discrimination*
*Labor & Employment Law > Discrimination > Disparate Impact > Statutory Application > Reconstruction Statutes (secs. 1981, 1983 & 1985)*
*Labor & Employment Law > Discrimination > Disparate Treatment > Statutory Application > Reconstruction Statutes (secs. 1981, 1983 & 1985)*
[HN7]The United States Supreme Court has held that 42 U.S.C.S. § 1981 can only be violated by purposeful discrimination. Accordingly, a plaintiff cannot assert a disparate impact claim under § 1981. Rather, the standard for liability under § 1981 is the same as the standard for liability in a disparate treatment case under Title VII. Thus, while a Title VII disparate impact plaintiff need only show that a disparity exists to state a prima facie case, in the context of 42 U.S.C.S. § 1981, statistical evidence of a disparate impact is significant only if that impact can be traced to a discriminatory purpose.

*Labor & Employment Law > Discrimination > Disparate Impact > Proof > Statistical Evidence*
*Labor & Employment Law > Discrimination > Disparate Treatment > Proof > Statistical Evidence*
*Labor & Employment Law > Discrimination > Disparate Treatment > Statutory Application > Reconstruction Statutes (secs. 1981, 1983 & 1985)*
[HN8]The U.S. Supreme Court has held that a decisionmaker acts with a discriminatory purpose if that decisionmaker selected or reaffirmed a particular course of action at least in part "because of," and not merely "in spite of," its adverse effects upon an identifiable group. As a result, the Second Circuit has held that statistical proof alone cannot ordinarily establish a prima facie case of disparate treatment under 42 U.S.C.S. § 1981 in individual disparate treatment cases. This is because an individual § 1981 plaintiff must prove that he or she in particular has been discriminated against on the basis of race.

Case 1:07-cv-10384-HB    Document 7-4    Filed 01/18/2008    Page 3 of 17

1997 U.S. Dist. LEXIS 15689, *; 157 L.R.R.M. 2421

*Civil Rights Law > Contractual Relations & Housing > Equal Rights Under the Law (sec. 1981) > Proof of Discrimination*

[HN9]In class action suits under 42 U.S.C.S. § 1981 alleging a pattern or practice of intentional discrimination, where gross statistical disparities can be shown, they alone may in a proper case constitute prima facie proof of intentional discrimination. However, the disparity must be so significant that it is more likely than not that the disparity resulted from intentional discrimination, rather than any legitimate factor.

*Labor & Employment Law > Collective Bargaining & Labor Relations > Arbitration > Judicial Review of Awards > General Overview*

[HN10]The existence vel non of bad faith of a union's action is a justiciable issue.

*Labor & Employment Law > Collective Bargaining & Labor Relations > Fair Representation*

[HN11]Bad faith in a union merger can be defined by a three-pronged test. Bad faith in ordering a merger can be found on evidence that union officials acted contrary to the international's best interests, out of self-interest, or in an unconscionable or outrageous way.

*Labor & Employment Law > Collective Bargaining & Labor Relations > Judicial Intervention*

[HN12]There is a well-established federal policy of avoiding unnecessary interference in the internal affairs of unions. Absent bad faith or special circumstances, an interpretation of a union constitution by union officials, as well as interpretation of the union's rules and regulations, should not be disturbed by the court.

**COUNSEL:** For LOCAL UNIONS 20, 135, 246, 257, 296, 531, 740, 902, 1456, 1536, 1994 AND 2287 OF THE UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, CHARLES TERJESEN, JR., JULIUS D. KLEINSTEIN, SCOTT E. RUBIN, plaintiffs: Angelo R. Bisceglie, Jr., Bisceglie & Friedman, Newark, NJ.

For UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, DOUGLAS J. MCCARRON, DISTRICT COUNCIL OF NEW YORK CITY AND VICINITY OF THE UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, defendants: Richard M. Zaroff, Greenberg, Traurig, Hoffman, Lipoff, Rosen & Quentel, New York, NY USA.

**JUDGES:** CHARLES S. HAIGHT, JR., UNITED STATES SENIOR DISTRICT JUDGE.

**OPINION BY:** CHARLES S. HAIGHT, JR.

**OPINION**

*MEMORANDUM OPINION AND ORDER*

HAIGHT, Senior District Judge:

The plaintiffs in this action are eight Local Unions of the defendant United Brotherhood of Carpenters and Joiners of America ("UBC") and individuals associated with them. [1] They move under Rule 65(a), Fed. R. Civ. P., for a preliminary injunction enjoining implementation by defendants of a plan ("the Restructuring Plan" or "the Plan"), by which the UBC [*2] proposes to restructure the Local Unions, including plaintiffs, which are embraced within defendant District Council of New York and Vicinity of the United Brotherhood of Carpenters and Joiners of America ("the District Council").

> 1  The caption reflects the present parties plaintiff, following the departure of some original plaintiffs as the result of stipulations of discontinuance or voluntary dismissals. *See* plaintiffs' supplemental memorandum at 3. Plaintiffs also stipulated to discontinue the action against two original defendants, the United States and Kenneth J. Conboy.

Plaintiffs first sought to assert their opposition to the Restructuring Plan by moving to intervene in an action commenced in this Court by the United States against the District Council and certain of its officers. 90 Civ. 5722 (CSH). In that civil RICO suit, the government alleged in substance that the District Council was being controlled by organized crime. Trial of the action was terminated by a Court-endorsed consent decree dated [*3] March 4, 1994 ("the Consent Decree"). The Court denied plaintiffs' motion to intervene in that action in an opinion dated July 24, 1997, familiarity with which is assumed, and which recites much of the factual background pertinent to the present motion.

Following denial of their motion to intervene in 90 Civ. 5722, plaintiffs commenced this action. In addition to the UBC and the District Council, plaintiffs have named as defendants Douglas J. McCarron, the General President of the UBC, and Douglas Banes, [2] the Supervisor of the District Council, which the UBC has placed under trusteeship.

2    Banes's name is misspelled "Baines" in the pleadings and briefs. This opinion uses the correct spelling.

I

McCarron was elected General President of the UBC in September, 1995. Headquartered in Washington, D.C., the UBC is a labor organization with approximately 500,000 members in the United States and Canada. The UBC charters Regional (or District) Councils and Local Unions, such as the plaintiff Locals and the District [*4] Council in the case at bar. The relationships between the UBC, its Councils and Locals, and their officers and members are created and governed by the written Constitution of the UBC, the present form having been promulgated on January 1, 1996. McCarron affidavit, verified August 18, 1997, at PP 3-4.

Since becoming General President, McCarron has pursued a process of restructuring entities within the UBC, avowedly "in order to serve the best interests of the UBC and its members." McCarron affidavit at P 6. Specifically, McCarron believes that mergers of District Councils and Local Unions "were necessary to the preservation of the Carpenters Union," since "through mergers, the Union is able to consolidate operations which saves money and allows the Union's Business Representatives to engage in more productive tasks." Id. at P 7. McCarron was also active as a UBC functionary in recommending restructurings and mergers to Sigurd Lucassen, his predecessor as General President. The number and nature of the restructurings with which McCarron has been involved over the years are detailed in PP 7-33 of his affidavit. These restructurings took place in a number of the United States and [*5] in Canada.

McCarron has determined that "it is in the best interest of the UBC and its members to restructure the Carpenters Union in New York City." McCarron affidavit at P 5. That determination has given rise to the Restructuring Plan which forms the subject matter of the case at bar.

The UBC General President's authority to restructure UBC entities is derived from Section 6(A) of the UBC Constitution, which provides in pertinent part:

> The United Brotherhood is empowered . . . in the discretion of the General President subject to appeal to the General Executive Board, where the General President finds that it is in the best interests of the United Brotherhood and its members, locally or at large, to establish or dissolve any Local Union or Council, to merge or consolidate Local Unions and Councils, . . . and to permit, prohibit or require the af-

filiation with or disaffiliation from any Council by any Local Union . . .

II

The Restructuring Plan prepared for defendant District Council and its constituent Locals, including plaintiffs, contains the following elements:

> 1. The New York City District Council of Carpenters shall be restructured into a Full Service [*6] District Council through centralization of administration and oversight. The District Council will be governed by a greatly expanded delegate body and officers who shall be accountable to that body.

> 2. Under the restructuring plan, the following functions previously performed by the various Local Unions will be performed by the Full Service District Council:

>> a. the referral of workers to jobs;

>> b. the appointments of job stewards;

>> c. policing work and servicing the membership; and

>> d. organizing.

> The functions shall be performed by Business Representatives employed by and responsive to the Full Service District Council.

> 3. Several Local Unions affiliated with the New York City District Council of Carpenters shall be merged:

>> a. Local Union 17 shall be merged into Local Union 608;

>> b. Local Unions 257 and 135 shall be dissolved and a new Local Union chartered with geographic jurisdiction over the East side of Manhattan;

c. Local Unions 531 and 348 shall be dissolved and a new Local Union chartered for the borough of Queens;

d. Local Unions 902 and 296 shall be dissolved and a new Local Union chartered for the borough of Brooklyn;

e. [*7] Local Unions 246 and 1994 shall be dissolved and a new Local Union chartered to represent shop employees;

f. Local Union 2710 is currently being dissolved at its request and pursuant to an earlier order;

g. a Civil Service Employees Local shall be chartered to represent members employed in civil service in the New York City area;

h. Specialty Local Unions 1536, 1456, 2287, 740 shall continue to represent their members; and

i. Local Union 20 shall retain its geographic jurisdiction of Staten Island.

*New York District Council Restructuring Plan*, Ex. 2 to the Special Interim Report of Kenneth Conboy, Investigations and Review Officer, dated May 30, 1997, at pp. 1-2.

Plaintiffs' present claims, designated "counts," are asserted in an amended complaint dated August 14, 1997. Plaintiffs assert that the Restructuring Plan violates the Consent Decree, Federal and state labor laws, Federal, state and local civil rights laws, and the UBC Constitution. They seek a preliminary injunction enjoining implementation of the Plan pending trial.

To the extent that plaintiffs assert that the Restructuring Plan violates the Consent Decree, they are reiterating claims that [*8] this Court rejected in denying their motion to intervene in the government's RICO action. *See* July 24, 1997 Opinion in 90 Civ. 5722, at Part II(A), slip op. 5-13. In their briefs on the present motion, the parties debate at some length whether that holding bars assertion in this action of plaintiffs' claims based on the Consent Decree, under the doctrines of collateral estoppel or law of the case. I need not plumb those questions to their depths. It is sufficient for present purposes to say that I adhere to the conclusions previously expressed. It follows that in the analysis of whether a preliminary injunction should or should not issue, plaintiffs' Consent Decree violation theories will play no part, either in determining plaintiffs' likelihood of success or the existence of serious merits questions constituting fair grounds for litigation.

III

[HN1]To obtain a preliminary injunction, the movant must establish "(a) the injunction is necessary to prevent irreparable harm, and (b) either (i) likelihood of success on the merits, or (ii) sufficiently serious questions going to the merits of the claim as to make it a fair ground for litigation, and that a balance of the hardships tips [*9] decidedly in favor of the movant." *Malkentzos v. DeBuono*, 102 F.3d 50, 54 (2d Cir. 1996). Need for proof of irreparable harm is "more pronounced" when "the plaintiff establishes something less than probable success on the merits." *Triebwasser & Katz v. American Telephone & Telegraph Co.*, 535 F.2d 1356, 1359 (2d Cir. 1976), cited and quoted in *Jack Kahn Music Co., Inc. v. Baldwin Piano & Organ Co.*, 604 F.2d 755, 759 (2d Cir. 1979).

Plaintiffs claim that they will suffer irreparable harm if the Court does not preliminarily enjoin the UBC from implementing the Restructuring Plan. The UBC contends that it will be irreparably harmed if the injunction issues. I defer a detailed consideration of irreparable harm, and first consider the merits of plaintiffs' claims.

It is fair to say that McCarron's efforts, as General President of the UBC, to restructure the international union and its constituent locals have not met with unanimous approval by the rank and file. Typically, the restructuring plans in the various geographical areas where they have been implemented involve the merging of local unions, either into other local unions or into a regional council. Local unions targeted [*10] for merger, or otherwise affected by UBC restructuring plans, have responded with litigation in a number of Federal courts. Those dissident locals have asserted claims under section 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185, and under sections 101, 302, 501, and 609 of the Labor Management Reporting and Disclosure Act (LMRDA), 29 U.S.C. §§ 411, 462, 501, and 529. The main thrust of the dissident locals' actions has been that these Federal labor laws create vehicles for contending that the UBC's restructuring plans violate the UBC Constitution as well as the Federal statutes themselves.

Every circuit court of appeals that has considered these issues (the First, Sixth and Ninth) has rejected the local unions' contentions. *See, e.g., Lathers Local 42-L v. United Brotherhood of Carpenters and Joiners of America*, 73 F.3d 958 (9th Cir. 1996) (rejecting Local's claim brought pursuant to § 301 of the Labor Management Relations Act (LMRA) that UBC and District Council breached Affiliation Agreement by seeking to compel Local to comply with amendments to by-laws that grant

Case 1:07-cv-10384-HB   Document 7-4   Filed 01/18/2008   Page 6 of 17

1997 U.S. Dist. LEXIS 15689, *; 157 L.R.R.M. 2421

exclusive control over the selection of business representatives to the District Council; [*11] holding that by-law amendments did not violate UBC constitution); *Dresden Local No. 267 v. United Brotherhood of Carpenters and Joiners of America, 992 F.2d 1418 (6th Cir. 1993)* (rejecting Local's claim brought pursuant to § 301 of the LMRA and the Labor Management Reporting and Disclosure Act (LMRDA) that new by-laws proposed by the UBC as part of a reorganization plan that eliminated the right to elect business representatives violated the UBC constitution; holding that dissolution and merger of local did not violate LMRDA); *Local 1052 v. Los Angeles County District Council of Carpenters, 944 F.2d 610 (9th Cir. 1991)* (rejecting Local's claim brought pursuant to the LMRA and the LMRDA that merger of local unions and the elimination of right to elect business representatives violated the UBC constitution); *Local No. 48 v. United Brotherhood of Carpenters and Joiners of America, 920 F.2d 1047 (1st Cir. 1990)* (rejecting Local's claim brought pursuant to the LMRA and the LMRDA that merger of local unions violated the UBC constitution and federal labor law); *Millwright Local # 1079 v. United Brotherhood of Carpenters and Joiners of America, 878 F.2d 960 (6th Cir. 1989)*, [*12] *cert. denied, 493 U.S. 965, 107 L. Ed. 2d 373, 110 S. Ct. 407 (1990)* (same). In those cases, not every local union relied upon every section of the LMRA or LMRDA that I have referred to *supra*, but they all relied upon one provision or another of both of these Federal labor laws.

In a recent opinion denying a local union's motion to preliminarily enjoin a UBC restructuring plan, Chief Judge Henderson of the Northern District of California summarized these appellate decisions by saying: "These cases make it plain that, absent bad faith, General President McCarron has the authority to order a local to affiliate or merge with a regional council. Under the terms of the UBC Constitution, the affected locals do not have a right to vote on the matter, and may in fact be dissolved if they resist a reorganization directive." *Pile Drivers, Divers, Carpenters, Bridge, Wharf and Dock Builders Local Union 34, et. al. v. Northern California Carpenters Regional Council and United Brotherhood of Carpenters and Joiners of America,* No. C97-2277 (N.D.Cal., Sept. 5, 1997) at slip op. 6 (citations omitted). That is an entirely accurate summary of the holdings of the cited decisions of the First, [*13] Sixth, and Ninth Circuits.

It would appear that, prior to this case, the UBC has not attempted any restructuring in the states of New York, Connecticut or Vermont. Accordingly the Second Circuit has never been called upon to consider the legality of such restructuring plans. However, while I am not bound by the decisions of the First, Sixth and Ninth Circuits previously cited, I agree with their conclusions. It

follows that, to the extent that the plaintiffs at bar assert the same claims that were rejected when asserted by other locals in these other circuits, they do not raise sufficiently serious questions going to the merits of their claims as to make them a fair ground for litigation, let alone establishing the likelihood of success.

In these circumstances, the claims alleged in the plaintiffs' amended complaint must be examined in detail, in order to ascertain whether and to what extent they differ from the claims asserted by dissident UBC Locals in the cited cases. Disregarding plaintiffs' claims of violation of the Consent Decree alleged in Count One, which I will not consider for the reasons previously stated, the amended complaint alleges claims under five general headings: [*14] Federal labor law; state labor law; Federal civil rights law; state and local civil rights law; and the UBC Constitution. I will consider those headings in order.

*Federal Labor Law*

Count Two of the amended complaint alleges that the Restructuring Plan violates section 101 of the LMRA, *29 U.S.C. § 157*, in that the Plan denies plaintiffs the right to bargain collectively through representatives of their own choosing. Plaintiffs' theory is that, under the Restructuring Plan, "the business representatives currently elected by the locals to represent their members' interests would be appointed by the District Council; Locals would be merged or dissolved; and interim district council Delegates would be appointed. All of these actions would deprive plaintiffs of their chosen representatives." Main Brief at 15-16. Such deprivation violates *29 U.S.C. § 157*, plaintiffs contend, because that section provides that "employees shall have the right . . . to bargain collectively through representatives of their own choosing. . ."

Count Five of the amended complaint alleges that the Restructuring Plan violates section 101(a)(1) of the LMRDA, *29 U.S.C. § 411(a)(1)*. That section provides [*15] in part that [HN2]"every member of the labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization . . . and to participate in the deliberations and voting upon the business of such meetings. . ."

Count Five alleges generally that "[a] purpose and effect of the Restructuring Plan is to eliminate *29 U.S.C. § 411(a)(1)* rights to members of Locals not favored by McCarron." Amended complaint at P 49. Plaintiffs' specific charges of *§ 411(a)(1)* violations are stated, not in the amended complaint, but in their main brief at 12-13. There are two asserted factual bases for this claim. First, plaintiffs say that the UBC asked Local 608 "for its input

Case 1:07-cv-10384-HB   Document 7-4   Filed 01/18/2008   Page 7 of 17

1997 U.S. Dist. LEXIS 15689, *; 157 L.R.R.M. 2421

regarding certain features of the Restructuring Plan," and also provided Local 608 with "the opportunity to vote on the issue of a transfer of funds from Local 608 to the Full Service Council." None of the other Locals, plaintiffs continue, was given the opportunity to vote on the plan and make the results of that vote known to defendants; and, "in exchange for its support of the Restructuring Plan," Local 608 "was allowed to retain its [*16] name and its charter."

The second asserted factual basis for a § 411(a)(1) violation sets forth a theory which underlies not only that claim, but plaintiffs' civil rights claims as well. Succinctly put, plaintiffs contend that the Restructuring Plan will merge several smaller unions, whose members belong predominantly to ethnic or racial minorities, into larger locals, a process which "will effectively eliminate the political voice of any unfavored or racial group or local." Main Brief at 13.

### State Labor Laws

Counts Three and Four of the amended complaint allege respectively that the Restructuring Plan violates Article 1, § 17 of the New York Constitution, and § 703 of the New York Labor Law, both of which provide that employees shall have the right to bargain collectively through representatives of their own choosing. These state law claims parallel the claim plaintiffs assert in Count Two, under § 101 of the LMRA, 29 U.S.C. § 157.

### Federal Civil Rights Laws

Plaintiffs' civil rights claims were first asserted in the amended complaint dated August 14, 1997. In Counts Six, Seven and Eight, plaintiffs respectively allege that the Restructuring Plan violates 42 [*17] U.S.C. § 1981, § 1982, and § 1985(3). The substantive counts, Five and Six, both allege that implementation of the Restructuring Plan will lead to "the elimination of locals that historically have been predominantly made of minorities and whose leadership has predominantly consisted of minority members." Amended complaint, PP 52, 54. Plaintiffs say that this violates § 1981 by "denying plaintiffs the same right to make and enforce contracts and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens," P 52, and violates § 1982 by "denying plaintiffs the same right as is enjoyed by white citizens to hold real and personal property," P 54. The conspiracy count, Eight, charging that the Restructuring Plan violates § 1985(3), alleges that "defendants and Local 608 have conspired to eliminate locals that historically have been predominantly made up of minorities and whose leadership has predominantly consisted of minority members, thus depriving plaintiffs of the equal

protections of the laws, or of equal privileges and immunities under the laws." Amended complaint, P 56.

### State Civil Rights Laws

[*18] The alleged effect of the Restructuring Plan upon minority unions, which underlies plaintiffs' Federal civil rights claims, also forms the factual predicate for Count Nine, alleging a violation of New York Executive Law § 296(1)(c), and Count Ten, alleging a violation of New York City Administrative Code § 8-107.

### The UBC Constitution

Finally, Counts Eleven, Twelve, and Thirteen of the amended complaint allege that the Restructuring Plan violates Section 6(A) of the UBC Constitution. Plaintiffs assert that the Plan evidences bad faith on the part of McCarron, by acting to increase his power, purposely eliminate plaintiff Locals, confiscate their assets, discriminate against plaintiffs on racial grounds, deny plaintiffs an opportunity to vote on the future make-up of the UBC, and merging the Local Unions and unilaterally appointing their leadership (Count Eleven); and by permitting Local 608 to vote on the Restructuring Plan while denying a vote to all other Locals (Count Twelve). Count Thirteen alleges that the Restructuring Plan violates Section 3 of the UBC Constitution, which recognizes "that the interests of all labor are identical regardless of occupation, sex, nationality, [*19] religion or color, for a wrong done to one is a wrong done to all," by discriminating against plaintiffs on racial and ethnic grounds.

\* \* \* \*

For the most part, these claims do not duplicate or echo claims asserted by other UBC locals and rejected by the appellate decisions previously cited. The parties do not cite, and the Court's research has failed to disclose, any case addressing such claims in the context of a merger of local unions mandated by an international union pursuant to a constitution such as that of the UBC.

Accordingly I will consider the merits of these claims in turn, to determine whether they adequately support plaintiffs' motion for a preliminary injunction barring the implementation of the UBC's Restructuring Plan.

### IV

### A

Defendants claim that there is no substance to plaintiffs' claim that the Restructuring Plan would deny them the right to bargain collectively through representatives of their own choosing, because in the New York area the District Council has traditionally been the collective bargaining agent for its constituent Locals and their mem-

bers, an arrangement that the Restructuring Plan does not alter.

Plaintiffs respond by pointing out that since [*20] the UBC imposed a trusteeship upon the District Council, no elected officials are functioning at the Council; and that, under the Restructuring Plan, the District Council will initially appoint all delegates and the Executive Board of the District Council, to hold office until elections to be held at some unspecified future date. In these circumstances, plaintiffs contend, "the appointment of delegates and Executive Board members to the District Council will ensure that plaintiffs will *not* have the right to elect representatives of their own choosing to negotiate collective bargaining agreements with employers." Reply Brief at 34 (emphasis in original).

This is an assertion that harm will occur in the future. But plaintiffs submit no evidence with respect to the imminence of the circumstance which they profess to view with alarm. Plaintiffs submit no affidavit describing the present state of the collective bargaining agreement between the District Council and employers in the contracting industry: whether such an agreement is currently in force; if so, how long it has to run; and when negotiations of a new agreement may be expected to commence.

The Restructuring Plan proclaims [*21] in its third paragraph that the Plan "is designated to culminate, at the earliest provident time, in rank and file elections of both District Council officers and members of the newly expanded District Council delegate body," an election that must await "the systematic redefinition of function between council, officers and council delegates, the reassignment under new oversight mechanisms of business agents, the computerized central enforcement of the job referral system, the putting in place of extensive financial reforms and controls, and the carrying out of necessary mergers of certain locals."

Only if these preliminary steps have not been accomplished, and accordingly no elections held, at the time when a new collective bargaining agreement must be negotiated, would plaintiffs have even an arguable claim that defendants have violated section 101 of the LMRA and the comparable state law guarantees of union members' right to choose their collective bargaining representatives. In saying that, I do not mean to suggest that the argument would succeed if existing circumstances permitted it to be made. But I think it is clear that in the present circumstances, there is no substance to [*22] plaintiffs' claim that representatives they have not chosen are engaged in collective bargaining for them.

Plaintiffs also complain that the Restructuring Plan, by merging certain Local Unions, would deprive them of such "chosen representatives" as business representatives and District Council delegates. Section 101 of the LMRA, 29 U.S.C. § 157, set out in full in the margin, [3] ties the concept of "representatives of their own choosing" solely to the process of bargaining collectively. The other rights of self-organization are stated generally; and the Constitution between the UBC and its constituent Locals and members is itself a form of organization contemplated by the LMRA. [HN3]Union constitutions such as these are regarded by courts as enforceable contracts between the international and its locals. *Local 1052 v. Los Angeles County District Council of Carpenters*, 944 F.2d 610, 613 (9th Cir. 1991) (citing cases). *See also International Brotherhood of Teamsters v. Local Union No. 810*, 19 F.3d 786, 791 (2d Cir. 1994) ("The [IBT] constitution is not only a contract between IBT and its locals, it also may be characterized as a 'contract' between labor organizations representing [*23] employees in an 'industry affecting commerce' within the meaning" of the LMRA. [HN4]Under the plain wording of section 101 of the LMRA, the employees' right to "representatives of their own choosing" is confined to the collective bargaining process.

> 3  [HN5]Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.

On the present record, plaintiffs demonstrate neither a likelihood of success nor a sufficient ground for litigation with respect to their claim that the Restructuring Plan violates section 101 of the LMRA. The [*24] same analysis applies with respect to Counts Three and Four of the Amended Complaint, which assert parallel claims under state law.

B

There is no substance at all to plaintiffs' claim that in its treatment of Local 608, the UBC violated the guarantee of equal rights and privileges in union electoral matters found in section 101(a)(1) of the LMRDA, 29 U.S.C. § 411(a)(1).

The alleged preferential treatment of Local 608 is said to be manifested by a letter dated May 28, 1997, sent by the officers of that Local to Banes. Ex. H to Amended Complaint. The letter refers to a meeting held on April 28, 1997 between Local 608's Executive Board and three UBC representatives, at which the Board

members "were asked for input regarding implementation of the Full Service Council." *Id.*, p. 1. The letter then sets forth a number of concerns expressed by Local 608 members, and says to Banes that "we would appreciate it if you would address" them. *Id.* The letter concludes with these paragraphs at p. 2:

> As you know, we have already discussed many of these issues, however, we wanted to give the membership the opportunity to vote on any transfer of funds. At our meeting this evening, the [*25] membership voted overwhelmingly to support the restructuring provided these concerns are addressed.
>
> In closing, we wish to thank you, on behalf of ourselves and our membership, for allowing us the opportunity to provide input regarding the future of our Council.

This politely innocuous letter does not demonstrate the sort of preferential treatment plaintiffs profess to read into it. The UBC representatives made similar presentations to most if not all of the Locals, as evidenced by letters of comment sent by nine other Locals and attached as Ex. A to the UBC's brief. [4] While Local 608 took a vote on one aspect of the Restructuring Plan, it did so on its own initiative, without encouragement or permission from the UBC. The UBC's position has consistently been that locals have no right under the Union Constitution to vote on restructurings, *see* McCarron affidavit at P 39. The courts have equally consistently affirmed that position.

> 4    Ordinarily, attaching exhibits to briefs of counsel is insufficient to get them into evidence. But plaintiffs do not challenge the authenticity of these letters from other Locals.

[*26] V

Plaintiffs assert a number of claims based upon the general proposition that implementing the Restructuring Plan would have adverse and discriminatory effects upon Locals whose members belong predominantly to ethnic or racial minorities: what plaintiffs refer to as "minority" Locals. As noted, such claims have not been put forward by the dissident locals in the other UBC cases, or, so far as the parties' and the Court's research reveals, in any other comparable context.

Plaintiffs at bar first asserted this group of claims in the amended complaint dated August 14, 1997. They were discussed in plaintiffs' supplemental brief dated August 29, but plaintiffs served no evidentiary material

in support of any of them until Friday, September 11, with the hearing on their preliminary injunction motion scheduled (as it had been weeks earlier) for September 15.

Under this Point, I will consider all plaintiffs' claims that sound the basic theme of minority representation. Some assert violations of labor laws; others assert violations of civil rights laws.

Plaintiffs articulate their claims falling within this category at various points throughout their submissions. The following quotations [*27] are illustrative.

"The purpose and effect of the Restructuring Plan is and will be to reduce the size and influence of Locals that historically have been predominantly Black, Jewish and Italian and which currently have a rank and file membership consisting mainly of minorities." Supplemental Brief at 10. "Implementation of the Restructuring Plan will result in the loss of minority representation in the rank and file members in the newly formed Locals." *Id.* at 12. "Minority representation on the Executive Boards of the dissolving Locals will be severely affected if the Restructuring Plan is implemented." *Id.* at 13. "The loss of voting power of the minorities in the rank and file ensures that minority representation on the Executive Board will be non-existent. Furthermore, the decrease in minority rank and file representation and in Executive Board representation will result in greater competition for minorities to secure jobs from the Local's Referral List and in less protection from the Executive Board to ensure that minorities have the same opportunities to secure employment." *Id.* at 14 (footnote omitted). "Ultimately, the Restructuring Plan has the purpose and effect [*28] of discriminating against Locals on the basis of race." *Id.* at 15. "It is clear from the Restructuring Plan as proposed by the defendants that *only* minority Locals are the targets of merger and dissolution, since the sole non-minority Local, Local 608, will be allowed to continue to exist." Reply Brief at 32. "What you're going to have is a diminution in the amount of minorities on the executive board of the reconstituted locals." September 15, 1997 Hearing, Transcript of Oral Argument by Plaintiffs' Counsel, at 17. "And the probability, I submit, your Honor, of there being a minority member on the executive board of a new merged local is as good as my flying to the moon tomorrow. It is basically non-existent." *Id.* at 22.

Plaintiffs' supplemental brief tracked and expanded upon the conclusory allegations of the amended complaint. Neither the pleading nor the brief was accompanied by any evidentiary material, such as affidavits executed by persons with knowledge of the pertinent facts who could testify to them at trial. Plaintiffs' first proffer of evidence occurred on September 15, 1997, after de-

Case 1:07-cv-10384-HB    Document 7-4    Filed 01/18/2008    Page 10 of 17

1997 U.S. Dist. LEXIS 15689, *; 157 L.R.R.M. 2421

fendants had filed their opposing brief. On that date, plaintiffs filed a [*29] reply brief, accompanied by affidavits.

Plaintiffs' September 15, 1997 evidentiary submissions consist of nine affidavits by individual carpenters and some exhibits. The affiants are Charles Phipps, George Swapp, Phillip Fulgieri, Scott Rubin, Ivan Gontarski, Michael Castaldo, James K. Hayes, Sr., William Lebo, and Salvester Zarzana. I place the affidavits of Hayes and Lebo aside for the present, because they do not address the issue of minority representation.

Charles Phipps is an African-American and member of Local 17, which is not a plaintiff. Phipps served as business representative from 1992 to 1995. He states that Local 17 has a total membership of approximately 2,200, of which 45% are Black, 10% Hispanic, 2% Jewish, 3% Italian, and 5% Asian, for what Phipps refers to as "a total minority percentage of 92%." Affidavit, P 4. The Executive Board of Local 17 "consists of 3 blacks, 1 Hispanic, 5 Italians and 1 White." Id., P 5. Counsel for plaintiffs said at oral argument that in this context, "1 White" on the Executive Board means "[a] non-Italian, non-Jewish white." Tr. 21. Phipps went on to say that, on information and belief, Local 608 has about 4,000 members, of which [*30] "75% are non-minority," so that if Local 17 is merged into Local 608 under the Restructuring Plan, "the 55% black and Hispanic majority of Carpenters Local 17 will be reduced to approximately 29% of the enlarged Carpenters Local 608," with the predicted result that "it will be all but impossible to elect any minority officers in the merged local." Affidavit, P 6.

George Swapp is an Afro-American and member of plaintiff Local 902. His affidavit describes past acts of perceived racial discrimination when he "shaped" for jobs at various union hiring halls. He says that prior to his retirement in April 1997, he served as a trustee of Local 902, and recalls that the Executive Board of that Local "was comprised of nine members, of which three were Afro-Americans, one was Hispanic, five were Italian and one was German." Affidavit, P 14. [5]

5    That makes for a total of ten Board members, not nine, as stated in the affidavit.

Phillip Fulgieri is Italian and Jewish, and a member of plaintiff Local 296, which he serves [*31] as Executive Board member, business representative, and delegate to the District Council. Local 296 has approximately 706 members, of whom "approximately 17% are Black, 4% are Hispanic, 23% are Jewish and 34% are Italian, or a total of 78% minority." Affidavit, P 4.

Scott Rubin is Jewish, and a member of plaintiff Local 135. The Executive Board of Local 135 "is comprised of Jewish members," Affidavit, P 3. Local 135 has ap-

proximately 1,728 members, of whom "approximately 18% are Black, 7% are Hispanic, 19% are Jewish, 20% are Italian and 1% are Asian, or a total of 64% minority." Id., P 4. Rubin says that since its incorporation in 1917, Local 135 has been "considered a Jewish Local." Id., P 5. He has encountered anti-Semitic discrimination during his work as a carpenter. Id., PP 9-10.

Ivan Gontarski, who is Jewish and a member of Local 135, submits an affidavit which is identical to that of Rubin.

Michael Castaldo is Italian and a member of Local 135. He says that during his years as a carpenter, "I have had occasions to work in the Local 608 jurisdiction and have personally experienced discrimination because I was not Irish." Affidavit, P 3. Castaldo goes on to describe [*32] further perceived acts and declarations of prejudice against Italian and in favor of Irish carpenters. Id., PP 4-10. Castaldo expresses his belief that "without Local 135, people like myself would have no form of protection against racial discrimination." Id., P 11.

Salvester Zarzana is Italian-American and a member of Local 902. He says that Local 902 has approximately 1,024 members, of whom "approximately 23% are Afro-American, 6% are Hispanic, 33% are Italian, 1% are Asian and 2% are Jewish, for a total of 65%." Affidavit, P 4. [6] "There are three Afro-American Trustees, one Hispanic Recording Secretary, three Italians, one Greek and one German on the nine member Executive Board." Id., P 5.

6    Following plaintiffs' statistical approach, the phrase "total of 65%" presumably is meant to convey 65% minority representation.

The question now arises whether this evidence, offered in support of plaintiffs' discrimination claims, satisfies either prong of the merits analysis that determines plaintiffs' [*33] entitlement to a preliminary injunction.

The statistical evidence that can be culled from the affidavits is sketchy. Each Local merger or dissolution mandated by the Restructuring Plan that arguably falls within plaintiffs' claims is considered separately.

*Local 17 will be Merged into Local 608.*

While Phipps, the carpenter whose affidavit addresses this merger, is a member of Local 17, the Local itself is not a plaintiff in the action. That is somewhat surprising, since as noted plaintiffs' counsel identify the merger of Local 17 into Local 608, "the sole non-minority Local," Reply Brief at 32, as the strongest indication of the UBC's invidious and discriminatory purpose. But laying that question aside, Phipps' affidavit says that Local 17's 2,200 membership has a total minor-

Case 1:07-cv-10384-HB    Document 7-4    Filed 01/18/2008    Page 11 of 17

1997 U.S. Dist. LEXIS 15689, *; 157 L.R.R.M. 2421

ity representation of 92%, when one defines "minority" by adding together all Black, Hispanic, Jewish, Italian and Asian carpenters. Local 608, Phipps says "on information and belief," has 4,000 members and is 75% non-minority.

Extrapolating these numbers, the new and enlarged Local 608 will have 3,024 minority members (2,024, being 92% of the present Local 17 membership of 2,200, *plus* 1,000, being [*34] 25% of the present Local 608 membership of 4,000), and 3,176 non-minority members (176, being 8% of 2,200, *plus* 3,000, being 75% of 4,000). This gives a minority representation of 49% and a majority membership of 51%: significantly less dire a result than that posited by plaintiffs' claims. In a subsequent sentence, Phipps's affidavit seeks to maximize the dilution of minority percentages by calculating only Black and Hispanic representation in an enlarged Local 608; but plaintiffs cannot be consistent, and cannot change their definition of "minority" for the sake of a particular effect. Accepting *arguendo* plaintiffs' inclusive concept of an ethnic and racial "minority," [7] an enlarged Local 608 does not, on plaintiffs' own figures, paint the picture of a Local whose minority members labor under the yoke of an overwhelming majority.

> 7   A number of cases have considered discrimination against Blacks and Hispanics together as violative of civil rights statutes. *See, e.g., E.E.O.C. v. Local 580*, 925 F.2d 588, 590 (2d Cir. 1991) (Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*). In *Shaare Tefila Congregation v. Cobb*, the Supreme Court held that Jews were entitled to assert a claim of racial discrimination under 42 U.S.C. § 1982. I have not found, and plaintiffs have not cited, a case melding so many ethnic or racial groups into a "minority" as the plaintiffs do; if I follow their reasoning, the only "majority" carpenters are Irish.

[*35] *Locals 257 and 135 will be Dissolved, and a New Local will be Chartered.*

Locals 257 and 135 are both plaintiffs. The only statistical evidence on the consequences of this restructuring is found in Rubin's affidavit, which says that Local 135 has 1,728 members and a total minority representation of 64%, comprised of Black, Hispanic, Jewish, Italian, and Asian carpenters.

Plaintiffs furnish no evidence with respect to the present composition of Local 257. But it must be observed -- and this observation applies to all dissolutions still to be considered -- that if, as plaintiffs state, Local 608 is the *only* majority Local, Locals 257 and 135 must perforce both be minority Locals, as plaintiffs define that term; and it would seem necessarily to follow that a new

Local, rising Phoenix-like from the ashes of two minority Locals, will itself be a minority Local.

> *Locals 531 and 348 will be Dissolved, and a New Local will be Chartered.*

Local 531 is a plaintiff. Local 348 is not. Plaintiffs furnish no evidence about the ethnic or racial composition of either Local, or the impact of the Restructuring Plan upon their minority representations. However, I assume from plaintiffs' [*36] papers that both are minority Locals to begin with.

> *Local 902 and Local 296 will be Dissolved, and a New Local will be Chartered.*

Zarzana's affidavit says that Local 902 has 1,024 members and a total minority representation of 65%, made up of Afro-American, Hispanic, Italian, Asian, and Jewish carpenters. The nine-member Executive Board is comprised of three Afro-Americans, one Hispanic, three Italians, one Greek, and one German. Fulgieri's affidavit says that Local 296 has 706 members and a total minority representation of 78%, made up of Black, Hispanic, Jewish, and Italian carpenters. The present makeup of the Local 296 Executive Board is not stated.

On these figures, the new Local will have a pronounced "minority" majority; and the strikingly diverse composition of Local 902's Executive Board would seem to argue against any ethnic or racial group being frozen out of election to the new Local's Board. [8]

> 8   Local 17, described in the Phipps affidavit, *see* p. 22 *supra*, demonstrates a comparable diversity in the composition of its Executive Board. The Board is comprised of ten members. The membership of the Local is 45% Black, with three Blacks on the Executive Board; 10% Hispanic, with one Hispanic on the Board; 2% Jewish, with no Jewish Board member; 30% Italian, with five Italians on the Board; 5% Asian, with no Asians on the Board; and 8% "non-Italian non-Jewish white," with one such individual on the Board. This pattern is more reflective of proportional representation than dominance by any particular group or groups, to the exclusion of others. Thus a "majority" member (as plaintiffs define that term) won one of the ten Board positions, although that group comprised only 8% of the Local membership. I see no reason to assume, as plaintiffs seemingly ask me to do, that comparable election patterns will not emerge among the Plan's merged or reconstituted Locals.

[*37] *Local 246 and Local 1994 will be Dissolved, and a New Local will be Chartered to Represent Shop Employees.*

Case 1:07-cv-10384-HB    Document 7-4    Filed 01/18/2008    Page 12 of 17

1997 U.S. Dist. LEXIS 15689, *; 157 L.R.R.M. 2421

While Locals 246 and 1994 were originally parties plaintiff, they subsequently withdrew from the action. The remaining plaintiffs offer no statistical evidence with respect to the impact of the Restructuring Plan upon them.

\* \* \* \*

If plaintiffs intended by this evidence to demonstrate that the Restructuring Plan would have a disparate impact upon the Locals comparable to that involved in certain civil rights contexts, it falls well short of the mark. The evidence lends only marginal and speculative support to plaintiffs' two dire predictions of post-Plan implementation events, namely, the inability of "minority" union members to win election as Local officers, and an unfair distribution of jobs. The weakness of the present statistical evidence supporting the first of these predictions need not be further analyzed. At oral argument plaintiffs' counsel said that the likelihood of "a diminution in the amount of minorities on the Executive Board of the reconstituted Locals" was evidenced by the fact that "there are no minorities" on the General Executive Board "that rules [*38] the UBC." Hearing Tr. 17-18. However, as plaintiffs' counsel also stressed, New York City "is a unique circumstance. It is, as everybody says, a melting pot. You have minority groups." *Id.* Counsel made that observation to advance a different point, but it resonates in the present context because the participants and processes involved in the election of General Executive Board members are not shown to mirror what takes place in the election of officers of a New York Local. I do not think that what happens at a General Executive Board election is a persuasive predictor of what will happen at post-Plan elections in the reconstituted Locals.

As to the second prediction, an important feature of the Restructuring Plan is that the referral of workers to jobs, a function previously performed by the various Locals, will now be done by the Full Service District Council, which will establish a centralized computer job referral system. That system will operate within the context of the substantive job referral rules formulated under the Consent Decree and approved by the Court, pursuant to which carpenters are assigned to jobs from the top of the out-of-work list. The Plan refers to other [*39] District Councils where similar computerized job referral systems have been installed, and says of one of them, the Southern California District Council of Carpenters: "Complaints about being bypassed for jobs have virtually been eliminated, and any questions that do arise are quickly answered by examining the computer records." Restructuring Plan at 5.

The purpose and anticipated effect of this job referral system sound plausible enough, and it squarely addresses the second of the two concerns professed by

plaintiffs, since computer-logged communications from and to carpenters seeking work are ethnically and racially blind. At oral argument plaintiffs' counsel was reduced to arguing that

> even with the whole new computer system set up by the UBC, there's not going to be a lot of opportunities, your Honor, because there's going to be no sensitivity to the needs. What happens if you have a Jewish carpenter and he needs to take off for the High Holy Day? Is a nonminority restructured Local going to have business agents that are sensitive to that ?Those rights are going to be infringed upon. Tr. 26.

Of course, one hopes that the restructured Locals would respect the requirements [*40] of carpenters' religious faiths, and there is no present showing that they would not. But the larger point is that discrimination in job referrals, a sore subject for a number of the affiants when the Locals were performing that function, should be eliminated or reduced under the Plan's Full Service District Council centralized computerized system. This consideration undermines plaintiffs' argument that the Plan will bring about a discriminatory effect in violation of labor or civil rights laws.

Not only is the present evidence of a discriminatory disparate impact upon the affected Locals less than compelling, [HN6]disparate impact alone is not sufficient to sustain a claim under civil rights statutes such as 42 U.S.C. § 1981. There must be a showing of discriminatory intent.

In *General Building Contractors Association v. Pennsylvania*, 458 U.S. 375, 390-91, 73 L. Ed. 2d 835, 102 S. Ct. 3141 (1982), the Supreme Court held that [HN7]42 U.S.C. § 1981 can only be violated by purposeful discrimination. [9] Accordingly, a plaintiff cannot assert a disparate impact claim under § 1981. *General Building Contractors Association*, 458 U.S. at 383 n.8, 390; *see also Guardians Association of* [*41] *New York City v. Civil Service Commission*, 633 F.2d 232, 263-68 (2d Cir. 1980) (holding that disparate impact claim cannot be sustained under § 1981). Rather, the standard for liability under § 1981 is the same as the standard for liability in a *disparate treatment* case under Title VII. See *Martin v. Citibank, N.A.*, 762 F.2d 212, 217 (2d Cir. 1985); *Knight v. Nassau County Civil Service Commission*, 649 F.2d 157, 161-62 (2d Cir. 1981); *Hudson v. IBM*, 620 F.2d 351, 355 (2d Cir. 1980). Thus, while a Title VII disparate impact plaintiff need only show that a disparity exists to state a prima facie case, *District Council 37, AFSCME v.*

*New York City Department of Parks and Recreation*, 113 F.3d 347, 351-52 (2d Cir. 1997), in the context of § 1981, statistical evidence of a disparate impact is significant only if "'that impact can be traced to a discriminatory purpose.'" *General Building Contractors Associations*, 458 U.S. at 390, citing *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 272, 60 L. Ed. 2d 870, 99 S. Ct. 2282 (1979).

    9  The Supreme Court applies the same analysis to § 1982 as § 1981. *See General Building Contractors Association*, 458 U.S. at 383-88.

    [*42]  In *Feeney*, 442 U.S. at 279, [HN8]the Supreme Court held that a decisionmaker acts with a discriminatory purpose if that decisionmaker "selected or reaffirmed a particular course of action at least in part 'because of,' and not merely 'in spite of,' its adverse effects upon an identifiable group." As a result, the Second Circuit has held that "statistical proof alone cannot ordinarily establish a prima facie case of disparate treatment . . . under § 1981" in individual disparate treatment cases. *Martin*, 762 F.2d at 217 (rejecting statistical proof and reversing finding of liability under § 1981); *see also Hudson*, 620 F.2d at 355 (holding that statistical evidence of disparate impact standing alone does not establish prima facie case in § 1981 action). [10] This is because an individual § 1981 plaintiff must prove that he or she in particular has been discriminated against on the basis of race. *Hudson*, 620 F.2d at 355.

    10  The plaintiffs cite *Coalition of Bedford Stuyvesant Block v. Cuomo*, 651 F. Supp. 1202, 1211 (E.D.N.Y. 1987), which cites *Martin*, for the proposition that "the Second Circuit has held that a showing by plaintiff of disparate impact shifts the burden of production, but not persuasion, to the defendant with regard to intent." As the above quoted language indicates, *Martin* does not clearly stand for this proposition. Rather, the Second Circuit expressed skepticism that statistical evidence of disparate impact could establish a prima facie case of intentional discrimination. *See Martin*, 762 F.2d at 218.

    [*43]  This is not the case in class action suits alleging a pattern or practice of intentional discrimination. In such a case, [HN9]"where gross statistical disparities can be shown, they alone may in a proper case constitute prima facie proof" of intentional discrimination. *Hazelwood School District v. United States*, 433 U.S. 299, 307, 53 L. Ed. 2d 768, 97 S. Ct. 2736 (1977); *see also Ottaviani v. State University of New York*, 875 F.2d 365, 370-71 (2d Cir. 1989) (reciting rule that disparity must be statistically significant to establish prima facie case of intentional discrimination). However, the dispar-

ity must be so significant that it is more likely than not that the disparity resulted from intentional discrimination, rather than any legitimate factor. *See International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 337-43, 52 L. Ed. 2d 396, 97 S. Ct. 1843 (1977) (evidence of longlasting and persistent disparity is telltale sign of purposeful discrimination); *Palmer v. Shultz*, 259 U.S. App. D.C. 246, 815 F.2d 84, 91 (D.C. Cir. 1987) ("If the disparity between selection rates for men and women is sufficiently large so that the probability that the disparities resulted [*44] from chance is sufficiently small, than a court will infer from the numbers, alone that, more likely than not, the disparity was a product of unlawful discrimination."); *cf. AFSCME v. County of Nassau*, 96 F.3d 644, 651 (2d Cir. 1996) (holding that plaintiff established prima facie case of intentional discrimination through "extensive statistical studies" which showed that salary differential between men and women could not be explained by any legitimate variable). [11]

    11  Statistical evidence can also be used at the pretext stage of litigation to rebut the defendant's purported nondiscriminatory explanation. *McDonnell Douglas*, 411 U.S. 792 at 805.

    Thus, to establish a prima facie case of intentional discrimination under § 1981 on the basis of statistical evidence, the Local 20 plaintiffs must show a disparity so significant that it raises an inference that the UBC is pursuing the merger plan at least in part because of its adverse effects on minorities.

    In the case at bar, the statistical evidence thus [*45] far comes nowhere near that level. Moreover, there is no direct evidence of defendants' discriminatory purpose in implementing the Restructuring Plan. Of course, such purpose is more often inferred from circumstantial evidence. But the present record does not strongly support that inference, and there are circumstances which militate against it.

    First, this Restructuring Plan constitutes the UBC's application in New York of a UBC policy professedly conceived (wisely or not, a question beyond the competence of courts) to improve union effectiveness; a stated policy that McCarron and the UBC have been pursuing on a nationwide basis for a number of years. It is at least as plausible to infer that the UBC's purpose in this Plan is to extend that policy to this locality, rather than to discriminate against minority New York Locals.

    Second, McCarron's affidavit states that the Restructuring Plan is based in part upon a report concerning the New York City District Council area, prepared by two UBC "National Representatives," Jerry Rhoades and Robert Statkus ("the Rhoades-Statkus Report"). [12] McCarron Affidavit at P 36, and Ex. 2. This seven-page,

single-spaced report, dated April 29, 1997, [*46] describes the conditions prevailing in the District Council and among the various Locals, identifies objectives, and recommends actions in terms that reflect non-invidious, non-discriminatory motivations. [13] The Restructuring Plan follows the report's recommendations. While the existence of the Rhoades-Statkus report is not determinative on the issue of UBC motivation, it is probative. *Cf. Pile Drivers*, at slip op. 13 (in addressing the issue whether the UBC "could rationally conclude that the reorganization was worth the risk of employer dissatisfaction," the Court observed that "the anticipated benefits of reorganization were outlined in a report prepared by Michael Draper, a member of the General Executive Board of the UBC, after studying the UBC's operations in the Northern California area. Mr. Draper concluded that regional reorganization would result in administrative savings and would permit the union to direct additional resources to organizing, a priority for the UBC."). The Rhoades-Statkus Report sounds similar themes, and constitutes admissible evidence of the UBC's purpose in preparing the Plan at bar. [14] Counsel for plaintiffs accurately points out that he has not [*47] yet had an opportunity to depose the authors of this report, but does not suggest the specific lines of inquiry to be pursued.

12    The record does not describe the status or function of a UBC National Representative, or how one attains that position.

13    The parties debate the meaning intended by the report's sole explicit reference to minorities, which appears at page 2:

> Although our market share study has not yet been fully completed, we believe that the union share of the construction market is smaller than it should be, and points to a lack of concerted and coordinated effort to rebuild the organization. *Many agents are reporting a growing concern over minority coalitions demanding work with our union employers and instead of actively seeking to represent them, we appear to be stuck in a mode of managing a decline.* (emphasis added)

The precise thought sought to be conveyed by this statement may not be entirely clear; but it appears to be supportive of, rather than intended to foster discriminate against, minorities.

14    With respect to the merging of Locals, the Rhoades-Statkus Report tends to support an inference of noninvidious intent, and militates against one of discriminatory intent. A principal objective stated in the Report is to achieve greater geographic efficiency among the New York area Locals. The Report points out at p. 1 that of the five City boroughs, "many of the boroughs have multiple locals in a very small area," which "represents a duplication of costs and services to the membership." In that circumstance, the Report recommended at p. 5 that Local 17 be merged into Local 608 "to create one local on the West side of Manhattan and the Bronx"; that Locals 257 and 135 be dissolved "and a new local created to set up one local on the East side of Manhattan"; that Locals 531 and 348 be dissolved and a new local be created "making one local for the borough of Queens"; and that Locals 902 and 348 be dissolved and "a new local be created for the borough of Brooklyn." However, the Report also recommended that Local 20, the Staten Island local, remain intact, since "in excess of 80% of the membership lives on this island and have a substantial influence on the work performed [sic] there"; and that Locals 1536, 1456, 2287, and 740 remain intact, since "they are specialty locals and the mixing of membership would not be a good fit." *Id.* at p. 6. The Plan adopts these recommendations. The impression that emerges is that concepts of administrative efficiency informed the recommendations to merge, or *not* to merge, particular Locals.

[*48] As noted, the plaintiffs' overarching claim on this aspect of the case is that the purpose and effect of the Restructuring Plan is to reduce the size and influence of minority Locals. While no reported case supports that claim, I will assume, without deciding, that such a purpose and effect, if proved, would violate one or more of the labor or civil rights laws plaintiffs invoke in their amended complaint. But plaintiffs' present evidence is sufficient neither to establish a likelihood of their ultimate success, nor, in the totality of the circumstances, sufficiently serious questions going to the merits to justify a preliminary injunction. I reach this conclusion with respect to each of the counts asserting discrimination as the basis for relief, and need not discuss them separately. [15]

15    The claims covered by the discussion under this Point are the second theory of an LMRDA § 411(a)(1) violation argued for in plaintiffs' brief discussing Count Five, the claims alleged in Counts Six through Ten, and the claims alleged in

Case 1:07-cv-10384-HB    Document 7-4    Filed 01/18/2008    Page 15 of 17

1997 U.S. Dist. LEXIS 15689, *; 157 L.R.R.M. 2421

Counts Eleven through Thirteen, to the extent that those claims allege illicit discriminatory purpose and effect.

[*49] VI

Counts Eleven, Twelve and Thirteen of the amended complaint allege that in utilizing Section 6(A) of the UBC Constitution to promulgate the Restructuring Plan, McCarron was and is acting in bad faith.

[HN10]The existence *vel non* of bad faith is a justiciable issue. *See, e.g., Local 48*, 920 F.2d at 1053 ("[A] union's action, though arguably authorized by, and not patently unreasonable, under its governing documents, may still be blocked by the courts if undertaken in bad faith."). *Cf. Teamsters*, 19 F.3d at 790 (statutory 18-month presumption of union trusteeship's validity "does not leave open to question the judgment that prompted its imposition by making that judgment subject to a question of fact, saving only cases where dishonesty or bad faith is shown.").

Apparently the First Circuit in *Local 48* was the first court to define "bad faith" in the context of a union merger. *See* 920 F.2d at 1054. The court of appeals adopted [HN11]"a three-pronged test, holding that bad faith in ordering a merger can be found on evidence that union officials acted contrary to the international's best interests, out of self-interest, or in an unconscionable or outrageous way." *Id.* [*50] at 1055. I agree with that First Circuit test, and apply it to the case at bar.

The dissident locals bear the burden of proving bad faith. It is a demanding burden. [16] For example, it is not open to a dissident local to argue that the merger is economically senseless. *See Local 48*, 920 F.2d at 1054 ("The General President's explanation was that the UB-CJA's long-term policy and program of consolidating local unions provided a reasoned, non-arbitrary basis for the decision. . . . Once the International has given a reasoned and founded explanation for the merger, judicial inquiry into the decision's reasonableness as a tell-tale for bad faith must end."). Any other approach, the court of appeals reasoned, "would run[] up against the principle of judicial non-interference in internal union affairs." *Id.*

16    In *Local 48* the First Circuit did not quantify the standard of proof necessary to show bad faith in the context of union mergers. Where a local union seeks to bar the imposition of a trusteeship, the governing statute requires it to produce "clear and convincing proof that the trusteeship was not established or maintained in good faith for a purpose allowable" under the statute. 29 U.S.C. § 464(c); *Teamsters*, 19 F.3d at 794. While I would be inclined to impose a similar burden in the pre-

sent context, on the ground that charges of malfeasance generally require clear and convincing proof, I need not reach the question, because plaintiffs' present proof is insufficient even under a preponderance standard.

[*51] In the case at bar, to the extent that plaintiffs assert that the Plan's discriminatory effect upon minority Locals is a telltale of defendants' bad faith, the analysis under Point V applies, and the present evidence is insufficient to justify a preliminary injunction on that ground.

Counts Eleven, Twelve, and Thirteen also charge McCarron with self-aggrandizement, and in *Local 48* the First Circuit identified "self-interest" as an element of bad faith on the part of a union officer in McCarron's position. [17] But this avails the plaintiffs nothing, since their allegations of bad faith are conclusory in nature, and depend upon suppositions for which there is a poverty of present proof. [18] I reach that conclusion with respect to each of the three prongs articulated by the First Circuit in *Local 48. Cf. Teamsters*, 19 F.3d at 794 ("Local 810's references to bad faith were limited to conclusory accusations and suggestions that fell far short of the statutory standard requiring clear and convincing evidence.").

17    *Local 48* arose out of a restructuring plan formulated by Sigurd Lucassen, McCarron's predecessor as UBC General President.

[*52]

18    I am mindful of the claims made by a number of the plaintiffs' affiants that McCarron and those acting on behalf of or in concert with the UBC have acted recently in a high-handed fashion. Charles Phipps is critical of "Supervisor Peron" of Local 17 for blocking votes on motions which he disfavored. Affidavit, P 8, 9. Phillip Fulgieri says that a McCarron appointee to the District Council made "baseless charges" against Fulgieri's brother-in-law, Michael Alongi, in retaliation for Fulgieri's involvement in this lawsuit and his opposition to the Plan. Affidavit, PP 9-12. James Hayes and William Lebo say that similarly baseless charges have been made against them for comparable reasons.

As the exhibits to these affidavits reflect, such charges come before a Trial Committee under provisions of the UBC Constitution. I am not prepared to assume that these constitutional procedures will not expose baseless claims for what they are, and I decline plaintiffs' invitation to involve the Court at this early stage of their resolution. The pertinent consideration on this motion is whether the conduct complained of by the affiants furnishes a sufficient basis for inferring that

Case 1:07-cv-10384-HB    Document 7-4    Filed 01/18/2008    Page 16 of 17

1997 U.S. Dist. LEXIS 15689, *; 157 L.R.R.M. 2421

McCarron acted in bad faith in fashioning the Restructuring Plan. It does not.

[*53] The principal case upon which plaintiffs rely in accusing McCarron and the UBC of bad faith is Judge Dorsey's unreported decision in *United Brotherhood of Carpenters and Joiners of America v. Raymond*, Civil No. 2:92CV00250 (D. Conn., Nov. 15, 1993). In *Raymond*, the UBC ordered the merger of Local 43 into another Local and sought a declaratory judgment enforcing its order. Raymond, Local 43's business agent, and the Local itself opposed the UBC's application and counterclaimed for alleged violations of Federal labor and civil rights laws. Judge Dorsey reviewed the recent history of the relations and dialogue between the UBC and Local 43, concluded that "the evidence suggests dubious circumstances surrounding the merger order," slip op. at 7, enumerated "some of the dubious conduct" on the part of UBC representatives, including then General President Lucassen, *id.* at 8-14, and declared the merger order void.

With the greatest respect, I think that the district court in *Raymond* entered into a degree of second-guessing the UBC's merger decision that appellate cases and public policy do not sanction. For example, the court dismissed statistical membership evidence presented [*54] by the UBC as "hardly a significant differential suggestive that 210, the proposed merger survivor, would be any more successful in union endeavors." Slip op. at 9. That observation led the court to characterize, as evidence of "dubious conduct" tantamount to bad faith, "the lack of a convincing showing that a merger would eliminate the shortcomings Lucassen recited, after originally declining to articulate his reasons." *Id.* In my judgment, a national union president exercising the discretionary power conferred upon him by the union constitution to merge locals need not, in order to proceed, first convince a district judge that the restructuring will achieve its stated objectives. I agree with the First Circuit's observations in *Local 48, 920 F.2d at 1054*: "Weighing the evidence of the locals' relative financial condition against the policy reasons undergirding the merger would involve the court in precisely the sort of surveillance over union decision-making that judges should abjure." But the *Raymond* court indulged in precisely that exercise when it concluded that the merger "was not a good faith determination of the best interests of the UBC and its membership, particularly [*55] the membership of Local 43, . . . notwithstanding the reasons given by Mr. Lucassen for his order which are not credited, documented, substantiated or soundly supportive of the objectives he claimed to have intended." Slip op. at 14.

The district court in *Raymond* was more appropriately concerned with the manner in which the merger process progressed. The court said at slip op. 13:

By his willingness to move the merger process through a new [General Executive Board] with no notice to Local 43 or opportunity for it to be heard, the good faith of the [General President] is seriously doubted. A person who exercises power in good faith seeks a full exposure of the pros and cons of an action, as their consideration insures the best decision in the interests of all concerned. The [General Executive Board] vote on April 2, 1992 reflects an unwillingness to expose the issue to the light of full debate, an autocratic attempt to exercise power not at all in keeping with the good faith owed to all concerned.

I assume, without deciding, that such procedural considerations may demonstrate a level of bad faith sufficient to bar a merger upon which the affected locals, under [*56] the UBC Constitution, have no power to vote in the first place. But *Raymond* is distinguishable from the case at bar, since McCarron has allowed or participated in the sort of discussion that his predecessor apparently eschewed in *Raymond*. McCarron and the UBC submitted the Plan, accompanied by the report recommending it, to all the Locals; he published it in the District Council's newspaper, *The Carpenter*; he directed UBC representatives to meet with the affected Locals to explain the Plan and receive comments (as evidenced by the responsive letters from a number of Locals and the contents of the Rhoades-Statkus Report); as defendants' counsel say in their brief at 35, McCarron "directed his representatives to participate in the open hearing before this Court on April 3, 1997." I am not sure if McCarron had any practical choice about that attendance, but the pros and cons of the Plan were vigorously discussed at that hearing, and thereafter individual carpenters wrote letters to the Court which were passed on to the District Council. Lastly, McCarron submitted the Plan to the United States Attorney and the IRO for their consideration and possible objections (there [*57] were none). In doing so, McCarron was not impelled solely by democratic principles; the Consent Decree mandated these submissions; nonetheless, they are additional elements in a process of publication, notice, dissemination of information, and public comment that bears no resemblance to what troubled Judge Dorsey in *Raymond*.

In sum, I hold that the claims plaintiffs assert in Counts Eleven, Twelve and Thirteen, viewed in the light of the present record, do not justify a preliminary injunction.

1997 U.S. Dist. LEXIS 15689, *; 157 L.R.R.M. 2421

## VII

I have said that in the totality of the circumstances, plaintiffs have not demonstrated their entitlement to a preliminary injunction barring implementation of the Restructuring Plan. Those circumstances include two considerations not previously discussed in detail.

### A

The first consideration is a matter of public policy. [HN12]"There is a well-established federal policy of avoiding unnecessary interference in the internal affairs of unions. . . . Absent bad faith or special circumstances, an interpretation of a union constitution by union officials, as well as interpretation of the union's rules and regulations, should not be disturbed by the court." *Motion Picture & Videotape Editors* [*58] *Guild, Local 776 v. International Sound Technicians, Local 695, 800 F.2d 1476, 975* (citing cases), *amended, 806 F.2d 1410 (9th Cir. 1986), cert. denied, 483 U.S. 1022 (1987).* The more recent appellate cases dealing with the UBC's restructuring efforts illustrate the application of that policy. *Cf. Teamsters, 19 F.3d at 790* ("To prevent federal courts from intervening in internal union affairs, Congress established for the first 18 months after a trusteeship is imposed a presumption of its validity.")

Notwithstanding that policy of judicial nonintervention, as Chief Judge Henderson pointed out in *Pile Drivers*, slip op. at 4, "federal law does impose certain limits on the wide-ranging autonomy enjoyed by international unions. At root, this case turns on the difficult question of where exactly to draw the line between the two competing principles."

And so does the case at bar. Within the context of the plaintiffs' motion for a preliminary injunction, I think that the federal policy against court interference in union affairs requires an enhanced showing of the factors necessary to obtain that relief; and that showing is not made on the present record.

### B

Lastly, I [*59] come to the factor of irreparable harm. Plaintiffs say that if implementation of the Restructuring Plan is not enjoined, but they ultimately prevail after plenary trial or on appeal, it will be impossible to "unscramble the eggs." The UBC says that continued delay in implementation of the Plan and its objectives would cause irreparable harm to those who will benefit from it.

Both positions are plausible, if not wholly persuasive. For example, it is not entirely clear that the dissident Locals could not be returned to the *status quo ante* if they ultimately prevail. Merged Locals may be unmerged, and the original bodies reinstituted; presumably the UBC could respond for any provable financial damages suffered by an improvidently merged Local. [19] As for the UBC, it concentrated its restructuring efforts in other parts of the nation for a considerable period of time before turning to New York, and it is not clear that some further delay would entirely frustrate the Plan's purposes.

> 19 In saying that, I intimate no view as to whether, in such circumstances, a Local would have a viable claim for economic damages.

[*60] On balance, I think that plaintiffs' claim of irreparable harm is marginally better than that of the UBC, but that neither claim is particularly strong. That militates against granting a preliminary injunction, since as the Second Circuit held in *Triebwasser & Katz, 535 F.2d at 1359*, a movant's need to demonstrate irreparable harm is "more pronounced" when "the plaintiff establishes something less than probable success on the merits," a phrase that applies to the case at bar, to say the very least.

In short, the doubts that exist with respect to the merits of plaintiffs' claims, when combined with a less than compelling showing of irreparable harm, persuade the Court that this motion fails.

Plaintiffs' motion for a preliminary injunction is denied. The temporary restraining order is vacated. A separate order of reference to a Magistrate Judge for supervision of discovery and pre-trial procedures will be entered.

It is SO ORDERED.

DATED: New York, New York

October 9, 1997

CHARLES S. HAIGHT, JR.

UNITED STATES SENIOR DISTRICT JUDGE

LEXSEE



Caution
As of: Jan 04, 2008

CORRINE M. AYTON, Plaintiff, v. LENOX HILL HOSPITAL, MAGGIE
ZEIDMAN, and RENA RENELL, Defendants.

93 Civ. 6601 (BSJ)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

1997 U.S. Dist. LEXIS 122

January 9, 1997, Decided
January 10, 1997 FILED

**DISPOSITION:** [*1] Defendants' motion for summary judgment granted with respect to all of plaintiff's Title VII claims. Defendant's motion on the remainder of plaintiff's claims denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff, a former employee of defendant hospital, filed an employment discrimination suit against the hospital, defendant director of nursing for cardiovascular services, and defendant nurse, alleging conduct violative of Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 1981 (Title VII), the New York Human Rights Law (NYHRL), and New York tort law. Defendants moved for summary judgment.

**OVERVIEW:** Although defendants contended that the employee failed to demonstrate a prima facie case of race discrimination in connection with her discharge, the court found that the employee met her burden. Defendants argued that the employee was not qualified or performing satisfactorily. The employee, however, presented evidence that she was asked to be a preceptor, a nurse who had good clinical skills and the ability to teach others, and had received positive evaluations. As such, a factual dispute regarding the employee's qualification existed. Plaintiff was fired expressly for her numerous complaints of alleged racial discrimination, evidence of which she presented. The court determined that a rational jury could find that the discriminatory animus motivating such alleged discrimination also precipitated her dis-

charge. The court held that the employee presented evidence that would allow a rational jury to find that the hospital's rationale for discharging her was merely a pretext for discrimination. Accordingly, the court denied defendants' motion for summary judgment, except with regard to Title VII claims against individual defendants, and § 1981 claims against the individual nurse.

**OUTCOME:** The court granted defendants' motion for summary judgment with respect to all of plaintiff's Title VII claims against the individual defendants, and to all of plaintiff's § 1981 claims against defendant individual nurse. The court denied defendants' motion on the remainder of plaintiff's claims.

**CORE TERMS:** summary judgment, discriminatory, return to work, nurse, rational jury, protected activity, prima facie case, hostile, retaliation, discrimination claims, retaliatory discharge, work environment, retaliatory, discriminatory discharge, racial discrimination, disparate treatment, discharged, harassment, pretext, employment discrimination, disparate impact, circumstantial, co-employee, continuous, co-workers, nursing, patient, animus, common law

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Motions for Summary Judgment > General Overview*

*Civil Procedure > Summary Judgment > Standards > Appropriateness*
*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
[HN1]Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party has the burden to show the absence of a genuine issue of material fact. Once the moving party has met this burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). In ruling on a summary judgment motion, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-moving party. Generally, courts are cautious to grant summary judgment to an employer in discrimination suits, where the employer's intent is a central issue to be determined by the fact finder. In an action under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 1981, where a defendant's intent and state of mind are placed in issue, summary judgment is ordinarily inappropriate. Summary judgment is ordinarily inappropriate where an individual's intent is implicated.

*Civil Rights Law > Contractual Relations & Housing > Equal Rights Under the Law (sec. 1981) > Proof of Discrimination*
*Labor & Employment Law > Discrimination > Disparate Treatment > Proof > Burden Shifting*
*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview*
[HN2]Courts require the same standards and burdens of proof for claims brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 1981, and the New York Human Rights Law, § 1981.

*Civil Rights Law > Contractual Relations & Housing > Equal Rights Under the Law (sec. 1981) > Protected Parties*
*Evidence > Procedural Considerations > Burdens of Proof > Allocation*
*Labor & Employment Law > Discrimination > Retaliation > Statutory Application > Reconstruction Statutes (secs. 1981, 1983 & 1985)*
[HN3]In analyzing employment discrimination and retaliation claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 1981, the New York Human Rights Law (NYHRL), the United State Court of Appeals for the Second Circuit follows the three part evidentiary framework set out in McDonnell Douglas, and its prog-

eny. Initially, plaintiff bears the burden of proving a prima facie case of discrimination. To establish a prima facie case, plaintiff must show that (i) she is a member of a protected class; (ii) she was qualified for the position; (iii) she was discharged; and (iv) the discharge occurred under circumstances that suggest it was the result of discrimination. Plaintiff's burden of proof at the prima facie stage is de minimis. The burden then shifts to the defendant employer to articulate a legitimate, nondiscriminatory rationale for the employee's discharge. Upon such a showing, the plaintiff must prove by a preponderance of the evidence that the reasons offered by the defendant were merely a "pretext for discrimination."

*Evidence > Relevance > Circumstantial & Direct Evidence*
*Labor & Employment Law > Discrimination > Racial Discrimination > Proof > Burdens of Proof > Employee Burdens*
*Labor & Employment Law > Discrimination > Racial Discrimination > Proof > Circumstantial & Direct Evidence*
[HN4]An employee may often be constrained to rely on indirect or circumstantial proof of discrimination in employment discrimination cases. Because writings directly supporting a claim of intentional discrimination are rarely, if ever, found among an employer's corporate papers, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > General Overview*
*Evidence > Procedural Considerations > Circumstantial & Direct Evidence*
*Evidence > Relevance > Circumstantial & Direct Evidence*
[HN5]To survive a motion for summary judgment, the employee must show that there is a material issue of fact as to whether (i) the employer's asserted reason for discharge is false or unworthy of belief and (ii) more likely than not the employee's race was the real reason for her discharge. Plaintiff may rely on circumstantial evidence to show discriminatory intent. Employment discrimination is often accomplished by discreet manipulations and hidden under a veil of self-declared innocence. An employer who discriminates is unlikely to leave a "smoking gun," such as a notation in an employee's personnel file, attesting to a discriminatory intent. A victim of discrimination is therefore seldom able to prove his or her claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence.

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > General Overview*
*Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Collateral Estoppel*
*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > Remedies > Alternative Dispute Resolution*

[HN6]While a court may accord an arbitrator's decision such weight as it deems appropriate, it is not bound by the decision. An adverse arbitration award will not preclude subsequent action under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 1981 (Title VII). A prior adverse arbitration determination is not entitled to res judicata or collateral estoppel effect in a subsequent Title VII or § 1981 proceeding. An arbitrator's decision is entitled to such weight as the court deems appropriate.

*Labor & Employment Law > Collective Bargaining & Labor Relations > Unfair Labor Practices > Interference With Protected Activities*
*Labor & Employment Law > Discrimination > Retaliation > Burdens of Proof*
*Labor & Employment Law > Discrimination > Retaliation > Elements > Protected Activities*

[HN7]To establish a prima facie case of retaliatory discharge, the plaintiff must demonstrate that (i) she was participating in "protected activity"; (ii) her employer was aware of such activity; (iii) her employer took adverse action against her based upon her activity; and (iv) a causal connection between the protected activity and the adverse employment action exists. At this stage, plaintiff's burden is de minimis. A violation occurs when a retaliatory motive plays a part in adverse employment actions toward an employee, whether or not it was the sole cause. Further, a violation occurs when an employer is motivated by retaliatory animus, even if valid objective reasons for the discharge exist. Once a prima facie case is made out, the burden again shifts to the defendant to demonstrate a legitimate nondiscriminatory rationale for its decision. If such a reason is articulated, plaintiff must then prove that the proffered reason was a pretext for retaliation and that defendant's real motivation was the impermissible retaliatory motive.

*Criminal Law & Procedure > Accusatory Instruments > General Overview*
*Healthcare Law > Business Administration & Organization > Employment Discrimination*
*Healthcare Law > Business Administration & Organization > Wrongful Termination > Retaliatory Discharge*

[HN8]To establish that an activity was protected, a plaintiff need not prove the merit of her underlying discrimination complaint, but only that she was acting under a good faith, reasonable belief that a violation existed. A wide range of activity, beyond filing a formal Equal Employment Opportunity Commission complaint, is protected.

*Labor & Employment Law > Affirmative Action > Discrimination*
*Labor & Employment Law > Discrimination > Retaliation > General Overview*

[HN9]To determine whether an employee's conduct constitutes protected activity a court must balance the purpose of the Act to protect persons engaging reasonably in activities opposing discrimination, against Congress' equally manifest desire not to tie the hands of employers in the objective selection and control of personnel.

*Healthcare Law > Business Administration & Organization > Employment Discrimination*
*Labor & Employment Law > Discrimination > Racial Discrimination > Employment Practices > Discharges*
*Labor & Employment Law > Discrimination > Retaliation > General Overview*

[HN10]Filing formal Equal Employment Opportunity Commission complaints is considered "protected activity."

*Labor & Employment Law > Discrimination > Retaliation > General Overview*

[HN11]As for a "causal connection," between protected activity and discriminatory treatment, a plaintiff may establish this element indirectly, by showing that the protected activity was followed by discriminatory treatment.

*Labor & Employment Law > Discrimination > Disparate Treatment > Employment Practices > Pattern or Practice*
*Labor & Employment Law > Discrimination > Harassment > Racial Harassment > Hostile Work Environment*
*Labor & Employment Law > Discrimination > Racial Discrimination > Employment Practices > Pattern or Practice*

[HN12]Racial discrimination claims can proceed under several theories, including (i) disparate impact, (ii) individualized disparate treatment, (iii) disparate treatment (pattern or practice), and (iv) hostile work environment.

1997 U.S. Dist. LEXIS 122, *

*Labor & Employment Law > Discrimination > Disparate Impact > Employment Practices > Selection Procedures > Neutral Factors*
*Labor & Employment Law > Discrimination > Disparate Impact > Proof > Burdens of Proof*
*Labor & Employment Law > Discrimination > Disparate Impact > Statutory Application > Reconstruction Statutes (secs. 1981, 1983 & 1985)*
[HN13]A plaintiff's disparate impact claims can only be made under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 1981 and the New York Human Rights Law claims must be predicated on intentional discrimination. To establish a prima facie disparate impact case, a plaintiff must identify a specific employment practice having an adverse impact on members of a protected class, and then that the practice excluded him or her, as a member of a protected group, from a job or promotion opportunity.

*Labor & Employment Law > Discrimination > Disparate Treatment > Proof > Burden Shifting*
*Labor & Employment Law > Discrimination > Racial Discrimination > Coverage & Definitions*
[HN14]In a disparate treatment case, a plaintiff must initially establish that she belongs to a racial minority and was treated differently than similarly-situated whites. The focus must be on whether there was intentional discrimination against the plaintiff.

*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview*
[HN15]A hostile work environment is created when harassment in the workplace is sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment. The incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief.

*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview*
[HN16]In addition to demonstrating that she was subjected to a hostile working environment, a plaintiff must establish that the conduct that created the hostile situation should be imputed to the employer. An employer is liable for harassment by co-employees if the employer knew of the alleged conduct yet failed to take steps reasonably likely to stop the harassment. Whether an employer has fulfilled his responsibility in this regard is to be determined upon the facts in each case.

*Civil Rights Law > Contractual Relations & Housing > Equal Rights Under the Law (sec. 1981) > Liable Parties*
*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview*
[HN17]Individual defendants with supervisory control over a plaintiff may not be held personally liable under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 1981 (Title VII). This individual immunity extends to co-workers of Title VII plaintiffs as well.

*Civil Rights Law > Contractual Relations & Housing > Equal Rights Under the Law (sec. 1981) > Liable Parties*
*Civil Rights Law > Contractual Relations & Housing > Equal Rights Under the Law (sec. 1981) > Proof of Discrimination*
*Labor & Employment Law > Discrimination > Reconstruction Statutes (secs. 1981, 1983 & 1985)*
[HN18]A plaintiff can maintain claims against individual defendants under 42 U.S.C.S. § 1981, because employers and their agents are individually liable under § 1981, provided they were personally involved in the discriminatory activity.

*Torts > Intentional Torts > Assault & Battery > General Overview*
*Torts > Vicarious Liability > Employers > Activities & Conditions > Intentional Torts*
*Workers' Compensation & SSDI > Administrative Proceedings > Claims > General Overview*
[HN19]A plaintiff may maintain an action against a co-employee if the co-employee was not acting within the scope of her employment and was engaged in willful or intentional tort when plaintiff was injured.

**COUNSEL:** For CORRINE M. AYTON, plaintiff: Gail W. Boyd, Brooklyn, NY.

For LENOX HILL HOSPITAL, defendant: Eric Rosenfeld, Edward Cerasia, II, Seyfarth Shaw Fairweather & Geraldson, New York, NY. For MAGGIE ZEIDMAN, RENA RENELL, defendants: Edward Cerasia, II, Seyfarth Shaw Fairweather & Geraldson, New York, NY.

**JUDGES:** Barbara S. Jones, United States District Judge

**OPINION BY:** Barbara S. Jones

**OPINION**

**OPINION AND ORDER**

Barbara S. Jones, United States District Judge:

## I. Introduction

Plaintiff Corrine Ayton, a nurse formerly employed at Lenox Hill Hospital ("Lenox Hill"), brings this employment discrimination suit against Lenox Hill, Director of Nursing for Cardiovascular Services Maggie Zeidman, and nurse Rena Renell, alleging conduct violative of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, the New York Human Rights Law ("NYHRL"), and New York tort law. Defendants move for summary judgment. Having reviewed the submissions, this Court grants defendants' motion for summary judgment with respect [*2] to all of plaintiff's Title VII claims against defendants Zeidman and Renell and to all of plaintiff's § 1981 claims against defendant Renell. It denies defendants' motion on the remainder of plaintiff's claims. Further, this Court finds no basis to assert jurisdiction over plaintiff's common law tort claim against defendant Renell.

## II. Defendant Lenox Hill

### A. Discriminatory Discharge

#### 1. Subject Matter Jurisdiction

As a preliminary matter, defendants raise a jurisdictional issue regarding plaintiff's Title VII discriminatory discharge claim against Lenox Hill, because she failed to specifically claim "discriminatory" discharge in her EEOC complaint, which alleges "retaliatory" discharge. Plaintiff's discriminatory discharge claim, however, is based on conduct which this Court finds to be "reasonably related" to the conduct alleged in the EEOC charge, because it "would fall within the scope of the EEOC investigation" growing out of the retaliation claim. See Butts v. City of N.Y. Dept. of Housing Preservation and Dev., 990 F.2d 1397, 1402 (2d Cir. 1993) (quoting Smith v. American President Lines, 571 F.2d 102, 107 n.10 (2d Cir. 1978)). Accordingly, the [*3] Court finds that the EEOC complaint as filed suffices for jurisdiction.

#### 2. Summary Judgment in the Employment Discrimination Context

[HN1]Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the burden to show the absence of a genuine issue of material fact. Once the moving party has met this burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P.

56(e); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). In ruling on a summary judgment motion, "the court must resolve all ambiguities and draw all reasonable inferences in favor of [the non-moving party]." Patrick v. LeFevre, 745 F.2d 153, 158 (2d Cir. 1984); Rosen v. Thornburgh, 928 F.2d 528, 533 (2d Cir. 1991).

Generally, courts are cautious to grant summary judgment to an employer in discrimination suits, where the employer's [*4] intent is a central issue to be determined by the fact finder. See Rosen, 928 F.2d at 533 ("In a Title VII action, where a defendant's intent and state of mind are placed in issue, summary judgment is ordinarily inappropriate."); Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985) (summary judgment is ordinarily inappropriate where an individual's intent is implicated).

#### 3. Title VII, § 1981, and the NYHRL [1]

1 [HN2]Courts require the same standards and burdens of proof for claims brought under Title VII, § 1981, and the NHHRL. Tomka v. Seiler, 66 F.3d 1295, 1304 n.4 (2d Cir. 1995) (citing Miller Brewing Co. v. State Div. of Human Rights, 66 N.Y.2d 937, 498 N.Y.S.2d 776, 489 N.E.2d 745, (1985) (NYHRL and Title VII claims entail same standards of proof); Song v. Ives Lab., Inc., 957 F.2d 1041, 1048 (2d Cir. 1992) (noting "New York's wholesale adoption of federal standards in discrimination cases under [its Human Rights Law]"); Patterson v. McLean Credit Union, 491 U.S. 164, 186-88, 109 S. Ct. 2363, 2377-79, 105 L. Ed. 2d 132 (1989) (burdens of proof and persuasion in Title VII actions apply equally to § 1981 actions); Albert v. Carovano, 851 F.2d 561, 571 (2d Cir. 1988) (§ 1981 claim must be predicated on intentional racial discrimination). Accordingly, this Court addresses plaintiff's Title VII, § 1981, and NYHEL claims together.

[*5] [HN3]In analyzing employment discrimination and retaliation claims under Title VII, § 1981, and the NYHRL, the Second Circuit follows the three part evidentiary framework set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and its progeny. See Rosen, 928 F.2d at 532 (Title VII); Tyler v. Bethlehem Steel Corp., 958 F.2d 1176, 1180 (2d Cir.), cert denied 506 U.S. 826, 121 L. Ed. 2d 46, 113 S. Ct. 82 (1992) (NYHRL); Lopez v. S.B. Thomas, Inc., 831 F.2d 1184, 1188 (2d Cir. 1987) (§ 1981). Initially, plaintiff bears the burden of proving a prima facie case of discrimination. McDonnell, 411 U.S. at 802, 93 S. Ct. at 1824. To establish a prima facie case, plaintiff must show that (i) she is a member of a protected class; (ii) she was qualified for the position; (iii)

she was discharged; and (iv) the discharge occurred under circumstances that suggest it was the result of discrimination. *Rosen*, 928 F.2d at 532. Plaintiff's burden of proof at the prima facie stage is *d e minimis*. *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir. 1988).

The burden then shifts to the defendant employer to articulate [*6] a legitimate, nondiscriminatory rationale for the employee's discharge. *McDonnell*, 411 U.S. at 802, 93 S. Ct. at 1824. Upon such a showing, the plaintiff must prove by a preponderance of the evidence that the reasons offered by the defendant were merely a "pretext for discrimination." *McDonnell*, 411 U.S. at 804, 93 S. Ct. at 1825.

Although defendants contend that plaintiff has failed to demonstrate a prima facie case of race discrimination in connection with her discharge, this Court finds that plaintiff has met her burden. It is uncontested that plaintiff is a black woman and was discharged from employment with Lenox Hill. Defendants argue that plaintiff was not qualified or performing satisfactorily, as her continuous complaints prevented her from working effectively with the nursing staff. Plaintiff's complaints, however, were based on the very racial discrimination that she alleges exists at Lenox Hill. Further, plaintiff has presented evidence that she was asked to be a Preceptor (a nurse who has good clinical skills and the ability to teach others, and who has received positive evaluations) after working only four months on the unit, and that this position is usually [*7] reserved for nurses who have been on the unit for at least a year. As such, a factual dispute regarding plaintiff's qualification exists.

Defendants also contend that plaintiff has presented no evidence to suggest that her discharge was the result of discrimination. The Second Circuit has recognized that [HN4]an employee may often be constrained to rely on indirect or circumstantial proof of discrimination in employment discrimination cases. *See Gallo v. Prudential Residential Serv.*, 22 F.3d 1219, 1224 (2d Cir. 1994) ("because writings directly supporting a claim of intentional discrimination are rarely, if ever, found among an employer's corporate papers, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination."). Plaintiff was fired expressly for her numerous complaints of alleged racial discrimination, evidence of which she has presented. A rational jury could find that the discriminatory animus motivating such alleged discrimination also precipitated her discharge.

In the face of this prima facie showing, defendants have put forth a legitimate, nondiscriminatory rationale for its termination decision: Lenox [*8] Hill discharged Ayton because management determined that her unsub-stantiated allegations were disruptive to the provision of effective patient care through teamwork.

Plaintiff, in turn, has presented evidence that would allow a rational jury to find that Lenox Hill's rationale is merely a pretext for discrimination. [HN5]To survive a motion for summary judgment, the employee must show that there is a material issue of fact as to whether (i) the employer's asserted reason for discharge is false or unworthy of belief and (ii) more likely than not the employee's race was the real reason for her discharge. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 113 S. Ct. 2742, 2752, 125 L. Ed. 2d 407 (1993); *Viola v. Philips Medical Systems of North America*, 42 F.3d 712, 717 (2d Cir. 1994). Again, plaintiff may rely on circumstantial evidence to show discriminatory intent:

> Employment discrimination is often accomplished by discreet manipulations and hidden under a veil of self-declared innocence. An employer who discriminates is unlikely to leave a 'smoking gun,' such as a notation in an employee's personnel file, attesting to a discriminatory intent. (citations omitted) A victim of [*9] discrimination is therefore seldom able to prove his or her claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence (citations omitted).

*Rosen*, 928 F.2d at 533. Plaintiff has offered proof of what she has perceived to be repeated discriminatory incidents and biased investigations of them. A rational jury might find that the employer's failure to effectively address racial discrimination in the nursing unit -- not plaintiff's complaints -- was, in fact, the cause of any break down in effective patient care. [2] Additionally, a rational jury might find that the discriminatory animus motivating the alleged discrimination perceived by plaintiff also precipitated her discharge. Accordingly, defendants' motion for summary judgment with respect to plaintiff's discriminatory discharge claims is denied.

2  The arbitrator's findings regarding plaintiff's employment at Lenox Hill are not, contrary to defendants' arguments, dispositive on the issue of Lenox Hill's intent to discharge plaintiff or on any other point. [HN6]While this Court may accord an arbitrator's decision such weight as it deems appropriate, it is not bound by the decision. *See Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 42-43, 49 n.10, 39 L. Ed. 2d 147, 94 S. Ct. 1011 (1974) (adverse arbitration award will not preclude subsequent Title VII action). *See*

*also Hendrix v. American Airlines, Inc.,* 92-CIV-2426, Slip. op. at 10 n.10 (E.D.N.Y. Jan. 5, 1994) (prior adverse arbitration determination is not entitled to res judicata or collateral estoppel effect in a subsequent Title VII or § 1981 proceeding); *Howard v. Holmes,* 656 F. Supp. 1144, 1149 (S.D.N.Y. 1987) (arbitrator's decision entitled to such weight as the Court deems appropriate).

### [*10] B. Retaliatory Discharge

[HN7]To establish a prima facie case of retaliatory discharge, the plaintiff must demonstrate that (i) she was participating in "protected activity"; (ii) her employer was aware of such activity; (iii) her employer took adverse action against her based upon her activity; and (iv) a causal connection between the protected activity and the adverse employment action exists. *Tomka,* 66 F.3d at 1308; *Cosgrove v. Sears, Roebuck & Co.,* 9 F.3d 1033, 1039 (2d Cir. 1993). At this stage, plaintiff's burden is de minimis. *Tomka,* 66 F.3d at 1308. A violation occurs when a retaliatory motive plays a part in adverse employment actions toward an employee, whether or not it was the sole cause. *Cosgrove,* 9 F.3d at 1039. Further, a violation occurs when an employer is motivated by retaliatory animus, even if valid objective reasons for the discharge exist. *Sumner v. U.S. Postal Service,* 899 F.2d 203, 209 (2d Cir. 1990); *Cosgrove,* 9 F.3d at 1039.

Once a prima facie case is made out, the burden again shifts to the defendant to demonstrate a legitimate nondiscriminatory rationale for its decision. If such a reason is articulated, plaintiff must then prove [*11] that the proffered reason was a pretext for retaliation and that defendant's real motivation was the impermissible retaliatory motive. *Tomka,* 66 F.3d at 1308.

Defendants contend that plaintiff has not established a prima facie case of retaliatory discharge. First, they argue that defendant's conduct, i.e. continuing allegations concerning fellow nurses, was "disruptive" and thus not "protected activity" under Title VII, § 1981 or the NYHRL. [HN8]To establish that an activity was protected, a plaintiff need not prove the merit of her underlying discrimination complaint, but only that she was acting under a good faith, reasonable belief that a violation existed. *Sumner,* 899 F.2d at 209; *Cosgrove,* 9 F.3d at 1039. A wide range of activity, beyond filing a formal EEOC complaint, is protected. *Kotcher v. Rosa and Sullivan Appliance Center, Inc.,* 957 F.2d 59, 65 (2d Cir. 1992) (plaintiff's internal complaint to company management constituted protected activity); *see also Sumner,* 899 F.2d at 209 (complaining to management, writing critical letters to customers, and expressing support of co-workers who have filed formal charges constitute protected activity); *EEOC v. Kallir,* [*12] *Philips, Ross., Inc.,* 401 F. Supp. 66 (S.D.N.Y. 1975), *aff'd* 559

F.2d 1203 (2d Cir.), *cert denied,* 434 U.S. 920, 54 L. Ed. 2d 277, 98 S. Ct. 395 (1977) (protected activity where plaintiff discreetly obtained from customer of employer a written description of her job for use by New York City Commission on Human Rights).

[HN9]To determine whether an employee's conduct constitutes protected activity a court must balance "the purpose of the Act to protect persons engaging reasonably in activities opposing . . . discrimination, against Congress' equally manifest desire not to tie the hands of employers in the objective selection and control of personnel." *Hochstadt v. Worcester Foundation for Experimental Biology,* 545 F.2d 222, 231 (1st Cir. 1976). In *Hochstadt,* relied on by defendants, plaintiff caused disruptions for over three years; these included interrupting staff meetings, circulating rumors, commissioning a covert affirmative action survey, inviting a newspaper reporter to examine confidential salary information, misusing secretarial copying services, running up exorbitant personal telephone bills on the employer's phone, and causing two other employees to leave the [*13] company. *Hochstadt,* 545 F.2d at 227-9. The Second Circuit has instructed that *Hochstadt* is "clearly an exceptional case" and "must be read narrowly lest legitimate activism by employees asserting civil rights be chilled." *Grant v. Hazelett Strip-Casting Corporation,* 880 F.2d 1564, 1570 (2d Cir. 1989).

Plaintiff's complaints included filing and then twice amending a charge with the EEOC for perceived discrimination both on the job and in connection with her discharge. The law is well settled that [HN10]filing formal EEOC complaints is considered "protected activity." *Kotcher,* 957 F.2d at 65. Within the hospital structure, plaintiff's actions included responding to perceived discriminatory acts or words, speaking at staff meetings called specifically to discuss problems of race discrimination on the unit, sending a written complaint after she was refused permission to begin work in May, 1993, and several discussions with Zeidman after allegedly discriminatory incidents. To the extent that her complaints were continuous, plaintiff presents evidence that the alleged discriminatory conduct and failure to investigate such conduct was also ongoing. The only specific employer directive [*14] that she failed to follow was that contained in the Final Warning Notice -- the first and only written warning she received -- notifying her that additional complaints would result in dismissal. Plaintiff did lodge an additional complaint, after being refused permission to return to work for, in her view, discriminatory and retaliatory reasons; she also complained about an incident during which, allegedly, co-workers "patted" her down, squeezed her breasts, and grabbed her groin. A rational jury could find that plaintiff's complaints were

reasonable in light of the circumstances and thus protected activity within the meaning of the statutes. [3]

> 3 _Graham v. Texas Gulf Inc.,_ 662 F. Supp. 1451 (D. Conn. 1987), cited by defendants, is similarly distinguishable from the present case. Plaintiff Graham, like plaintiff Hochstadt, flouted specific employer instructions and policies. She communicated her complaints outside of the customary mechanisms, severed ties with her colleagues, and refused to comply with reasonable demands that she cooperate in monitoring the transition of her affairs at work. _662 F. Supp. at 1462._

[*15] Plaintiff has offered evidence that establishes the remaining elements in her prima facie case. It is clear from the record, and not disputed, that Lenox Hill was aware of plaintiff's complaints; in fact, the hospital expressly discharged her for such protests. [HN11]As for a "causal connection," plaintiff may establish this element indirectly, by "showing that the protected activity was followed by discriminatory treatment." _Sumner, 899 F.2d at 209_; _Cosgrove, 9 F.3d at 1039_. Plaintiff has done so by offering that she was discharged after her complaint regarding the "pat down" on May 24, 1993.

From this evidence, a rational jury could find that Lenox Hill's termination was motivated by retaliatory animus. Accordingly, Lenox Hill's motion for summary judgment on this claim is denied.

C. _Job Discrimination_

[HN12]Racial discrimination claims can proceed under several theories, including (i) disparate impact, (ii) individualized disparate treatment, (iii) disparate treatment (pattern or practice), and (iv) hostile work environment. While plaintiff's accompliant broadly states a claim under "job discrimination," her papers, arguably, proceed under three of these theories.

1. _Disparate_ [*16] _Impact_

[HN13]Plaintiff's disparate impact claims can only be made under Title VII and the NYHRL, as _§ 1981_ claims must be predicated on intentional discrimination. _Albert v. Carovano, 851 F.2d 561, 571 (2d Cir. 1988)_ (citing _General Building Contractors Ass'n v. Pennsylvania, 458 U.S. 375, 391, 102 S. Ct. 3141, 3150, 73 L. Ed. 2d 835 (1982)._ To establish a prima facie disparate impact case, a plaintiff must identify a specific employment practice having an adverse impact on members of a protected class, and then "that the practice excluded him or her, as a member of a protected group, from a job or promotion opportunity." _Maresco v. Evans Chemetics. Div. of W.R. Grace & Co., 964 F.2d 106, 114 (2d Cir. 1992)_ (citing _Waisome v. Port Auth., 948 F.2d 1370, 1375 (2d Cir. 1991))._

Plaintiff's bald assertion that she was discriminated against by more frequent assignment to the Stepdown Room ("SR") rather than to the Open Heart Recovery Room (Room 1109) fails as a claim, because the defendants have introduced uncontested evidence that plaintiff was assigned to Room 1109 at least nine times more than to the SR. Plaintiff's claim with respect to discriminatory assignments to chronically [*17] ill patients fails, because plaintiff has submitted no evidence of white nurses' assignments to such patients, and no proof of discrimination against black nurses as a class.

2. _Individualized Disparate Treatment_

[HN14]In a disparate treatment case, plaintiff must initially establish that she belongs to a racial minority and was treated differently than similarly-situated whites. The focus must be on whether there was intentional discrimination against the plaintiff. _Martin v. Citibank, 762 F.2d 212, 216 (2d Cir. 1985)_. To the extent that plaintiff claims disparate treatment in work assignments, plaintiff's claim fails for the same reason that her disparate impact claim fails.

Plaintiff has met her burden, however, with respect to the decision not to allow her to return to work in May, 1993. Plaintiff has introduced evidence that she was told by Dr. Tabia (Director of Employee Health Services at Lenox Hill) that she could not return to work if she was under a restriction against lifting more than 15 pounds, while other white nurses who had been on sick leave were allowed to return to work before they were so capable. Specifically, plaintiff introduced testimony by Edna Igoe, union [*18] representative, that two white nurses with leg injuries were allowed to return to work on monitor duty. Further, plaintiff has submitted evidence from which a rational jury could find that Lenox Hill's rationale for not allowing her to return to work (a medical decision) was merely a pretext for discrimination. Plaintiff points to a discrepancy in testimony concerning whether Dr. Tabia spoke with defendant Zeidman about plaintiff's return to work before he made his decision. Dr. Tabia testified that he did not speak with Zeidman prior to making his own decision, and that he did not make this decision until after June 9, 1993. Zeidman, in contrast, testified that she had had two conversations with Dr. Tabia regarding plaintiff's return to work, at least one of which was at the end of May, 1993. As such, defendant's motion for summary judgment with respect to plaintiff's job discrimination claim in connection with plaintiff's return to work is denied.

3. _Hostile Work Environment_

[HN15]A hostile work environment is created when harassment in the workplace is "sufficiently severe or pervasive to alter the conditions of employment and cre-

ate an abusive working environment." *Meritor Savings* [*19] *Bank v. Vinson, 477 U.S. 57, 67, 106 S. Ct. 2399, 2405, 91 L. Ed. 2d 49 (1986).* The incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief. *Carrero v. New York City Housing Authority, 890 F.2d 569, 577 (2d Cir. 1989)* (citing *Lopez v. S.B. Thomas, Inc., 831 F.2d 1184, 1189 (2d Cir. 1987)).*

Plaintiff has submitted evidence of an alleged steady barrage of racial comments made by white nurses, including use of the words "nigger" and "black bitch" to refer to black nurses and "slave cable" to refer to a piece of medical equipment. Plaintiff also points to an occasion on which Zeidman characterized a black nurse in an allegedly stereotypical way, comparing her to a character in the movie "Gone with the Wind." A rational jury could find that such terms were used in a racially derogatory manner. Plaintiff also produced evidence of allegedly being "patted down" (during which white nurses allegedly squeezed her breasts, grabbed her groin, and felt for a tape recorder on her body) and of allegedly having mucous blown on her by a white male nurse. In addition, plaintiff has produced evidence of allegedly ineffective or biased investigations [*20] of these incidents. If this evidence is believed, a rational jury could find that such conduct was pervasive enough to create a racially hostile work environment.

[HN16]In addition to demonstrating that she was subjected to a hostile working environment, plaintiff must establish that the conduct that created the hostile situation should be imputed to the employer. *Kotcher, 957 F.2d at 63* (citing *Meritor, 477 U.S. at 70-71, 106 S. Ct. at 2407).* An employer is liable for harassment by co-employees if the employer knew of the alleged conduct yet failed to take steps reasonably likely to stop the harassment. Whether an employer has fulfilled his responsibility in this regard is to be determined upon the facts in each case. *Snell, 782 F.2d 1094 (2d Cir. 1986).* [4]

4  In *Snell,* cited by defendants, the Second Circuit found that the employer had failed to take reasonable steps, despite its announcement that the use of racial slurs was prohibited and the fact that it had investigated some complaints and subsequently disciplined certain employees. The employer had failed to investigate many other complaints, and several witnesses testified they chose not to report offensive conduct for fear of retribution by co-workers. *Snell, 728 F.2d at 1104 & n. 10.* Similarly, plaintiff has pointed to testimony indicating black employees had expressed incidents of racial animosity or complaints of discriminatory work assignments to their supervisor

or the union, but had specifically requested anonymity for fear of retaliation.

[*21]  Plaintiff has produced evidence that she informed Zeidman of several incidents, and that Zeidman allegedly failed to investigate them effectively. Specifically, plaintiff has produced testimony from Edna Igoe explaining that Zeidman began two investigations with statements that she did not believe plaintiff's accusations, but that she had to follow up and make a report anyway. [5] The facts here are distinguishable from those in *Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708 (2d Cir. 1996),* cited by defendants, in which discrimination was not imputed to the employer. Although the employer in *Van Zant* was unsympathetic to the plaintiff, it expressed its doubts about her claim *only to her;* within 15 days of conducting interviews, the employer terminated the co-employee, indicating its impartial approach to the investigation. *Van Zant, 80 F.3d at 711, 715.* A rational jury could therefore determine that defendants failed to reasonably address any racial discrimination occurring on the nursing unit. Accordingly, defendants' motion for summary judgment with respect to plaintiff's hostile work environment claim is denied.

5  Defendants contend that under the NYHRL, plaintiff was required to come forward with evidence that Lenox Hill "became a party to [the alleged harassment] by encouraging, condoning or approving it." *State Div. of Human Rights v. St. Elizabeth's Hosp., 66 N.Y.2d 684, 687 496 N.Y.S.2d 411, 412, 487 N.E.2d 268 (1985).* Plaintiff has done this by pointing to Zeidman's own allegedly discriminatory comments and her allegedly biased investigations.

[*22] D. *Retaliation During Employment*

Plaintiff has satisfied her burdens with respect to a prima facie case and showing of pretext for her claim of retaliation, under the NYHRL, in connection with the refusal to allow her to return to work. A rational jury could find that her activity at Lenox Hill was protected activity, and that Lenox Hill was aware of it. Second, Lenox Hill took adverse action -- i.e. they refused to allow plaintiff to return to work when her private doctor had cleared her to begin again. Third, plaintiff has established a "causal connection" by offering that she was refused permission to return to work after she had lodged numerous complaints at the hospital. Finally, a rational jury could find that the discrepancy between the testimony of defendant Zeidman and the testimony of Dr. Tabia indicates that Zeidman influenced Dr. Tabia's decision not to clear plaintiff for return to work in May, 1993. Accordingly, defendant's motion for summary

judgment with respect to plaintiff's NYHRL retaliation claim against Lenox Hill is denied.

### III. Defendants Zeidman and Renell

Plaintiff's complaint states claims against the individual defendants under Title VII [*23] and § 1981 only. It is now settled in this Circuit that [HN17]"individual defendants with supervisory control over a plaintiff may not be held personally liable under Title VII." *Tomka, 66 F.3d at 1313*. This individual immunity extends to co-workers of Title VII plaintiffs as well. *See Ullah v. National Westminster Bank, PLC, 1995 U.S. Dist. LEXIS 18753, 1995 WL 747831* at *1 (S.D.N.Y. Dec. 18, 1995). Accordingly, defendants' motion for summary judgment with respect to plaintiff's Title VII claims for discriminatory and retaliatory discharge and for job discrimination against individual defendants Zeidman and Renell is granted.

[HN18]Plaintiff, however, can maintain claims against individual defendants under § 1981, *see Tomka, 66 F.3d at 1316* (employers and their agents are individually liable under § 1981), provided they were personally involved in the discriminatory activity. See *Jett v. Dallas Independent School District, 491 U.S. 701, 735, 109 S. Ct. 2702, 2722, 105 L. Ed. 2d 598 (1989); Amin v. Quad/Graphics, Inc., 929 F. Supp. 73, 78 (N.D.N.Y. 1996)* (citing *Allen v. Denver Public School Bd., 928 F.2d 978, 983 (10th Cir. 1991)*).

While defendant Zeidman issued both the Final Warning Notice [*24] and termination notice to plaintiff, plaintiff has presented no evidence that defendant Renell was in any way personally involved in her discharge. Accordingly, defendants' summary judgment motion with respect to plaintiff's § 1981 discriminatory and retaliatory discharge claims against defendant Renell is granted. Defendants' summary judgment motion with respect to plaintiff's § 1981 discriminatory and retaliatory discharge claims against defendant Zeidman is denied.

With respect to her § 1981 job discrimination claim, plaintiff has submitted evidence discussed above that, if believed, would show that defendant Zeidman was personally involved in the decision not to allow plaintiff to return to work and in the creation or perpetuation of a hostile work environment. For these reasons, defendants' motion for summary judgment with respect to plaintiff's § 1981 job discrimination claim against defendant Zeidman is denied.

Plaintiff has failed to produce any evidence, however, that defendant Renell was personally involved in the decision not to allow her to return to work. Nor has plaintiff presented any evidence that Renell was personally involved in repeated and continuous discriminatory [*25] acts, rising to the level of "severe or pervasive" harassment. Accordingly, defendants' motion for summary judgment with respect to plaintiff's § 1981 job discrimination claim against defendant Renell is granted.

### IV. Assault and Battery Claim

Plaintiff concedes that her collection of worker's compensation collaterally estops her from proceeding against Lenox Hill on her assault and battery claim. [6] [HN19]Plaintiff, however, may maintain an action against co-employee Renell if Renell was not acting within the scope of her employment and was engaged in willful or intentional tort when the chair was pulled out. *See Maines v. Cronomer Valley Fire Dept., 50 N.Y.2d 535, 543, 429 N.Y.S.2d 622, 626, 407 N.E.2d 466 (Ct. App. 1980)*. Although the Board found that the incident was accidental vis-a-vis the employer, the same act may be intentional with respect to Renell. *See Werner v. State of N.Y., 53 N.Y.2d 346, 353, 441 N.Y.S.2d 654, 657, 424 N.E.2d 541 (Ct. App. 1981)* (citing *Maines, 50 N.Y.2d 535, 429 N.Y.S.2d 622, 407 N.E.2d 466*). [7] Since the Board did not address the issue of co-employee intent, collateral estoppel principles do not apply. Accordingly, defendants' summary [*26] judgment motion with respect to plaintiff's assault and battery claim against defendant Renell is denied.

> 6    Plaintiff's argument that she vigorously protested a decision by the Workers' Compensation Board cannot revive her claim. *Cunningham v. State of N.Y., 60 N.Y.2d 248, 252, 469 N.Y.S.2d 588, 591, 457 N.E.2d 693 (Ct. App. 1983)* (Workers' Compensation Board has the discretion to process a claim, whether filed by an employee or an employer, even if the claimant objects and a civil action is pending); *O'Connor v. Midiria, 55 N.Y.2d 538, 541, 450 N.Y.S.2d 455, 457, 435 N.E.2d 1070 (Ct. App. 1982)* (employer not estopped from filing compensation claim on employee's behalf where employee elects to pursue common law remedy for intentional tort).

> 7    The N.Y. Workers' Compensation Board Judge's decision, submitted by defendant, refers to a C-2 report stating that "another nurse accidentally moved the chair." Given that C-6 and C-8 forms were filed by the employer, it appears that the C-2 is not a form completed by the Workers' Compensation Board Judge, and thus that there was no finding by the judge as to Renell's intent.

[*27] Although plaintiff may maintain a common law tort action against defendant Renell, this Court finds that it does not have supplemental jurisdiction over such claim, pursuant to 28 U.S.C. § 1367(a), because the chair

1997 U.S. Dist. LEXIS 122, *

incident is not part of a "common nucleus of operative fact" with plaintiff's employment discrimination suit. *See United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725, 86 S. Ct. 1130, 1138, 16 L. Ed. 2d 218 (1966). Even if this Court did have supplemental jurisdiction over the tort claim, this Court would decline to exercise such jurisdiction, pursuant to 28 U.S.C. § 1367 (c), because it finds the connection between the common law tort and federal employment discrimination claims too distant, and because all other claims against defendant Renell have been dismissed. Accordingly, this Court will not assert jurisdiction over plaintiff's tort claim against defendant Renell.

Counsel are directed to confer with each other and submit a joint pretrial order by January 17, 1997.

So ordered.

Barbara S. Jones

United States District Judge

Dated: New York, New York

January 9, 1997

LEXSEE



Cited
As of: Jan 04, 2008

**DEBBIE L. HITCHENS and FRANCIS C. HITCHENS, Plaintiffs, v. PENTAIR, INC. and DELTA INTERNATIONAL MACHINERY CORPORATION, Defendants, PENTAIR, INC. and DELTA INTERNATIONAL MACHINERY CORPORATION, Third-Party Plaintiffs, v. CHASE PITKIN HOME AND GARDEN, a division of WEGMAN'S FOOD MARKETS, INC., Third-Party Defendant.**

**95-CV-807S(H)**

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF NEW YORK**

**1997 U.S. Dist. LEXIS 13918**

**June 26, 1997, Decided
June 27, 1997, Filed**

**DISPOSITION:**    [*1]  Recommended that this third-party defendant's motion to dismiss third-party complaint (Item 25) DENIED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Third-party defendant employer filed a motion to dismiss an action brought by third-party plaintiff manufacturer in the United States District Court for the Western District of New York (New York) seeking contribution or indemnity should a judgment be rendered in favor of plaintiff injured employee.

**OVERVIEW:** The employee brought an action for personal injuries allegedly suffered while she was engaged in moving stock while working for the employer. The employee claimed that she was moving a box containing a table saw manufactured and packaged by the manufacturer when the box collapsed, causing her to sustain herniated discs. The manufacturer filed a third-party action against the employer seeking indemnification or contribution should a judgment be rendered in favor of the employee. The employer filed a motion to dismiss the complaint on the ground that the Governor had signed into law the Omnibus Workers' Compensation Reform Act (Act), Ch. 635 of the Laws of 1996 and thus, the Act retroactively barred third-party actions against employers where the employee had not sustained a grave injury. The court found that the Act was intended to have prospective effect from the date of enactment, and could not be applied so as to divest the manufacturer of a cause of action they possessed as of the effective date. The court found that the Act did not contain any explicit statement of retroactivity.

**OUTCOME:** The motion to dismiss the complaint was denied.

**CORE TERMS:** retroactive application, retroactive, prospective application, prospectively, grave, recommendations, occurring, retroactivity, governor, N.Y Laws, rules of statutory construction, effect immediately, cause of action, legislative intent, retroactively, recommended, repeal, vested, Reform Act, pending claims, right to contribution, anticipated, reduction, repealing, carriers, audit, Compensation Law, date of enactment, retroactive effect, pending actions

**LexisNexis(R) Headnotes**

*Torts > Procedure > Multiple Defendants > Contribution > General Overview*

1997 U.S. Dist. LEXIS 13918, *

*Torts > Vicarious Liability > Employers > Indemnity*
*Workers' Compensation & SSDI > Administrative Proceedings > Evidence > Medical Evidence*
[HN1]An employer shall not be liable for contribution or indemnity to any third person based upon liability for injuries sustained by an employee acting within the scope of his or her employment for such employer unless such third person proves through competent medical evidence that such employee sustains a grave injury.

*Governments > Legislation > Effect & Operation > Prospective Operation*
*Governments > Legislation > Effect & Operation > Retrospective Operation*
*Governments > Legislation > Interpretation*
[HN2]As a general rule, statutes are to be construed as prospective in operation only, and they are not to receive a retroactive construction.

*Governments > Legislation > Effect & Operation > Prospective Operation*
*Governments > Legislation > Interpretation*
[HN3]Amendments to statutes are to be applied prospectively unless the language of the statute or the legislative intent clearly indicates otherwise.

*Governments > Legislation > Effect & Operation > Amendments*
*Governments > Legislation > Effect & Operation > Prospective Operation*
*Governments > Legislation > Interpretation*
[HN4]New York courts overwhelmingly have held that where a provision indicates that the statute or amendment is to take effect immediately, it is a clear indication that prospective application is appropriate.

*Governments > Legislation > Effect & Operation > Prospective Operation*
*Governments > Legislation > Effect & Operation > Retrospective Operation*
*Governments > Legislation > Interpretation*
[HN5]In general, a statute or amendment will be construed as prospective unless there is an unequivocal expression of legislative intent that it have retroactive effect.

*Civil Procedure > Appeals > Standards of Review > De Novo Review*
[HN6]A district court will ordinarily refuse to consider on de novo review arguments, case law and/or eviden-

tiary material which could have been, but is not presented to the magistrate judge in the first instance.

*Civil Procedure > Pleading & Practice > Pleadings > Time Limitations > Extensions*
*Civil Procedure > Appeals > Reviewability > Time Limitations*
[HN7]Failure to file objections within the specified time or to request an extension of such time waives the right to appeal a district court's order.

**COUNSEL:** For DEBBIE L. HITCHENS, FRANCIS C. HITCHENS, plaintiffs: J. Michael Hayes, Esq., Buffalo, NY.

For DELTA INTERNATIONAL MACHINERY CORPORATION, defendant: Brian David Knauth, Saperston & Day, P.C., Buffalo, NY.

For PENTAIR, INC., DELTA INTERNATIONAL MACHINERY CORPORATION, cross-defendants: Brian David Knauth, Saperston & Day, P.C., Buffalo, NY.

For CHASE-PITKIN HOME & GARDEN, third-party defendant: Lisa T. Sofferin, Paula L. Feroleto, Brown & Kelly, Buffalo, NY.

For DELTA INTERNATIONAL MACHINERY CORPORATION, third-party plaintiff: Brian David Knauth, Saperston & Day, P.C., Buffalo, NY.

**JUDGES:** CAROL E. HECKMAN, United States Magistrate Judge.

**OPINION BY:** CAROL E. HECKMAN

**OPINION**

**REPORT AND RECOMMENDATION**

This matter was referred to the undersigned by the Hon. William M. Skretny, to hear and report, in accordance with 28 U.S.C. § 636(b)(1)(B). Presently before the court is third-party defendant's motion to dismiss the third-party complaint (Item 25). For the reasons that follow, it is recommended that the motion be denied.

**BACKGROUND**

This is an action for [*2] personal injuries allegedly suffered by plaintiff, Debbie L. Hitchens, on or about August 25, 1992 as she was engaged in moving stock while in the employ of third-party defendant, Chase Pitkin Home and Garden (Chase Pitkin). Plaintiff claims

that she was moving a box containing a table saw manufactured and packaged by defendants Pentair, Inc. (Pentair) and Delta International Machinery Corporation (Delta) when the box collapsed, causing her to sustain herniated discs (Item 1, Complaint PP 5-7; Item 25, Ex. D). On July 1, 1996, defendants filed a third-party action against plaintiff's employer, Chase Pitkin, seeking indemnification or contribution should a judgment be rendered in favor of plaintiff (Item 13, P 8). Chase Pitkin filed its answer on July 31, 1996 (Item 16).

Subsequently, on September 10, 1996, Governor George Pataki signed into law the Omnibus Workers' Compensation Reform Act, Ch. 635 of the Laws of 1996. Thereafter, Chase Pitkin filed a motion to dismiss the third-party complaint on the ground that the Workers' Compensation Reform Act retroactively bars third-party actions against employers where the employee has not sustained a "grave injury." Chase Pitkin claims that [*3] Debbie L. Hitchens did not sustain a "grave injury" as defined in the Act. In response, Pentair and Delta argue that the Act was intended to have prospective effect from the date of enactment, and may not be applied so as to divest Pentair and Delta of a cause of action they possessed as of the effective date.

## DISCUSSION

New York's trial courts have split over the issue of whether this new statute should apply retroactively to all claims, or prospectively to accidents occurring after September 10, 1996. Chase Pitkin cites three state supreme court decisions in its memorandum of law, two of which support its argument for retroactive application. [1] This court has identified a number of additional supreme court cases, including bench decisions, that have addressed this question as well. Upon review, it appears that the balance was tipping in favor of prospective application at the time Chase Pitkin's motion was filed. [2]

---

1 _Johnson v. Space Saver Corp._, 172 Misc. 2d 147, 656 N.Y.S.2d 715, 1997 WL 177661 (Sup. Ct. Westchester County March 25, 1997) (retroactive application); _Majewski v. Broadalbin-Perth Cent. School Dist._, 169 Misc. 2d 429, 653 N.Y.S.2d 822 (Sup. Ct. Fulton County Nov. 19, 1996) (retroactive application); _Gleason v. Holman Contract Warehousing, Inc._, 170 Misc. 2d 668, 649 N.Y.S.2d 647 (Sup. Ct. Albany County Sept. 18, 1996) (prospective application only).

[*4]

2 As of March 31, 1997, this court identified twelve decisions holding for prospective application and nine for retroactive application. In addition to the cases cited at note 1, those holding for

prospective application include _Flynn v. New York Life Ins. Co._, N.Y.L.J., Oct. 24, 1996, at 31 (Sup. Ct. Suffolk County Oct. 10, 1996); _Peloro v. Crosstad_, Index No. 12431/88 (Sup. Ct. Kings County Oct. 28, 1996); _DiLuzio v. Nova Group_, Index No. 1995-1418 (Sup. Ct. Erie County Oct. 30, 1996); _Hernandez v. Clark Equip._, Index No. 687/90 (Sup. Ct. Queens County Oct 30, 1996); _Irwin v. Niagara Frontier Trans. Auth._, Index No. 1192-14706 (Sup. Ct. Erie County Nov. 7 1996); _Frycek v. Corning Inc._, 171 Misc. 2d 220, 654 N.Y.S.2d 264 (1997); _Collins v. Welch_, Index No. 95-309 (Sup. Ct. Tompkins County Feb. 7, 1997); _Knapp v. Consol. Rail Corp._, 171 Misc. 2d 597, 1997 N.Y. Misc. LEXIS 34, 655 N.Y.S.2d 732 (1997); _Kerr v. The Black Clawson Co._, Index No. 96899 (Sup. Ct. Lawrence County Dec. 6, 1996); _Quito v. Cannon U.S.A._, N.Y.L.J., March 25, 1997, at 31 (Sup. Ct. Suffolk County); and _Walsh v. N.Y. Life Ins._, Index No. 21838/92 (Sup. Ct. New York County March 18, 1997). Those holding for retroactive application include _Ciampitti v. Perenially Green, Inc._, Index No. 19139/93 (Sup. Ct. Queens County Dec. 20, 1996); _Weiner v. Lincoln/A. Pentair Co._, N.Y.L.J., March 25, 1997, at 30 (Sup. Ct. Nassau County); _Doria v. Cook Properties_, Index No. 117266/93 (Sup. Ct. New York County March 25, 1997); _Bliss v. Feigen_, Index No. 10436/91 (Sup. Ct. New York County March 21, 1997); _Taylor/Reid v. E.S. Gordon_, Index No. 104276/94 (Sup. Ct. New York County March 21, 1997); _Cutler v. Tishman_, Index No. 125809/93 (Sup. Ct. New York County March 21, 1997); and _Greenbaum v. ISS Maintenance Service_, Index No. 104103/94 (Sup. Ct. New York County March 12, 1997). It is noted that five of the cases finding in favor of retroactive application were decided by a single New York County judge.

[*5] More importantly, however, five additional courts ruled on the retroactivity issue during April of 1997, including the first state appellate court to do so. [3] All of these ensuing decisions held that the statute applies prospectively to bar third-party actions against employers for accidents occurring after September 10, 1996. For the reasons that follow, it is recommended that this court adopt that view as well.

---

3 _Morales v. Gross_, No. 96-00491, 230 A.D.2d 7, 657 N.Y.S.2d 711, 1997 WL 208988 (2d Dep't Apr. 21, 1997); _Joblon v. Solow_, No. 94 Civ. 0610, 1997 WL 158357 (S.D.N.Y. Apr. 3, 1997) (Sweet, R.W.); _Quintana v. Ciba-Geigy Corp._, No. 96 Civ. 1301, 1997 WL 160308 (S.D.N.Y. Apr. 3, 1997) (Martin, J.S.); _Lagano v. Chrysler_

*Corp.*, 957 F. Supp. 36 (E.D.N.Y. Apr. 1, 1997); *Barabash v. Farmingdale Union Free School District*, N.Y.L.J., Apr. 18, 1997, at 29 (Sup. Ct. Nassau County Apr. 18, 1997).

The primary purpose of the Workers' Compensation Reform Act is to repeal the decision [*6] of the New York Court of Appeals in *Dole v. Dow Chem. Co.*, 30 N.Y.2d 143, 331 N.Y.S.2d 382, 282 N.E.2d 288 (1972), which allowed third-party actions against employers for indemnification or contribution for injuries sustained by employees in the scope of their employment. 1996 N.Y. Laws, ch. 635, §§ 1,2. In furtherance of that purpose, § 2 of the Act, which amended § 11 of the Workers' Compensation Law, provides in pertinent part as follows:

> [HN1]An employer shall not be liable for contribution or indemnity to any third person based upon liability for injuries sustained by an employee acting within the scope of his or her employment for such employer unless such third person proves through competent medical evidence that such employee has sustained a "grave injury" . . . .

The Act makes no mention of retroactive application with respect to § 2, indicating only that it is to "take effect immediately." *Id.* at § 90. Thus, disputes have arisen over whether the legislature intended the statute to apply to pending lawsuits that involve accidents occurring prior to September 10, 1996, or to claims which may accrue on or after the enactment date, or to actions involving [*7] accidents occurring on or after the enactment date.

Other factors, beyond the ambiguous language of § 90, have added to this uncertainty. For instance, Governor Pataki's Executive Memorandum accompanying his approval of the bill states that the Act would effect the retroactive repeal of *Dole v. Dow Chemical Co.*, and would therefore apply to all pending claims. *Governor's Approval Memorandum*, No. 81, ch. 635, Memorandum filed with Assembly Bill Number 11331. The Governor's bill jacket also contains an opinion by the Superintendent of Insurance that the "Insurance Department construes the restriction to be effective to all claims for contribution . . . now pending . . . ." 1996 N.Y. Laws, ch. 635. Counterbalancing these assertions, however, are statements by the bill's sponsor, Assembly Majority Leader Michael Bragman, that the legislation was intended to apply prospectively to claims involving accidents occurring on or after the bill's enactment date. *See Lopes v. Cunnane Dev. Corp.*, N.Y.L.J., March 10, 1997, at 32 (Sup. Ct. Westchester County) (citing Transcript of New York State Assembly Proceedings, July 12, 1996). Also

of note is the fact that the legislation itself [*8] makes no specific reference to pending claims in connection with § 2.

In general, courts that have considered this issue have taken two approaches to resolving the ambiguity.

Those that have found in favor of retroactive application have generally examined other provisions within the Act to determine whether any would be rendered meaningless by giving the statute prospective effect only. The first case to take this approach, *Majewski v. Broadalbin-Perth Central School*, 169 Misc. 2d 429, 653 N.Y.S.2d 822 (Sup. Ct. Fulton County 1996), is cited by third-party defendant Chase Pitkin as dispositive on the issue of retroactivity. In *Majewski*, Justice Ferradino held that the Act must be applied retroactively to preserve the efficacy of § 88, which directs an audit of workers' compensation insurance carriers' reserves as of December 31, 1996. 1996 N.Y. Laws, ch. 635, § 88. It was contemplated that insurance carriers could reduce their reserves as a result of the potential reduction in liability occasioned by the bar to third-party actions against employers. *Id.* According to Justice Ferradino, an audit to be conducted at the end of the year in which the provisions were enacted [*9] would be meaningless unless the Act applied retroactively to pending cases. *Majewski, supra,* 653 N.Y.S.2d at 825.

While it is true that some courts have since adopted the *Majewski* holding, *see Johnson v. Space Saver Corp.*, N.Y.L.J., March 14, 1997, at 35 (Sup. Ct. Westchester County); *Weiner v. Lincoln/A. Pentair Co.*, N.Y.L.J., March 25, 1997, at 30 (Sup. Ct. Nassau County), several others have found fault with its reasoning. Most significantly, *Majewski* was rejected by the Second Department, the only appellate court to consider this issue to date. *Morales v. Gross*, No. 96-00491, 230 A.D.2d 7, 657 N.Y.S.2d 711, 1997 WL 208988 (April 21, 1997). After examining the audit provisions of the Act, Justice Thompson rejected the conclusion that § 88 was without meaning or purpose if applied prospectively, stating that:

> Reliance upon these relatively obscure accounting provisions would require us to presume that the Legislature selected a surprisingly circuitous and indirect means of conveying its intent. To the extent that these provisions can be utilized as any type of barometer of legislative intent, we concur in the view that they would have [*10] meaning under a purely prospective application of the statute since under such circumstances, the number of future claims anticipated by compensation carriers would still be actuarially reduced.

*Id.* at *4-5. *See also, Frycek v. Corning Inc.*, 171 Misc. 2d 220, 654 N.Y.S.2d 264, 267 (1997) ("Section 88 would still have effect . . . if the amendment to Section 11 is applied only prospectively to accidents which occur on or after September 10, 1996, by reducing the future losses anticipated by the insurer."); Knapp v. Consol. Rail Corp., 1997 N.U. Misc. LEXIS 34, 655 N.Y.S.2d 732 (1997) (§ 88 serves useful purpose of providing mechanism to transfer "windfall" profits to state treasury in the event the courts ultimately hold statute retroactive); *Lagano v. Chrysler Corp.*, 957 F. Supp. 36, 37-38 (E.D.N.Y. 1997) (rejecting *Majewski* reasoning in absence of clear legislative intent to effect retroactive application).

In contrast to the approach taken above, cases that have found in favor of prospective application have relied on New York's rules of statutory construction in the first instance. McKinney's Statutes § 51(b) provides that:

> [HN2]As a general rule, statutes are to be construed [*11] as prospective in operation only, and they are not to receive a retroactive construction. This has been said to be a primary rule of statutory construction. Stated differently, a construction of a statute which will give it a retroactive operation is not favored by the courts, but on the contrary, the laws favors [sic] a prospective interpretation wherever possible. It is well settled also that a statute will not be given a retroactive construction unless an intention to make it retroactive is to be deduced from its wording, and a law will not receive a retroactive construction unless its language, either expressly or by necessary implication, requires that it be so construed. A clear expression of the legislative purpose is required to justify a retrospective application.

*See also, Gleason v. Holman Contract Warehousing, Inc.*, 170 Misc. 2d 668, 649 N.Y.S.2d 647 (Sup. Ct. Albany County Sept. 18, 1996); *Dorfman v. Leidner*, 76 N.Y.2d 956, 563 N.Y.S.2d 723, 565 N.E.2d 472 (1990). [HN3]Amendments to statutes are also to be applied prospectively unless the language of the statute or the legislative intent clearly indicates otherwise. McKinney's Statutes § 52; *Flynn v. New* [*12] *York Life Insurance Co.*, N.Y.L.J., Oct. 24, 1996, at 31 (Sup. Ct. Suffolk County Oct. 10, 1996) (citing *Bac v. State of New York Office of Mental Health*, 203 A.D.2d 283, 609 N.Y.S.2d 648 (2d Dep't 1994)). Furthermore, [HN4]New York courts overwhelmingly have held that where a provision indicates that the statute or amendment is to take effect immediately, it is a clear indication that prospective application is appropriate. *Lagano, supra*, 957 F. Supp. at 38; *Moynihan v. New York State Employees' Retirement System*, 192 A.D.2d 913, 914, 596 N.Y.S.2d 570 (3d Dep't 1993); *Lusardi v. Lusardi*, 167 A.D.2d 3, 570 N.Y.S.2d 376 (3d Dep't 1991); *Fuerst v. Fuerst*, 131 A.D.2d 426, 428, 515 N.Y.S.2d 862 (2d Dep't 1987); *Murphy v. Bd. of Educ., N. Bellmore Union Free School Dist.*, 104 A.D.2d 796, 797, 480 N.Y.S.2d 138 (2d Dep't 1984), *aff'd*, 64 N.Y.2d 86, 473 N.E.2d 1184, 484 N.Y.S.2d 810 (1985). [HN5]In general, therefore, a statute or amendment will be construed as prospective unless there is an unequivocal expression of legislative intent that it have retroactive effect. With this presumption as a starting point, courts have gone on to examine various provisions of the Act in order to determine whether any contain [*13] express language or a clear implication that retroactivity was intended.

For instance, section 1 of the Act states that it was the legislature's intent "to *create a system* which protects injured workers and delivers wage replacement benefits in a fair, equitable and efficient manner, while reducing time-consuming bureaucratic delays, and repealing Dole liability except in cases of grave injury." 1996 N.Y. Laws, ch. 635, § 1 [emphasis added]. The first case to consider this issue, *Gleason, supra*, 649 N.Y.S.2d at 655, observed that the language of § 1, and particularly the phrase "to create a system," indicates a prospective intent.

In *Flynn v. New York Life Insurance Co.*, N.Y.L.J., Oct. 24, 1996, at 31 (Sup. Ct. Suffolk County Oct. 10, 1996), Justice Doyle focused on the language of § 90, which begins by stating that "this act shall take effect immediately." The court noted that § 90 goes on to set forth specific effective date provisions for certain other sections of the bill which clearly set forth an intention of retroactive effect. For example, § 57 was scheduled to take effect 180 days after enactment, but was made applicable to all claims pending on or after [*14] that date. Section 79 was set to take effect on September 1, 1997 and was to be applied to claims filed on or after that date. Also, §§ 49 through 51 were to take effect immediately and "be deemed to have been in full force and effect on and after April 12, 1996." Justice Doyle then made the straightforward observation that had the legislature intended § 2 of the Act, repealing *Dole v. Dow*, to apply to pending claims, it could have clearly indicated so as it did with other provisions. *See also, Lagano, supra*, 957 F. Supp. at 38 ("Rather, the language means what it says: § 2 is effective from the date of enactment forward.").

Courts have also looked to the related documents authored in conjunction with the Act for an expression of

intent. The Assembly Majority Task Force report filed with the Act states that an immediate reduction in compensation premiums was perceived as necessary in order to make New York companies competitive with those in other states. *Morales, supra,* 1997 WL 208988, at *2 (citing 1996 Report of Task Force, at 3). The legislative memorandum filed in support of the Act declares that "the exclusive remedy, a cornerstone of the Workers' Compensation [*15] Law, is restored and reinforced under this bill by prohibiting third parties . . . from asserting *Dole* or third-party suits against the employer." N.Y. Assembly Mem. in Support, 1996 McKinney's Session Laws of N.Y., at A-927. After reviewing the Act itself and these related materials, the Second Department observed that none contain an explicit statement that the repeal of *Dole* was intended to apply to actions pending at the time of enactment. *Morales, supra.* The *Flynn* court also reviewed the documents available from the bill jacket and noted the lack of consensus on retroactivity as evidenced by the conflicting statements of the governor and the bill's sponsor. Following the rules of statutory construction, Justice Doyle concluded that in the absence of an unequivocal expression of intent in that regard, either express or implied, there was no basis for retroactive application. N.Y.L.J., Oct. 24, 1996, at 31; *see also, Morales, supra,* 1997 WL 208988, at *2.

Another issue that has been raised in some decisions is the potential consequences of applying these amendments to pending actions. Two points have been discussed in that regard. First, it has been noted that [*16] the objective of these amendments is to reduce workers' compensation insurance rates, thereby decreasing the cost of doing business in New York State and improving the business climate. However, retroactive application would not further this objective. Since rates had already been set and paid with respect to accidents occurring prior to the enactment date of September 10, 1996, only future rates, determined by the anticipated reduction in employer liability resulting from this legislation, would be relevant. *Lagano, supra, 957 F. Supp. at 39* (citing *Gleason, supra, 649 N.Y.S.2d at 655*).

The second point of debate involves when a defendant's right to contribution accrues. Where a party possesses a vested right to a cause of action, due process considerations prevent retroactive elimination of that cause of action. McKinney's Statutes, § 53; *Knapp, supra, 655 N.Y.S.2d at 733; Majewski, supra, 653 N.Y.S.2d at 824* (citations omitted). Thus, if there is a vested right in a cause of action for contribution at the time an action is filed against the defendant, that right cannot be divested by a retroactive repeal.

Some cases have taken the position that the right to contribution [*17] is contingent, rather than vested, because a third-party has no obligation to contribute unless

and until the defendant is found liable. Under this analysis, there is no constitutional barrier to the elimination of such inchoate claims that are pending at the time of enactment. *Majewski, supra, 653 N.Y.S.2d at 824* (citations omitted).

Again, however, the Second Department rejected the reasoning of the *Majewski* court, stating:

> We disagree with the assertion that the right to contribution is not a significant or matured right merely because the third-party plaintiff has not yet, and may never, recover anything on its claim. This contention is ultimately 'no more convincing than an argument that the right of a plaintiff to recover damages in tort, or for that matter even in contract, is not vested until the amount of damages has been determined at trial.'"

*Morales, supra,* 1997 WL 208988, at *4 (quoting Siegel's Practice Review, No. 55, March 1997, at 2).

To summarize, the Act does not contain any explicit statement of retroactivity with respect to § 2, the related documents evidence disagreement as to the legislature's intent, and there are due process implications [*18] in applying § 2 to pending actions. After making similar observations, the highest state court to consider this issue concluded that the amendments repealing *Dole v. Dow* should be given prospective effect only. I agree that the New York rules of statutory construction compel such a finding. Accordingly, it is recommended that third party defendant's motion to dismiss be denied.

Upon a finding that the Act should be applied prospectively, there is no need to consider whether plaintiff, whose alleged accident occurred prior to September 10, 1996, suffered a "grave injury." It is noted, however, that the Act defines a "grave injury" very narrowly and specifically as one or more of the following:

> Death, permanent and total loss of use or amputation of an arm, leg, hand or foot, loss of multiple fingers, loss of multiple toes, paraplegia or quadriplegia, total and permanent blindness, total and permanent deafness, loss of nose, loss of ear, permanent and severe facial disfigurement, loss of an index finger or an acquired injury to the brain caused by an external physical force resulting in permanent total disability.

Thus, it would appear that the plaintiff's herniated [*19] discs cannot be characterized as a "grave injury" in any event.

## CONCLUSION

For the reasons stated above, it is recommended that third-party defendant's motion to dismiss the third-party complaint (Item 25) be DENIED.

Respectfully submitted,

CAROL E. HECKMAN

United States Magistrate Judge

DATED: Buffalo, New York

June 26, 1997

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

ORDERED, that this Report and Recommendation be filed with the Clerk of the Court.

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed.R.Civ.P. 72(b) and Local Rule 72.3(a)(3).

[HN6] The district court will ordinarily refuse to consider on de novo review arguments, case law and/or evidentiary material which could have been, but was not presented to the magistrate judge in the first instance.

See, e.g., Patterson-Lietch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co., 840 F.2d 985 (1st Cir. 1988).

[HN7] Failure to file objections within the specified time or to request an extension [*20] of such time waives the right to appeal the District Court's Order. Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985); Wesolek, et al. v. Canadair Ltd., et al., 838 F.2d 55 (2d Cir. 1988). The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Court's refusal to consider the objection.

Let the Clerk send a copy of this Order and Report and Recommendation to the attorneys for the parties.

SO ORDERED.

CAROL E. HECKMAN

United States Magistrate Judge

DATED: Buffalo, New York

June 26, 1997

# EXHIBIT C

THE LEGISLATU
Ch. :

the County. The Hudson River Valley Greenway Act of 1991 promotes voluntary regio
cooperation among its over 240 communities. It also affords opportunities for plann
grants and other technical assistance to communities as they plan for future econo
development and natural resource protection.

**LEGISLATIVE HISTORY:**
This is a new bill.

**FISCAL IMPLICATIONS:**
None.

**LOCAL FISCAL IMPLICATIONS:**
None.

**EFFECTIVE DATE:**
Immediately.

---

## PROTECTION FROM DISCRIMINATION TO CURRENT EMPLOYEES AND LICENSEES

### Memorandum in Support, New York State Senate

*Text of Law, see ch. 284*

**BILL NUMBER:** S1602A

**SPONSOR:** VOLKER

**TITLE OF BILL:**
An act to amend the correction law, in relation to extending protection from discriminatio
to current employees and licensees

**PURPOSE:**
The bill extends the provisions of Article 23–A of the Correction Law to prohibit unfa
discrimination against current employees and license holders who have a previous crimin
conviction that is unrelated to the employment or license.

**SUMMARY OF PROVISIONS:**
Section 1 of the bill amends Section 750 of the Correction Law to make the definition
"direct relationship" applicable to current employees and license holders.

Section 2 of the bill amends Section 751 of the Correction Law to make Article 23–
applicable to current employees and license holders.

Section 3 of the bill amends Section 752 of the Correction Law to prohibit discriminatio
against current employees and license holders based on a previous criminal conviction o
convictions unless there is a direct relationship between the conviction(s) and the duties o
responsibilities of the employment or license.

Section 4 of the bill makes a conforming amendment to Section 753 of the Correction
Law.

Section 5 of the bill provides that it shall take effect immediately.

**JUSTIFICATION:**
Article 23–A of the Correction Law currently prohibits unfair discrimination agains
individuals with criminal records whose convictions are unrelated to the job or license sough
and do not constitute a threat to safety. The law further encourages "the licensure and
employment of persons previously convicted of one or more criminal offenses." However, the
statutes inapplicability to current employees and licensees have limited the intended protec-
tions of the law.

The anti-discrimination protections in Section 752 of the Correction Law currently apply
only to applicants for employment or occupational licenses who have criminal convictions.

A–722

THE LEGISLATURE

promotes voluntary regional
opportunities for planning
y plan for future economic

**MEMORANDA**

law provides no protection to current employees or license holders who face unfair
nation based on criminal records that predate their employment or licensure. This
extends the anti-discrimination protections to current employees and license holders
convictions predate employment or licensure and were not improperly denied by the
cant in response to legal inquiries from the employer or licensing agent.

With the advent of the computer age and all the other means by which criminal history
mation can be obtained, employers have easy access to criminal history information,
ng more employers to refuse to hire, or fire individuals with criminal records. This bill
necessary in order to ensure that New York's strong, long-standing policy of encouraging
employment of qualified individuals with criminal records is enforced.

**LEGISLATIVE HISTORY:**

Similar to S.7730A/A.10986A, Veto #401.

**FISCAL IMPLICATIONS:**

None.

**EFFECTIVE DATE:**

The bill takes effect immediately.

TO CURRENT
ES

e Senate

otection from discrimination

ction Law to prohibit unfair
ho have a previous criminal

aw to make the definition of
olders.

Law to make Article 23-A

w to prohibit discrimination
vious criminal conviction or
nviction(s) and the duties of

ction 753 of the Correction

ely.

fair discrimination against
to the job or license sought
courages "the licensure and
al offenses." However, the
limited the intended protec-

ection Law currently apply
o have criminal convictions.

# EDUCATION—REGULATIONS AND BY-LAWS
## ON COMMUNITY COUNCIL MEMBERS

### Memorandum in Support, New York State Senate

*Text of Law, see ch. 285*

**BILL NUMBER:** S1666A

**SPONSOR:** PADAVAN

**TITLE OF BILL:**

An act to amend the education law, in relation to the effect of certain regulations and by-
laws on community council members, community superintendents, and all other officers and
employees in schools and programs under the jurisdiction of the community district education
councils

**PURPOSE:**

Chapter 123 of the laws of 2003 created a new structure for the New York City public
school system. As part of the reform allowing mayoral control of the school system (Chapter
91 of the laws of 2002), provisions that there shall be a community school board for each
community school district were repealed as of June 30, 2003. Chapter 123 established
community education councils (CECs) composed primarily of parents elected by the parent
associations in each community district.

**JUSTIFICATION:**

As these councils began to operate, a serious flaw in the legislation became apparent:
Council members are subject to the same provisions for financial disclosure as the previous
school boards. Subdivision 6 of section 2590-e of education law subjects CECs to the
disclosure requirements of public officers law. This is an unnecessary requirement. School
boards members were elected officials who ran public campaigns, raised election funds and
had responsibilities that included influence over financial obligations of the local district. The
CECs that replaced these boards are elected by officers of the parent associations in the
districts, do not engage in public election campaigns and do not have fiscal responsibilities
within the districts. The application of public officers law, with the extensive disclosure
requirements in section seventy-three-a is unnecessary for these parent members.

The full disclosure requirement has become a major impediment to the successful establish-
ment of CECs in the NYC community school districts. Parents seeking to run for seats on
the education councils must provide full disclosure of personal financial information including

A–723

# PROTECTION FROM DISCRIMINATION TO CURRENT EMPLOYEES AND LICENSEES

## CHAPTER 284

S. 1602–A

Approved and effective July 18, 2007

AN ACT to amend the correction law, in relation to extending protection from discrimination to current employees and licensees

*The People of the State of New York, represented in Senate and Assembly, do enact as follows:*

§ 1.  Subdivision 3 of section 750 of the correction law, as added by chapter 931 of the laws of 1976, is amended to read as follows:

(3) "Direct relationship" means that the nature of criminal conduct for which the person was convicted has a direct bearing on his fitness or ability to perform one or more of the duties or responsibilities necessarily related to the license ~~or employment sought~~, opportunity, or job in question.

§ 2.  Section 751 of the correction law, as added by chapter 931 of the laws of 1976, is amended to read as follows:

§ 751.  Applicability

The provisions of this article shall apply to any application by any person for a license or employment at any public or private employer, who has previously been convicted of one or more criminal offenses, in this state or in any other jurisdiction, ~~to any public agency or private employer for a license or employment~~ and to any license or employment held by any person whose conviction of one or more criminal offenses in this state or in any other jurisdiction preceded such employment or granting of a license, except where a mandatory forfeiture, disability or bar to employment is imposed by law, and has not been removed by an executive pardon, certificate of relief from disabilities or certificate of good conduct. Nothing in this article shall be construed to affect any right an employer may have with respect to an intentional misrepresentation in connection with an application for employment made by a prospective employee or previously made by a current employee.

§ 3.  Section 752 of the correction law, as added by chapter 931 of the laws of 1976, is amended to read as follows:

§ 752.  Unfair discrimination against persons previously convicted of one or more criminal offenses prohibited

No application for any license or employment, and no employment or license held by an individual, to which the provisions of this article are applicable, shall be denied or acted upon adversely by reason of the ~~applicant's~~ individual's having been previously convicted of one or more criminal offenses, or by reason of a finding of lack of "good moral character" when such finding is based upon the fact that the ~~applicant~~ individual has previously been convicted of one or more criminal offenses, unless:

(1) there is a direct relationship between one or more of the previous criminal offenses and the specific license or employment sought or held by the individual; or

(2) the issuance or continuation of the license or the granting or continuation of the employment would involve an unreasonable risk to property or to the safety or welfare of specific individuals or the general public.

§ 4.  Paragraph (b) of subdivision 1 of section 753 of the correction law, as added by chapter 931 of the laws of 1976, is amended to read as follows:

(b) The specific duties and responsibilities necessarily related to the license or employment sought or held by the person.

826    Additions are indicated by underline; deletions by strikeout; vetoes by shading